**2023-1605**

# United States Court of Appeals for the Federal Circuit

ACHIEVE3000, INC.,

*Appellant,*

— v. —

BEABLE EDUCATION, INC.,

*Appellee.*

*On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2021-01169, Honorable Eric C. Jeschke, Administrative Patent Judge*

## BRIEF FOR APPELLANT

ROBERT M. ISACKSON
HENRY GABATHULER
LEASON ELLIS
One Barker Avenue
White Plains, New York 10601
(914) 288-0022
isackson@leasonellis.com
gabathuler@leasonellis.com

*Counsel for Appellant*

JUNE 26, 2023



**REPRESENTATIVE CLAIMS**

**CLAIM 1 OF U.S. PATENT NO. 9,652,993**

1. [1.p] A computer implemented method for providing differentiated content to a user of a plurality of users, comprising the steps of:

[1.1] obtaining in real-time, by a standards engine including one or more processors, a first unmodified content from at least one source using at least one computer;

[1.2] obtaining one or more educational standards using at least one computer;

[1.3] evaluating the one or more educational standards to produce a unique standards code by analyzing at least one of one or more statements of the one or more educational standards, a structure of the one or more educational standards, a core meaning of the one or more educational standards, a related and ancillary meaning of the one or more educational standards, a learning mode referenced by the one or more educational standards, an intent of the one or more educational standards, or related critical thinking, logical, philosophical, and pedagogical elements of the one or more educational standards using at least one computer;

[1.4] analyzing, by the standards engine, the first unmodified content to determine a reading difficulty level of the first unmodified content in accordance with each of the one or more educational standards;

[1.5] generating in real-time, by a differentiation engine including one or more processors, a plurality of aligned versions of the first unmodified content by transforming format and content of the first unmodified content, wherein each of the plurality of aligned versions is transformed, respectively, according to a reading difficulty level associated with corresponding one of the one or more educational standards, wherein generating the plurality of aligned versions of the first unmodified content further comprises breaking up the first unmodified content into sentences, selecting a different vocabulary and sentence length according to each reading difficulty level in accordance with the unique standards code while maintaining subject matter of the first unmodified content;

[1.6] transmitting, simultaneously, a first aligned version of the plurality of aligned versions of the first unmodified content to the user, wherein the first aligned version corresponds to a reading skill level of the user;

[1.7] generating, by the differentiation engine, one or more lesson plans for the user, the one or more lesson plans comprising questions associated with the first aligned version and subject matter of the first unmodified content, wherein the one or more lesson plans comprises a lesson comprising one or more of a specific spoken language, a particular font size and level appropriate vocabulary and a particular graphical format based on the reading skill level of the user; and

[1.8] providing the one or more lesson plans questions associated with the first aligned version to the user via a communication system,

[1.9] wherein each of the plurality of aligned versions are equivalent substantially similar in subject matter, meaning and context to subject matter, meaning and context of the first unmodified content.

Appx00121 (20:2-62).

## CLAIM 8 OF U.S. PATENT NO. 9,652,993

[8.p] A system for providing differentiated content to a user of a plurality of users, comprising:

a) at least one processor;

b) at least one input device coupled to at least one network; and

c) at least one storage device storing processor executable instructions which, when executed by the at least one processor, performs a method including:

[8.1] obtaining in real-time, by a standards engine executing on the at least one processor, a first unmodified content from at least one source using at least one computer;

[8.2] obtaining one or more educational standards using at least one computer;

[8.3] evaluating one or more educational standards to produce a unique standards code by analyzing at least one of one or more statements of the standards, a structure of the standards, a core meaning of the standards, a related and ancillary meaning of the standards, a learning mode referenced by the standards, an intent of the standards, or related critical thinking, logical, philosophical, and pedagogical elements of the one or more educational standards using at least one computer;

[8.4] analyzing, by the standards engine, the first unmodified content to determine a reading difficulty level of the first unmodified content in accordance with each of the one or more educational standards;

[8.5] generating in real-time, by a differentiation engine including one or more processors, a plurality of aligned versions of the first unmodified content by algorithmically transforming format and content of the first unmodified content, wherein each of the plurality of aligned versions is transformed, respectively, according to a reading difficulty level associated with corresponding one of the one or more educational standards wherein generating the plurality of aligned versions of the first unmodified content further comprises breaking UP the first unmodified content into sentences selecting a different vocabulary and sentence length according to each reading difficulty level in accordance with the unique standards code while maintaining subject matter of the first unmodified content;

[8.6] transmitting, simultaneously, a first aligned version of the plurality of aligned versions of the first unmodified content to the user, wherein the first aligned version corresponds to a reading skill level of the user;

[8.7] generating, by the differentiation engine, one or more lesson plans for the user, the lesson plan comprising questions associated with the first aligned version and subject matter of the first unmodified content wherein the one or more lesson plans comprises a lesson comprising one or more of a specific spoken language, a particular font size and level-appropriate vocabulary and a particular graphical format based on the reading skill level of the user; and

[8.8] providing the one or more lesson plans to the user via a communication system,

[8.9] wherein each of the plurality of aligned versions are substantially similar in subject matter, meaning and context to subject matter, meaning and context of the first unmodified content.

Appx00122 (21:36-22:29).

FORM 9. Certificate of Interest                                    Form 9 (p. 1)
                                                                   March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number**        2023-1605

**Short Case Caption**  Achieve3000, Inc. v. Beable Education, Inc.

**Filing Party/Entity**  Achieve3000, Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/26/2023

Signature: /s/ Robert M. Isackson

Name: Robert M. Isackson

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| 1. Represented Entities.<br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Achieve3000, Inc. | | AC Holdco, Inc. |
| | | McGraw Hill LLC |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| J. Steven Baughman | PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP | |
| Megan Raymond | PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)     ☐   No     ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

REPRESENTATIVE CLAIMS ..................................................................i

CERTIFICATE OF INTEREST ............................................................iv

TABLE OF AUTHORITIES ...............................................................ix

STATEMENT OF RELATED CASES ...................................................1

INTRODUCTION ...............................................................................2

JURISDICTIONAL STATEMENT .......................................................4

STATEMENT OF ISSUES ON APPEAL .............................................4

STATEMENT OF THE CASE...............................................................7

    I.     Procedural Background .........................................................7

    II.    Factual Background.............................................................8

         A.    The Parties...................................................................8

         B.    The '993 Patent is Directed to a Proprietary Software Engine, Achieve3000 Literacy, that Facilitates an Innovative Differentiated Learning System.............................11

         C.    The Board's Decision .............................................13

              1.    Invalidity Grounds and the Prior Art.............................13

              2.    Obviousness...................................................................19

    III.    Summary of Argument.......................................................23

    IV.    Argument.........................................................................24

         A.    Standard of Review...................................................24

         B.    Limitation 1.3/8.3.....................................................26

         C.    Limitation 1.5/8.8.....................................................34

        1.    Insubstantial Evidence Supports the Board's
Conclusion That Creating a Plurality of Aligned
Versions at Different Reading Levels Would
Have Been Obvious from Cupp in Combination
with Cappellucci ............................................................35

        2.    Insubstantial Evidence Shows the Prior Art
Discloses or Rendered Obvious Maintaining the
Unmodified Content's Subject Matter in Each of
the Plurality of Aligned Versions .................................43

   D.    Limitation 1.5/8.8 .....................................................................48

V.   CONCLUSION...................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
    246 F.3d 1368 (Fed. Cir. 2001) .................................................43

*Consol. Edison Co. v. N.L.R.B.*,
    305 U.S. 197 (1938)................................................................25

*Homeland Housewares, LLC v. Whirlpool Corp.*,
    865 F.3d 1372 (Fed. Cir. 2017) .................................................25

*Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. de C.V.*,
    865 F.3d 1348 (Fed. Cir. 2017) .................................................47

*In re Gartside*,
    203 F.3d 1305 (Fed. Cir. 2000) .................................................25

*In re Huai-Hung Kao*,
    639 F.3d 1057 (Fed. Cir. 2011) .................................................25

*In re McLaughlin*,
    443 F.2d 1392 (CCPA 1971) ............................................. *passim*

*In re Warsaw Orthopedic, Inc.*,
    832 F.3d 1327 (Fed. Cir. 2016) .................................................45

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
    751 F.3d 1327 (Fed. Cir. 2014) ......................................... 32, 34

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)................................................................25

*OSI Pharmaceuticals, LLC v. Apotex Inc.*,
    939 F. 3d 1375 (Fed. Cir. 2019) .................................................25

*PAR Pharm., Inc. v. TWI Pharm., Inc.*,
    773 F.3d 1186 (Fed. Cir. 2014) ......................................... 28, 45

*Personal Web Techs., LLC v. Apple, Inc.*,
    848 F.3d 987 (Fed Cir. 2017) .................................................24

*Polygroup Ltd. MCO v. Willis Elec. Co.*,
    780 F. App'x 880 (Fed. Cir. 2019).............................................47

*Randall Mfg. v. Rea*,
    733 F.3d 1355 (Fed. Cir. 2013) ................................................25

*TQ Delta, LLC v. CISCO Sys., Inc.*,
    942 F.3d 1352 (Fed. Cir. 2019) .......................................... *passim*

*Univ. of Strathclyde v. Clear-Vu Lighting LLC*,
    17 F.4th 155 (Fed. Cir. 2021) ....................................................40

*WBIP, LLC v. Kohler Co.*,
    829 F.3d 1317 (Fed. Cir. 2016) .................................................10

*Xerox v. Bytemark, Inc.*,
    IPR2022-00624 (PTAB Aug. 24, 2022)...............................29, 49

**Statutes & Other Authorities:**

28 U.S.C. § 1295(a)(4)(A) .........................................................4

35 U.S.C. § 103 .................................................................. 4, 13

35 U.S.C. § 141(c) ....................................................................4

35 U.S.C. § 319 ........................................................................4

37 C.F.R. § 42.6(b) ...................................................................4

37 C.F.R. § 90.2(a) ...................................................................4

37 C.F.R. § 90.3 .......................................................................4

Fed. Cir. R. 15 ..........................................................................4

Fed. Cir. R. 47.5 .......................................................................1

Fed. R. App. P. 15 ....................................................................4

## STATEMENT OF RELATED CASES

In accordance with Federal Circuit Rule 47.5, counsel for Appellant Achieve3000, Inc. ("A3K" or "Patent Owner") state:

No other appeal from the same proceeding was previously before this or any other appellate court. AC Holdco, Inc., the parent company of Patent Owner, asserted claims for patent infringement of the '993 Patent in the following case: *AC Holdco, Inc. v. Beable Education, Inc.*, No. 3:20-cv-09211 (MAS) (D.N.J.), filed July 21, 2020. This case is pending, although all patent issues have been stayed pending the outcome of these proceedings. *AC HoldCo, Inc. v. Beable Education, Inc.*, No. 3:20-cv-09211, Dkt. 125 ("ORDERED that Defendants' motion to stay this matter pending IPR of all claims of the '993 Patent by the PTAB is GRANTED in part; and it is further ORDERED that . . . this matter is stayed as to Plaintiff's patent claims . . .").

Counsel for Patent Owner are not aware of any other case pending in this Court or any other court that will directly affect or be affected by this Court's decision in this appeal.

## INTRODUCTION

This is a dispute about whether four prior art references considered in varying combinations rendered the claimed invention – an innovative system for developing content for differentiated learning – obvious to a person of ordinary skill in the art at the time of the invention ("POSITA") to create. Not every student in a class, or grade level, learns at the same speed. The challenges of providing content and lesson plans to a room full of students at differing educational levels – a challenge amplified in the midst of, and in the wake of, the COVID-19 pandemic – was a long-felt need not adequately resolved by the prior art. Hence, two of Appellant Patent Owner A3K's inventors (respectively now the Chief Executive Officer and Chief Academic Officer of Appellee Beable Education, Inc. ("Beable" or "Petitioner"), the first two named inventors on the patent at issue) were motivated to solve this problem by developing, patenting and commercializing a new piece of technology. Which technology, Achieve3000 Literacy, was praised and awarded for its novelty, innovation, and usefulness.

Prior to the invention of the Achieve3000 Literacy product, the invention at issue, the problem was not adequately solved. There was something missing. Petitioner claims that "something," or gap, was, first, disclosed in the prior art, and, second, obviously filled by combining pieces of prior art references.

Patent Owner challenges the Board's finding, that four combined references disclosed all claim elements, as flawed for simply adopting all of Petitioner's "positions as its own findings and conclusions" and unsupported by substantial evidence.  More specifically, Patent Owner contends the Board erred in: (i) rendering claims 1-14 of U.S. Patent No. 9,652,993 (the '993 Patent) unpatentable; (ii) finding claims 1-14 as unpatentable as obvious in view of U.S. 2003/0039949 A1 ("Cappellucci_949"), U.S. 2003/0078934 A1 ("Cappellucci_934"), U.S. 2003/0068603 ("Cupp"), and U.S. 2003/0017442 A1 ("Tudor"); (iii) finding that substantial evidence exists to support the conclusion that all elements were disclosed by the combined references; (iv) its application of *In re McLaughlin* with respect to Limitations 1.5 and 8.8 by using the claimed invention as a roadmap to fill the gaps between the combined references; (v) relying on expert testimony that merely parroted Petitioner's legal arguments and conclusions; and (vi) relying on expert testimony and references that should have been excluded.

Because Petitioner has failed to carry its burden of proof to demonstrate unpatentability, any one of the aforementioned errors requires reversal of the Board's decision.

## JURISDICTIONAL STATEMENT

This Court has exclusive jurisdiction over this appeal under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c) and 319.  Patent Owner appeals from the Patent Trial and Appeal Board's Final Written Decision ("Decision") in IPR2021-01169 holding Claims 1-14 of U.S. Patent No. 9,652,993 unpatentable as obvious under 35 U.S.C. § 103.  On March 17, 2023, Patent Owner timely filed its Notice of Appeal to this Court in accordance with 35 U.S.C. § 141(c), 37 C.F.R. §§ 42.6(b), 90.2(a), and 90.3, Federal Rule of Appellate Procedure 15, and Federal Circuit Rule 15.

## STATEMENT OF ISSUES ON APPEAL

Patent Owner raises the following issues:

1.     Whether the Board erred in finding that Petitioner has shown by a preponderance of the evidence that challenged claims 1-14 of the '993 Patent are unpatentable.

2.     Whether the Board erred in finding that Petitioner has shown by a preponderance of the evidence that challenged claims 1-14 of the '993 Patent are unpatentable under 35 U.S.C. § 103 as obvious in view of U.S. 2003/0039949 A1 Cappellucci_949, U.S. 2003/0078934 A1 (Cappellucci_934); U.S. 2003/0068603 (Cupp), and U.S. 2003/0017442 A1 (Tudor).

3.    The '993 Patent claims require evaluating "one or more educational standards to produce a unique standards code" and "generating in real-time . . . a plurality of aligned versions of [a] first unmodified content by transforming format and content of the first unmodified content, wherein each of the plurality of aligned versions is transformed, respectively, according to a reading difficulty level associated with corresponding one of the one or more educational standards, wherein generating the plurality of aligned versions of the first unmodified content further comprises breaking up the first unmodified content into sentences, selecting a different vocabulary and sentence length according to each reading difficulty level in accordance with the unique standards code while maintaining subject matter of the first unmodified content."    The Board found that the combination of Cappellucci_949, Cappellucci_934, Cupp and Tudor met all of the claim limitations rendering the claims obvious, notwithstanding that none of Cappellucci_949, Cappellucci_934, Cupp and Tudor discloses or even suggests evaluating educational standards to produce a unique standards code and then generating a plurality of aligned versions of a first unmodified content wherein the plurality of aligned versions are according to different reading difficulty levels in accordance with the unique standards code while maintaining subject matter of the first unmodified content.    Was the Board's finding that all the elements were disclosed by the combined references supported by substantial evidence?

4.     Did the Board err in its application of *In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971) to fill the gap between what the combined Cappellucci_949, Cappellucci_934, Cupp and Tudor prior art actually discloses, namely using either different (not aligned) content, or using exactly the same (vocabulary and sentence length) content, and the aforementioned claimed features of Limitation 1.5, because the applicable legal principle prohibits relying on the claimed invention to guide reconstruction of the prior art to bridge the gap between what the prior art discloses and the patent claims?

5.     Did the Board err in relying on expert testimony that should have been excluded as unsupported by substantial evidence and merely mimicking the legal argument misapplying *In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971)?

6.     Whether the PTAB erred in any further findings or determinations by the Director or the Board supporting or relating to the issues above, including the Board's consideration of the expert testimony, prior art, and other evidence in the record; the Board's claim constructions; and the Board's factual findings, conclusions of law, or other determinations supporting or related to the issues above.

## STATEMENT OF THE CASE

### I.    Procedural Background

This is an appeal from the Board's Final Written Decision ("Decision") dated January 3, 2023, in IPR2021-01169.  Appx00001-00097.  The patent at issue is U.S. Patent No. 9,652,993 (the '993 Patent), which issued on May 16, 2017.  A3K owns the '993 Patent, and the named inventors are Saki Dodelson, Susan Gertler, and Rivki Locker.  The first two named inventors now work for Petitioner.  Petitioner filed a petition to institute *inter partes review* on July 19, 2021, challenging all claims (claims 1-14) of the '993 Patent.  Appx00235-00326.  This appeal focuses on the Board's findings related to claim limitations 1.3, 1.5, and 1.9.[1]  The Board instituted review.   Appx02555-02603.   The Board considered Patent Owner's Response (Appx02647-02725), Sur-Reply (Appx03405-03430), and Motion to Exclude Evidence and Reply (Appx03449-03469, Appx03512-03521), Petitioner's Reply (Appx03370-03404) and Opposition to Patent Owner's Motion to Exclude (Appx03487-03508) and entered its Decision on January 3, 2023 (Appx0001-00097).

---

[1] Claims 2-7 depend from independent claim 1 and claims 9-14 depend from independent claim 8.  *See* Appx00121-00122.  Limitations 8.3-8.7 and 8.9 mirror 1.3-1.7 and 1.9, and the discussion and argument presented herein with respect to Limitations 1.3, 1.5, and 1.9 also apply to Limitations 8.6, 8.8, and 8.9 with the same effect and result.  *See id.*

In the Decision, the Board held that claims 1-14 of the '993 Patent are unpatentable as obvious in view of Cappellucci_949, published February 27, 2003 (Appx00788-00811), Cappellucci_934, published April 24, 2003 (Appx00813-00831), Cupp, published April 10, 2003 (Appx00833-00844), and Tudor, published January 23, 2003 (Appx00845-00856).  Appx00001-00097.  Patent Owner seeks reversal of these rulings.

## II.    Factual Background

### A.    The Parties

A3K, the Patent Owner-Appellant, was co-founded by the first two named inventors of the '993 Patent, Saki Dodelson and Susan Gertler, and at the time the '993 Patent was filed, they were its Chief Executive Officer ("CEO") and Chief Academic Officer ("CAO"), respectively.  Appx00098; Appx02298 (Answer to ¶3); Appx02305 (Answer to ¶59); Appx02510; Appx02310-02311 (¶¶102, 112-113) (Achieve3000 leadership team page, listing Saki Dodelson as CEO and Susan Gertler as CAO, on September 17, 2017).

On issuance of U.S. patent 8,714,986, the parent to the '993 Patent, which shares the same specification, then A3K CEO Dodelson asserted that "[r]eceiving this patent is proof of the uniqueness and effectiveness of our approach to differentiating instruction in a way that accelerates the path to college and career

readiness for all students." Appx02508.[2]  In addition, during Dodelson's tenure as Patent Owner's CEO, Dodelson stated in her website biography that, "[u]sing proprietary technology, Achieve3000 offers the only patented platform that assesses students to determine their precise reading levels and then delivers grade-appropriate nonfiction content *tailored* to each student's individual Lexile® *reading level*." Appx02512 (emphasis added).

Dodelson and Gertler, among others, subsequently sold A3K and founded Beable, the Petitioner-Appellee, where they now hold the same titles as Petitioner's CEO and CAO.  Appx02296 ("Saki Dodelson is the Founder and CEO of Beable. . ."); *see also, e.g.*, Appx02502 (stating Beable was "launched by ed-tech visionary Saki Dodelson and the founders of Achieve3000, which pioneered online differentiated learning"); Appx02507 (identifying Gertler as "Co-founder and Chief Academic Officer at Beable.").

Even now, years after their sale of A3K and commencement of Beable, Dodelson's biography on Beable's website describes A3K and its patented technology (which includes the '993 Patent and its parent) as "pioneering" and

---

[2] *See* Appx00375-00381 (terminal disclaimer of the '993 Patent over parent U.S. Patent No. 8,714,896 ("'896 Patent"), filed to overcome double-patenting rejection); *id.*, Appx00414, Appx00461 (rejecting pending claims as unpatentable over claims 1-41 of the '896 Patent because, "[a]lthough the claims at issue are not identical, they are not patentably distinct from each other because the claimed invention partially perform[s] the steps of the patented claims, which are obvious variations"); Appx02545-02548 (19:35-26:43).

covering a "breakthrough methodology." Appx02296 ("Prior to launching Beable, Saki was the Founder and CEO of the pioneering company that introduced online differentiated learning and patented its breakthrough methodology."); *see also* Appx02517 ("Saki was the Founder and CEO of Achieve3000 where she pioneered online differentiated learning and co-developed its patented method of differentiation").

In addition to praise by competitor Beable, the groundbreaking nature of the claimed invention has received public recognition. Appx02810 (¶103); *see WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1334 (Fed. Cir. 2016) (finding that receipt of industry awards and articles positively mentioning an invention is "strong evidence of industry recognition of the significance and value of the claimed invention weighs in favor of nonobviousness.").

In March 2021, A3K's Achieve3000 Literacy product earned Research-Based Design product certifications from Digital Promise, which is awarded based on research demonstrating the efficacy of these products, and A3K was one of seven awarded this certification in 2021. Appx03028. In 2017, the Center for Research and Reform in Education at John Hopkins University School of Education also recognized A3K for its patented method providing strong evidence of efficacy in improving literacy. Appx03030 ("Dodelson continued, 'Our mission is to give all educators the ability to use one platform to reach every kid, of every ability, using

our patented method of reaching all students at their precise Lexile® level. Thousands of schools use Achieve3000 to accelerate reading gains and prepare kids for college and career.  Now, evidence for ESSA makes it clear: Achieve3000 provides the greatest effect.'").

>    **B.    The '993 Patent is Directed to a Proprietary Software Engine, Achieve3000 Literacy, that Facilitates an Innovative Differentiated Learning System**

The '993 Patent's challenged claims are directed to a novel, non-obvious invention.  Prior to the '993 Patent's invention, teachers often struggled to teach grade-appropriate lessons to a single classroom of students at very different reading levels.    Appx00112 (1:28-32, 1:37-41, 1:52-2:3, 2:25-36, 2:55-3:2); *see also* Appx02749 (¶39).  Classroom teachers typically faced the difficult choice (a) to teach from a textbook that matched to the educational standards for that grade and presented the same subject matter to the whole class, but would both leave lower-level readers behind and fail to challenge higher-level readers; (b) to teach from a textbook from a lower grade level that "may not necessarily meet the educational requirements specified for grade level," but could be understood by students at lower reading levels; or (c) to give up on teaching a single lesson simultaneously to the whole class, and instead locate and provide different materials to each student, matching that particular student's reading skill level (but not necessarily the required

educational standards).  *See e.g.*, Appx00112-00113 (2:27-47, 2:55-3:12); *see also* Appx02750 (¶39).

Petitioner's background art not rejected by the Board, 1995 VA English SOL (Appx00962-00985), and DuBay (Appx01222-01299), do not teach creating different versions of the *same* content at different reading levels, but at most, disclose sourcing and providing *different* content to different users depending on their reading level.  None of these are examples of solving the differentiated learning problem by creating versions of the same article but at different reading levels, as in the '993 Patent claims.  Appx02749-02750 (¶39).  Rather, they simply exemplify the longstanding problem the prior art had been unable to solve.

The problem was not solved until the '993 Patent's inventors discovered, disclosed and claimed an invention generating "multiple aligned versions" of an original unmodified content, each corresponding to a curricular requirement for the subject matter and according to a particular "reading level."  Appx00121-00122 (cl.1-14), Appx00116 (10:47-48); *see also* Appx02769-02770.  More specifically, the invention involved "determining a skill level of the user, obtaining unmodified content, aligning the unmodified content to a set of content standards, modifying the aligned content in accordance with the user's skill level [to create multiple versions of aligned content at different reading levels], [and] providing the modified aligned content to the user. . . ."  Appx00098 (Abstract); *see also* Appx00113 (3:35-57, 4:44-

49, 4:58-62), Appx00116 (10:7-56), and Appx00119 (15:23-26); Appx02750-02751 (¶40). This learning tool "does not demand the extensive resources required for one-on-one or small classroom settings" and "continuously assesses the learning progress of an individual user and customizes learning content suited [to] the particular user while also aligning the learning content with applicable educational standards." Appx00113 (3:5-12); *see also* Appx00403-00405, Appx00449, Appx00451; and Appx02750-02751 (¶40).

### C.    The Board's Decision

**1. Invalidity Grounds and the Prior Art**

Petitioner's petition for IPR of claims 1-14 of the '993 Patent asserted the following grounds: Claims 1-14 are unpatentable under 35 U.S.C. § 103 as obvious over Cappellucci_949, Cappellucci_934, Cupp, and Tudor. The errors in the Board's Decision addressed in this appeal arise from the Board's analysis of these references, which are summarized below.

### *Cappellucci_949 and Cappellucci_934*[3]

- Cappellucci_949 is a patent application that published on February 27, 2003, based on an application filed April 19, 2002, which claims priority

---

[3] "Cappellucci" herein refers to the Cappellucci references Cappellucci_949 and Cappellucci_934.

from three provisional applications dating back to April 19, 2001.
Appx00788-00811;

- Cappellucci_934 is a patent application that published April 24, 2003,
  based on an application filed April 19, 2002, which claims priority from
  three provisional applications dating back to April 19, 2001. Appx00813-
  00831;

- Cappellucci_934 teaches, *e.g.*, "select[ing] different presentation
  format[s]" for different students, it does not describe creating different
  versions that have *different reading levels* by changing, *e.g.*, "larger fonts
  and bolder colors" as claimed. Appx00830 (¶90); Appx02771 (¶57);

- Cappellucci already addressed the problem of differentiated instruction by
  having sourced content available at different reading levels without the
  need for, and without any discussion of, any modification of content.
  Appx00809 (¶69) ("a teacher finding the lesson plan will be able to
  immediately find what resources will help her teach this subject . . .
  [including] student resources"); Appx00825 (¶42) ("[T]he system can
  automatically provide easier activities or assignments to below average
  students."); Appx00830 (¶90) (explaining that information profiles that
  include grade level and proficiency can be used to select information

presented to the user); *see also* Appx02773 (¶59); Appx02887-02888 (22:13-23:3);

- Cappellucci's disclosure of modifying the format of stored content is particularly limited and specific – to "provide larger fonts and bright colors," Appx00825 (¶42), and "select different presentation format for students depending upon grade level, for example, students from grades 1-3 can be provided with a presentation format that uses larger fonts and bolder colors than would be used for grades 4-6.  Note, however, students in grades 3 and 4, for example, may receive the same informational content, but will appear different on each student's computer." Appx00830 (¶90).

- Cappellucci's MLOs:  Cappellucci teaches that its content is already associated with "master learning objectives ('MLOs')" (Appx00264; *see also* Appx000252 and Appx00254), which in turn "relate to" the particular class grade a student is in (Appx00295).  *See also* Appx00252 ("Cappellucci . . . discloses . . . MLOs" (citing Appx00806 (¶¶51-52))); Appx00254 ("MLOs permit a user to search for and retrieve related resources." (citing Appx00809-00810 (¶¶65-75); Appx00795-00798 (FIGS. 7-9)); Appx00264 ("Cappellucci . . . discloses . . . correlating . . . content . . . to a set of . . . MLOs"); Appx00295 ("MLOs . . . relate to grade

levels" (citing Appx00810 (¶76))); Appx00808 (¶55) ("MLOs . . . can include . . . meta data indicating that the lesson plan is directed toward a particular grade level. . ."); Appx00810 (¶76) ("grade level field"); Appx00830 (¶90) ("The user information profiles can include information that is unique to the user, for example, a student's . . . grade level"); Appx02790 (¶79);

- An MLO, as described by Cappellucci itself, is a "master learning objective," such as "understands concept of addition." Appx00806-00807 (¶¶51, 54), Appx00828 (¶72);

***Cupp***

- Cupp is a patent application that published on April 10, 2003, based on an application filed September 17, 2002, which claims priority from a provisional application filed September 17, 2001. Appx00833-00844;

- Cupp describes a system focused on writing a *single original work* to a pre-determined target readability level— not a plurality of different versions of a single original work—including setting the reading level of that single work "before [it] is [ever] authored." Appx00838 (¶10) ("the term 'target' . . . indicate[s] *a number* (*e.g.*, readability level . . .) *that is selected before the reading material is authored*.") (emphasis added), *id.* (¶11), Appx02770-02271 (¶56);

- Cupp teaches that the "author, publisher, educator, or any other person" first selects the target readability level for the story (Appx00838, ¶¶10-11; *see also, e.g.*, Appx00834 (FIG. 1 (block 102)), and its method then proceeds to make modifications to the draft story to target that readability level;

- Cupp also discloses using human intervention to, for example, "maintain the flow" and to determine the "target percentage of sight words" (Appx00838 (¶12), Appx00841 (¶37));

- Cupp's explicit disclosure includes deleting entire sentences to reduce the reading difficulty level:



*FIG. 3*

Appx00836 FIG. 3 (excerpted and annotated) (step 318 "Delete Sentence"), Appx00841 (¶37); *cf.* Appx00291 (acknowledging this teaching in discussing a different Limitation 1.5 aspect).

- As Cupp explicitly teaches, if the story's longest sentence (each time the FIG. 3 method is performed on the story) is written in active voice and does not have a conjunction, it is simply deleted in its entirety. Appx00836, FIG. 3 (steps 308-318), Appx00841 (¶37).

- Cupp is silent with respect to editing the content of a story with specific regard to its subject matter. Appx00038. Cupp only discloses that an author might choose to type a replacement sentence to "maintain the flow of the story, if necessary." Appx00839 (¶¶22, 37).

***Tudor***

- Tudor is a patent application that published January 23, 2003, based on an application filed June 17, 2002, which claims priority from a provisional application filed June 15, 2001. Appx00845-00856. The only discussion in Tudor is a generic direction to "analyze standards," stating "[b]y analyzing these standards and collating them with the learning objectives from a plurality of standardized tests, a common set of essential learning objectives and skills for each subject for all grade levels are generated to form the item bank." *See, e.g.*, Appx00853 (¶35); Appx02804-02805 (¶96).

## 2. Obviousness

In its Decision, the Board combined the four references posited by Petitioner and held that claims 1-14 were unpatentable for obviousness.

Petitioner asserted that its proposed combination of Cappellucci_949, Cappellucci_934, Cupp, and Tudor demonstrate unpatentability. The Board addressed each clause of claim 1 to determine whether Beable demonstrated by a

preponderance of evidence that the relied-upon combination of prior art satisfied the

particular claim language.  For ease of this Court's reference, Patent Owner produces

the chart below summarizing the Board's findings with respect to claim limitations

in which Patent Owner presented a response and disputes the Board's findings on

appeal.

| [Limitation #] and Claim Language | Prior Art | Patent Owner's Response | Board's Finding |
|---|---|---|---|
| [1.3] evaluating the one or more educational standards to produce a unique standards code by analyzing at least one of one or more statements of the one or more educational standards, a structure of the one or more educational standards, a core meaning of the one or more educational standards, a related and ancillary meaning of the one or more educational standards, a learning mode referenced by the one or more educational standards, an intent of the one or more educational standards, or related critical thinking, logical, philosophical, and pedagogical | Cappellucci in view of Tudor "teaches or suggests" this element. Appx00022.  To the extent the claim language is not taught by Cappellucci, Petitioner relied on Tudor. *Id.*  Obvious to POSITA "to 'evaluat[e]. . . one or more educational standards to produce' essential learning objectives, as disclosed by Tudor, to produce the MLO's ('a unique standards code') disclosed in Cappellucci for at least the reasons" set forth in Beable's Petition.  Appx00023. | Presented 3 arguments: (i) Petitioner has not shown that Cappellucci teaches or suggests the recited "unique standard code;" (Appx00023-00024); (ii) Petitioner has not shown that the relied-upon prior art satisfies the recited requirement of "evaluating the one or more educational standards to produce a unique standards code;" (Appx00024-00027); (iii) Petitioner has not shown that the proposed combination satisfies the | Petitioner demonstrated by a preponderance of the evidence that the relied-upon combination of prior art satisfied this claim element. Appx00031. Petitioner also demonstrated by a preponderance of the evidence that POSITA at the time of the invention would have had reason to modify the prior art as proposed to result in the subject matter of element 1.3.  *Id.* |

| | | | |
|---|---|---|---|
| elements of the one or more educational standards using at least one computer; Appx00121 (20:10-22). | | requirement "to produce a unique standards code by analyzing at least one of" the seven options listed in element 1.3 (Appx00027-00031). | |
| [1.5] generating in real-time, by a differentiation engine including one or more processors, a plurality of aligned versions of first unmodified content by transforming format and content of the first unmodified content, wherein each of the plurality of aligned versions is transformed, respectively, according to a reading difficulty level associated with corresponding one of the one or more educational standards, wherein generating the plurality of aligned versions of the first unmodified content | Cappellucci in view of Cupp "teaches or suggests this element." Appx00034. Obvious to POSITA that: (i) "Cupp's reading difficulty levels are 'in accordance with the unique standards code'" and (ii) Cupp's methods 'maintain[] subject matter of the first unmodified content.'" Appx00035-00036. | Presented 4 arguments: (i) "Cupp does not disclose or suggest that the generated 'plurality of aligned versions' 'maintain[] subject matter of the first unmodified content' as recited[]"[4] (Appx00036-00038); (ii) Petitioner "fail[ed] to prove the disclosure or obviousness of 'generating. . .a plurality of aligned versions of the first unmodified content' in element 1.5." (Appx00039-00044); (iii) Petitioner "failed to | Petitioner demonstrated by a preponderance of the evidence that the relied-upon combination of prior art satisfied this claim element. Appx00049. Petitioner also demonstrated by a preponderance of the evidence that POSITA at the time of the invention would have had reason to modify the prior art as proposed to result in the subject matter of element 1.5. *Id.* |

---

[4] The Board's conversion of the claim language misapprehends Patent Owner's argument that Cupp, in combination with Cappellucci, does not disclose or suggest a step of "maintaining subject matter" as recited in Limitation 1.5. *See infra* IV.C.2.

| | | | |
|---|---|---|---|
| further comprises breaking up the first unmodified content into sentences, selecting a different vocabulary and sentence length according to each reading difficulty level in accordance with the unique standards code while maintaining subject matter of the first unmodified content; Appx00121 (20:27-41) | | prove that, in the proposed combination, 'each and every aligned version match[es] the unique standards code' - a single, unique code produced (as specified in Limitation 1.3) by 'evaluating the one or more education standards[]'" (Appx00044-00048); (iv) Petitioner "conflate[d] certain distinct claim terms in element 1.5 and 'effectively reads the unique standards code requirement out of the Challenged Claims[.]" (Appx00048-00049). | |
| [1.9] wherein each of the plurality of aligned versions are equivalent substantially similar in subject matter, meaning and context to subject matter, meaning and context of the first unmodified content. (20:58-61). | Cappellucci in view of Cupp. Appx00061. Obvious to POSITA the edits suggested by Cupp ("methods replace words with synonyms and combine or separate sentences") "modify the content without substantially | Presented the same arguments as it did with respect to element 1.5. Appx00061. | Petitioner demonstrated by a preponderance of the evidence that the relied-upon combination of prior art satisfied this claim element. Appx00062. Petitioner also demonstrated by a |

22

| | changing the subject matter, meaning, and context." *Id.* | | preponderance of the evidence that POSITA at the time of the invention would have had reason to modify the prior art as proposed to result in the subject matter of element 1.9. *Id.* |
|---|---|---|---|

Patent Owner also takes issue with the facts that the Board (i) merely adopted Petitioner's positions and its expert, Christopher Vento's *ipse dixit* conclusions; and (ii) disregarded and reached a conclusion inconsistent with the teachings of the applied prior art.

### III.    Summary of Argument

Patent Owner seeks reversal of the Board's findings that claims 1-14 of the '993 Patent are unpatentable as obvious in view of Cappellucci_949, Cappellucci_934, Cupp, and Tudor. Appx00001-00097.

The '993 Patent solves a long-felt problem, one not recognized by the prior art that published in 2003, which is to generate, and how to generate efficiently, differentiated content having the same subject matter for a class in which the students in the same grade have different reading skill levels (and present it to those students).

The combination of features from the prior art does not actually disclose at least two features of the claimed invention:

> (i) producing a unique standards code from educational standards (Limitation 1.3) (for use in making the alignments called for in Limitation 1.5); and

> (ii) making a plurality of aligned versions at different reading levels and having different vocabulary and sentence length, all versions maintaining the same subject matter (Limitations 1.5 and 1.9).

The Board also erroneously relied on expert testimony that should have been excluded as unsupported by evidence. The Board misapplied *In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971) with respect to Limitations 1.5 and 1.9 to fill the gap between what the prior art actually discloses, namely using either different (not aligned) content or exactly the same content (same vocabulary and sentence length), and the aforementioned two claimed features. The legal principle, read in full, prohibits relying on the claimed invention as, Patent Owner will argue in further detail *infra*, the Board did, to guide reconstruction of the prior art to bridge the gap between what the prior art discloses and the patent claims.

## IV.      Argument

### A. Standard of Review

This Court reviews the Board's legal determinations *de novo*, and the Board's factual findings underlying those determinations for substantial evidence. *Personal Web Techs., LLC v Apple, Inc.*, 848 F.3d 987, 991 (Fed Cir. 2017). Obviousness is a question of law based on underlying factual findings, which are reviewed for

substantial evidence. *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) (citing *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 406 (2007)).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). "[T]he substantial evidence standard asks 'whether a reasonable fact finder could have arrived at the agency's decision,' and 'involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision.'" *OSI Pharmaceuticals, LLC v. Apotex Inc.*, 939 F. 3d 1375, 1381-82 (Fed. Cir. 2019) (quoting *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000)). "Substantial evidence is more than a mere scintilla" and "[m]ere uncorroborated hearsay or rumor does not constitute substantial evidence." *In re Gartside*, 203 F.3d 1305, 1316.

When the Board "relie[s] on erroneous reasoning in making the factual determinations," those determinations are not supported by substantial evidence. *In re Huai-Hung Kao*, 639 F.3d 1057, 1065 (Fed. Cir. 2011); *see also Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1378 (Fed. Cir. 2017) ("[The court] must disregard the testimony of an expert that is plainly inconsistent with the record . . . or based on an incorrect understanding of the claim[s]." (internal quotations and citations omitted)).

## B.    Limitation 1.3/8.3

The Board erred in adopting Petitioner's argument that, to the extent Cappellucci_949 does not teach how its MLOs are produced, Tudor fills the gap with respect to "evaluating the one or more education standards to produce" learning objectives.    Appx00022-00023.    There is no substantial evidence to support Petitioner's argument, and the Board's conclusion, that MLOs address the creation of unique standards codes.

Saliently, putting aside that there is no substantial evidence to establish that Cappellucci's MLOs are unique standards codes, the Board agreed with Patent Owner that "Cappellucci *alone* does not disclose how codes like M6, M6.17/1 (assuming them to be unique standards codes) and the like ***are produced*** for Cappellucci's respective learning objectives.["].    Appx00025 (internal quotations omitted).    Nevertheless, the Board found that, in combination with Tudor, Limitation 1.3 was not only disclosed but that it would be obvious for a POSITA to combine Cappellucci and Tudor to yield Limitation 1.3.    Appx00023.    However, these conclusions are flawed logically and factually.    First, as the Board recognized, Cappellucci does not disclose how unique standards codes are produced. Appx00025.    Thus, there is no evidence, let alone substantial evidence, to support a conclusion that Cappellucci's MLOs, while including numerical codes, are also the unique standards code.    Without any disclosure of the provenance of the numerical

codes of Cappellucci's MLOs, and the Board concedes there is none, there is no evidence in Cappellucci to support a conclusion that the MLOs are unique standards codes required by Limitation 1.3. Stated otherwise, there is neither logic nor substantial evidence to support a conclusion that Cappellucci's numerical codes, however generated, equate to unique standards codes.

Next, despite the Board's acknowledgment that Cappellucci does not disclose how MLOs, or numerical codes are produced, the Board conflated the inclusion of a numerical scheme in Cappellucci_949's MLOs as addressing the production of the unique standards code. Appx00027. Even in combination with Tudor, the production of unique standards code is neither disclosed, nor obvious, nor logical. Tudor does nothing to disclose the unique standards code or its provenance as required by Limitation 1.3. Appx02801-02803. At best, Tudor demonstrates how to create learning objectives from education standards, not the claimed unique standards code. *Id.*

Third, the Board concluded that a POSITA would have used Tudor, which discloses evaluation of education standards to produce learning objectives, to produce the MLOs disclosed in Cappellucci_949. Appx00026. Maybe so, but the Board erred in finding that Tudor's disclosure "necessarily" included analyzing one or more statements of the one or more educational standards. Appx00029. In combination, Cappellucci and Tudor do not disclose producing unique standards

code as required by Limitation 1.3 because Cappellucci does not disclose how MLOs are produced, and Tudor only discloses part of the equation, *i.e.*, evaluating educational standards to produce learning objectives. Accordingly, there remains a fundamental gap between what the prior art plausibly teaches and what Limitation 1.3 requires.

Petitioner's hindsight argument that Cappellucci, in view of Tudor, discloses unique standards code, does not support the Board's "inherency" finding as Tudor's generic analysis to produce learning objectives is not based on "analyzing one or more statements" to produce a unique standards code. Appx00029. Nor does combining Cappellucci and Tudor fill the gap, as the Board suggests, Appx00024-00027, for the reasons already discussed. In the end, the Board erred in bridging the gap by relying on Mr. Vento's *ipse dixit* conclusions regarding whether the '993 Patent was disclosed in and whether it was obvious from Cappellucci and Tudor.

Mr. Vento's declaration addresses analyzing statements but only as one option; hence, there is no substantial evidence to support the Board's inherency argument. Appx00029 ("necessarily would have included"); Appx00030; *see e.g.*, *PAR Pharm., Inc. v. TWI Pharm., Inc.*, 773 F.3d 1186, 1195 (Fed. Cir. 2014) ("Inherency . . . may not be established by probabilities or possibilities." "The mere fact that a certain thing may result from a given set of circumstances is not sufficient." And noting that substantial evidence must "show that the natural result

flowing from the operation as taught would result in the performance of the questioned function."). Further, the Board cites the Vento Declaration at ¶176 (Appx00701), which instructs to use Cupp to determine readability and to write content to different levels but relies on Cappellucci's different "presentation" of "informational content" to students at different levels without accounting for the "different presentation" being of ***exactly the same textual material*** – not aligned content having ***different words and sentences***. Appx00031. Thus, Mr. Vento's testimony does not support the inherency argument adopted by the Board regarding Tudor's alleged teaching to produce unique standards codes because the "different presentations [of the same text]" of Cappellucci are so different in kind from the claimed invention.

Here, Mr. Vento's declaration should be given no weight on the issue of whether MLOs are a unique standards code. *Xerox v. Bytemark, Inc.*, IPR2022-00624, Paper 9 (PTAB Aug. 24, 2022) (designated precedential Feb. 10, 2023) (finding it improper to rely on experts who mimic a petitioner's argument); *see also TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1356-57 (Fed. Cir. 2019) (reversing the Board's decision where the Court found that the Board "accepted [the petitioner's] positions as its own findings and conclusions," relying "almost exclusively on the testimony of [the petitioner's expert]" and, "the Board's factfinding [was] based on conclusory testimony and is therefore unsupported by

substantial evidence."); *id.* at 1358-59 ("Conclusory expert testimony does not qualify as substantial evidence." (collecting cases)).    Without providing any explanation, Mr. Vento simply states that a unique standards code is the same as a MLO.  Appx00724-00728.  Mr. Vento points to two figures of Cappellucci_949 (FIG. 4 and Table 1) in an attempt to show that MLOs are unique standard codes. Appx00726.  These figures are duplicated below and annotated to demonstrate how they do Patent Owner the favor of showing that MLOs, learning objectives and numerical codes are not equivalent.  Appx00726.  More specifically, Table 1 and FIG. 4 of Cappellucci_949 are excerpted below and color-coded to identify what Cappellucci_949 refers to as "MLOs" with a green outer box, yellow highlighting to identify the "learning objectives" that are described in Cappellucci, and that Petitioner looks to Tudor for producing, and blue highlighting to identify the unique numerical codes associated with the learning objectives.  Appx00807 (¶54, Table 1); Appx00672-00673, Appx00694 (¶¶123-125, 156).



Appx00807 (Table 1) (excerpted and annotated)



Appx00792 (FIG. 4) (excerpted and annotated)

Further, Mr. Vento failed to provide "any meaningful explanation as to why one of ordinary skill in the art would be motivated to combine these references at the time of this invention." *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1353-54 (Fed. Cir. 2014). Like the expert in *InTouch* (and *TQ Delta*, among other cases), Mr. Vento's testimony "primarily consisted of conclusory references to his belief that one of ordinary skill in the art *could* combine these references, not they *would* have been motivated to do so." *Id.* at 1352. Mr. Vento fails to

differentiate *could* and *would* by not specifically explaining how a POSITA *would* take the learning objectives disclosed by Tudor and *produce* unique numerical codes such that MLOs result.

The Board's acceptance and adoption of Petitioner's arguments, via Mr. Vento, that Limitation 1.3 is obvious simply because Cappellucci discloses MLOs that include unique numerical codes and Tudor *appears* to produce learning objectives are fatally flawed. Appx00727-00733. Without a *specific* explanation of how it would have been obvious to produce a unique standards code from Tudor's learning objectives, and that a POSITA *would* produce unique standards codes from Tudor's learning objectives in the manner Mr. Vento's bare conclusions suggest, Mr. Vento's logic, despite all the ink spilled, amounts to nothing more than his *ipse dixit*. Appx00727-00733.

Exemplary of Mr. Vento's *ipse dixit* is his asserting that "to the extent the Cappellucci references do not expressly disclose how the MLOs ('*unique standards code*') are produced, Tudor teaches, suggest, or renders obvious how the MLOs would have been produced." Appx00728 (¶225). Critically, Mr. Vento does not demonstrate *how* unique standards codes are produced or how such creation is obvious. Appx00728-00729 (¶226). Rather, Mr. Vento explains that Tudor teaches how "essential *learning objectives* are produced." *Id.* (emphasis added). Pursuant to Mr. Vento's logic, a simple substitution of "learning objectives" for "unique

standards code" renders 1.3 obvious.  Appx00729 (¶227).  But as demonstrated in the figures above, a unique standards code is wholly distinct from a learning objective.  Thus, teaching how to produce one does not, without more than conclusory statements, render production of the other obvious.

An expert's *ipse dixit* is not substantial evidence upon which the Board can base its decision to connect the dots.  *TQ Delta*, 942 F.3d at 1358-59; *In Touch Techs.*, 751 F.3d at 1349.  For the foregoing reasons, this Court should reverse the Board's decision of unpatentability because there is no substantial evidence to support the Board's conclusion that Limitation 1.3 is disclosed in or suggested by the grounds asserted by Petitioner.

### C.    Limitation 1.5/8.8

The Board misapplied *In re McLaughlin* in its evaluation of Limitation 1.5 and erred in finding that Cappellucci, in view of Cupp, discloses Limitation 1.5.

1.5 recites:

> generating in real-time, by a differentiation engine including one or more processors, a plurality of aligned versions of the first unmodified content by transforming format and content of the first unmodified content, wherein each of the plurality of aligned versions is transformed, respectively, according to a reading difficulty level associated with corresponding one of the one or more educational standards, wherein generating the plurality of aligned versions of the first unmodified content further comprises breaking up the first unmodified content into sentences, selecting a different vocabulary and sentence length according to each reading difficulty level in accordance

with the unique standards code while maintaining subject matter of the first unmodified content.

Appx00121 (20:27-41).

### 1. Insubstantial Evidence Supports the Board's Conclusion That Creating a Plurality of Aligned Versions at Different Reading Levels Would Have Been Obvious from Cupp in Combination with Cappellucci

One key element of Limitation 1.5 is that it requires "generating . . . *a plurality of aligned versions* of the first unmodified content by transforming format and *content* of the first unmodified content," particularly by "selecting a different vocabulary and sentence length according to each reading difficulty level in accordance with the unique standards code while maintaining subject matter of the first unmodified content." *Id*.

With respect to this aspect of Limitation 1.5, the Board acknowledges that "neither Cupp nor Cappellucci *alone* teaches the entirety of the limitation at issue in element 1.5." Appx00039; *see also* Appx00042 ("we agree that Cappellucci does not teach the entirety of the limitation at issue"). Nor does Petitioner take the position that Cappellucci, or Cupp, expressly disclose creating a plurality of aligned versions as claimed. *See e.g.*, Appx03628 (15:4-17). However, the Board's conclusion that it would have been obvious to further modify Cappellucci in combination with Cupp to produce a *plurality* of aligned versions of the same original content having different reading levels by changing sentence length and vocabulary is not supported by substantial evidence. Rather, the combination and

35

modification of Cappellucci and Cupp to arrive at the claimed invention improperly utilizes the '993 Patent as a retrospective roadmap to render itself unpatentable – misapplying *In re McLaughlin* in a classic impermissible hindsight reconstruction.

To reiterate, Petitioner admits that "Cappellucci . . . 'does not describe creating different versions that have different reading levels by changing, *e.g.*, 'vocabulary and sentence length,' as claimed.'" Appx03383. Indeed, conspicuously absent from Cappellucci is any discussion of something akin to reading level, much less providing content to students based on their reading level.[5] Rather, Cappellucci discloses that different educational materials are correlated to learning objectives such that a teacher can find and select materials addressing students' respective learning objectives. Appx02774-02775 (¶60) (citing Appx00805-00806 ¶¶42-49). In other words, to address the issue of different students having different learning objectives, Cappellucci provides a large repository of different materials correlated to different learning objectives.

The Board's Decision heavily cites Mr. Vento's testimony, but that testimony merely parrots Petitioner's arguments. Appx00039-00041. In fact, the express disclosures in Cappellucci, which purportedly relate to providing differentiated content and on which the Board's conclusions are based, are limited. *See*

---

[5] The Board inexplicably misconstrues Patent Owner's Response at 18 as acknowledging that Cappellucci discusses the issue of having content available at different reading levels. Appx00042 (citing Appx02673).

Appx00270-00271 (citing Appx00825 (¶42), Appx00830-00831 (¶¶90, 93);

Appx00705 (¶182)). The cited portions of Cappellucci_934 (Appx00825 (¶42),

Appx00830-00831 (¶¶90, 93)), when properly considered in context, do not actually

explain why one of ordinary skill in the art would have modified Cappellucci to

change the informational content of Cappellucci's reading materials, much less

differently changed the reading level of the original informational content ***multiple***

***times*** in order to create a plurality of aligned versions of the original informational

content, and further less looked to Cupp to understand how to create plural versions

of unmodified content at different reading levels.

Cappellucci_934 at ¶90, which is repeatedly cited by the Board, teaches

selecting available content based on a student's grade level and using different

***presentation formats*** for different grade levels (*e.g.*, using larger fonts and bolder

colors for lower grade students). Appx00830 (¶90). However, even the Board

agrees that visually presenting content in different formats (*e.g.*, font size and color)

depending on grade level does not disclose or suggest changing the informational

content. Appx00038 ("we agree with Patent Owner that one of ordinary skill in the

art may not view changing merely font size and color (provided as exemplary

changes in paragraph 90 of Cappellucci_934) as changing 'informational content'").

Petitioner makes much ado about the fact that Cappellucci_934 at ¶90 (last sentence)

expressly notes that although presentations may vary depending on grade level,

"students in grade 3 and 4, for example, may receive the same informational content, but it will appear different on each student's computer." Appx00830. However, this exemplifies a clear directive in Cappellucci NOT to modify the content of reading materials, but only the presentation format of reading materials. Thus, in contradistinction to the Board's reliance on ¶90 as teaching some need for modifying informational content reading level, again based on Mr. Vento's conclusory opinion, Cappellucci_934 ¶90 actually teaches ***not*** to produce a plurality of aligned versions of the unmodified content having different reading levels (vocabulary and sentence length), as recited in Limitation 1.5.

Cappellucci_934 at ¶42 similarly only discloses that the system can be used to select among available learning materials according to learning objectives and provides only the generic teaching that a student's profile can be used to customize the user interface to select the information provided to a user, for example, providing "larger fonts and bright colors to keep the attention of students in grades kindergarten through two" or automatically providing easier activities or assignments to below average students. Appx00825 (¶42).

Lastly, Cappellucci_934 at ¶93 discloses an alternative embodiment in which a customized (*i.e.*, curated) selection of news is provided to a user based on their interests and profile attributes. Appx00831 (¶93). However, like the other embodiments of Cappelluci_934, this embodiment discloses only selecting,

assembling and formatting the presentation of existing information, and does not disclose or suggest modifying the underlying informational content of a selected piece of news, let alone changing its reading level by selecting a different vocabulary and sentence length. *Id.*

Ultimately, Cappellucci's approach to meeting the needs of students having different skill levels is to provide a large repository of learning materials (*e.g.*, lesson plans, activities, reading materials) associated with respective learning objectives such that a teacher can select the appropriate materials based on respective students' skill levels for the particular learning objectives. Appx00809 (¶69); Appx00825 (¶42) and Appx00830 (¶90). To the extent different students have different abilities, Cappellucci provides different materials to choose from. At most, Cappellucci presents the same informational materials to students of different grades using different fonts or colors. But even then, Cappellucci's intention is to NOT modify the underlying content based on an individual student's grade level, much less their reading level. Thus, Cappellucci's express teachings do not support the Board's conclusions that Petitioner adequately demonstrated why a person of ordinary skill in the art would have been motivated by Cappellucci to identify other ways to provide differentiated content. Appx00042-00044.

Cappellucci's teachings stop well short of teaching the innovative approach of the claimed invention in which the *reading* difficulty level of the unmodified

content is changed to produce multiple versions of the same content. *See Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155 (Fed. Cir. 2021) (finding that the Board erroneously determined that a combination of references disclosed an invention where two of the references did not teach or suggest the inventive element). Altering reading difficulty level of unmodified content to produce multiple versions of the same content is clearly more than, and different from, Cappellucci's limited approach for accommodating different *grade* levels and abilities by having different content for different learning objectives and using grade-specific visual formatting (*e.g.*, fonts, colors) Cappellucci's limited approach is consistent with the state-of-the-art methods for providing differentiated content *prior to* the Patent Owner's invention.

Consider Petitioner's background art, DuBay, which published one year after Cappellucci and Cupp and is cited by Petitioner and quoted by the Board as acknowledging that "not all students in the same class read at the same level" and that teachers "typically face a classroom of students with reading ability from the 2nd to the 12th grade." Appx00041. Not mentioned is that DuBay states in the immediately following sentence that "[g]ood teaching practice has long separated students in the same class by reading ability for *separate instruction*." Appx01229 (internal citations omitted) (emphasis added); *see also* Appx02657 (n. 2) (noting that none of Petitioner's other background art discloses creating versions of the same

article but at different reading levels). DuBay, considered in its entirety, thus teaches to solve the problem of different reading abilities in a classroom through separate instruction (*i.e.*, selecting different materials), same as Cappellucci, and undermines Petitioner's argument and the Board's determination.

Petitioner inherently admits that Cappellucci's teachings differ from the claimed invention because Petitioner is compelled to bridge the gap yet cannot do so without the benefit of hindsight. For completeness, Petitioner's assertions that "it would have been obvious to [one of ordinary skill in the art] to implement Cupp's method of Figure 1, beginning at step 108, in the system disclosed by Cappellucci to (i) determine the readability level of the content disclosed by Cappellucci and (ii) edit the content to generate one or more modified versions having different target readability levels" or that "[b]ased on Cupp's teachings" "Cupp's methods would have been used to create different versions of a written text for any or all reading levels" are not supported by substantial evidence. Appx00040-00041 (citing Appx00701 (¶176)); *see also* Appx00738-00739 (¶¶245-246). In support of its conclusions, Petitioner (and the Board) cites primarily the aforementioned portions of Cappellucci_934 and DuBay that, as discussed above, provide no motivation to modify Cappellucci's system to change reading difficulty of any given content. Petitioner otherwise cites only to Cupp's generic discussion that reading materials can be assigned and written to a readability level. Appx00040; *see also* Appx00738-

00739 (¶¶245-246) (citing Appx00838 (¶4)).  Because DuBay teaches the same as Cappellucci, it does not fill the gap, and fails to provide substantial evidence to support the Board's Decision that one of ordinary skill in the art would have modified Cappellucci as modified by Cupp further to create a plurality of aligned versions using Cupp's method of editing to arrive at the invention as claimed in Limitation 1.5.

Petitioner's expert Mr. Vento's testimony, Appx00701 (¶176) and Appx00738-00739 (¶¶245-246) ("it would have been obvious . . . to implement Cupp's method . . . [to] edit this content to generate one or more modified versions of the content at different target readability levels."), is exposed by Dr. Bederson as unqualified *ipse dixit*, devoid of any discussion of any motivation to modify Cupp such that a POSITA would want to achieve generating plurality of aligned versions from a first unmodified content as called for by the Challenged Claims.  Appx02770-02775 (¶¶54-60); *see also TQ Delta, LLC v. CISCO Sys., Inc.* 942 F.3d 1352, 1360 (the Court "concluded that the expert appeared to have improperly 'relied on the [challenged] patent itself as her roadmap for putting what she referred to as pieces of a 'jig-saw puzzle' together.'").

In view of the foregoing, insubstantial evidence supports the Board's finding of a motivation, based on Cappellucci's disclosure of changing presentation format and Cupp's teaching of changing the reading level of a written work, to further

modify Cappellucci in combination with Cupp to modify the reading level of Cappellucci's materials, much less use a single piece of unmodified content to produce a plurality of pieces of aligned content at different reading levels, in accordance with Limitation 1.5.

## 2. Insubstantial Evidence Shows the Prior Art Discloses or Rendered Obvious Maintaining the Unmodified Content's Subject Matter in Each of the Plurality of Aligned Versions

Another key element of Limitation 1.5 is that it requires "generating . . . a plurality of aligned versions of the first unmodified content by transforming format and content of the first unmodified content," particularly by "selecting a different vocabulary and sentence length . . . . while ***maintaining subject matter of the first unmodified content***[.]" Appx00121 (20:28-42). The Board erred in finding that Cappellucci, in view of Cupp, discloses this requirement of Limitation 1.5.

As part of a method claim1, Limitation 1.5 recites "maintaining," the gerund form of the verb "to maintain," and thus requires the affirmative step of "maintaining subject matter of the first unmodified content[,]" particularly "while" "selecting a different vocabulary and sentence length[.]" *Id*. In other words, "maintaining subject matter" is a positive limitation that calls for a manipulative difference in the step of "selecting different vocabulary and sentence length." *See e.g.*, *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1376 (Fed. Cir. 2001) (distinguishing claim language providing "only a statement of purpose and intended

result" with limitations calling for "a manipulative difference in the steps of the claim.").

Patent Owner does not dispute the Board's interpretation of the same "subject matter" as including "the same content topics, main ideas and core elements[.]" Appx00038 (n. 10).  However, the Board erred by effectively misinterpreting "maintaining subject matter" as simply a statement of intended result, instead of an affirmative step calling for a manipulative difference in the step of selecting a different vocabulary and sentence length.  More specifically, the Board was incorrect to adopt Petitioner's argument that "it would have been obvious that Cupp's methods 'maintain[] subject matter of the first unmodified content,'" based primarily on the Board's finding that Cupp's methods for increasing readability level of content might, in at least some instances, produce modified content having the same subject matter as the original content.  Appx00036-00038.

As for the actual teachings of Cupp, conspicuously absent from Cupp (including its method for increasing readability level) is any disclosure that, in Cupp's methods for increasing or decreasing reading level, modifications are made with specific regard to maintaining the subject matter of the original unmodified content.  The Board agrees that Cupp is silent on this issue.  Appx00038.

Cupp also does not inherently perform the step of "maintaining subject matter."  Even assuming *arguendo* the Board's determination that, in at least some

instances, the modified content output by Cupp's methods could have the same subject matter as the original content, this possibility does not meet the exacting standard of establishing obviousness by inherency. "Inherency . . . may not be established by probabilities or possibilities." *PAR Pharm., Inc. v. TWI Pharm., Inc.*, 773 F.3d 1186, 1195 (Fed. Cir. 2014). "The mere fact that a certain thing ***may*** result from a given set of circumstances is not sufficient." *Id*. (emphasis added). Rather, substantial evidence must "show that ***the natural result flowing*** from the operation as taught would result in the performance of the questioned function." *Id*. (emphasis in original).

Substantial evidence shows that an affirmative step of maintaining subject matter while selecting vocabulary or sentence length is not performed by or inherent in Cupp's methods. Considering the reference as a whole, *In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1332 (Fed. Cir. 2016), Cupp discloses and teaches nothing about why, let alone how, to change the reading level of content while maintaining the subject matter – in fact, Cupp does not even teach the notion of maintaining the subject matter of an original document to be written to a target readability level. Rather, Cupp provides a method for reducing the reading difficulty level of a story that explicitly teaches that if the story's longest sentence is written in the active voice and does not have a conjunction, it is simply deleted in its entirety. Appx00836 FIG. 3 (steps 308-318), Appx00841 (¶37). Deleting entire sentences would easily change

the subject matter (*e.g.*, topics, main ideas, core elements). Appx02786-02787 (¶¶74-75). Thus, Cupp's teaching of deleting entire sentences, with no accompanying instruction or caution about maintaining subject matter, let alone any discussion of how or why one would want to maintain the original subject matter, exemplify Cupp's complete indifference to whether any particular aspects of subject matter are affirmatively maintained. *Id*.; *see also* Appx02687-02691.

The Board misapprehends this argument by Patent Owner to be that Cupp's *silence* supports that deleting sentences necessarily changes the content's subject matter. Appx00038. But the Board also erred in crediting Cupp's *silence* on maintaining subject matter as somehow supporting Petitioner's argument. *Id.* Cupp's silence cannot somehow be interpreted to carry Petitioner's burden of proof on Cupp disclosing an affirmative step for "maintaining subject matter," as required in Limitation 1.5.

Cupp also teaches a method for increasing the reading level. Yet even if Cupp's methods could, in some random cases, produce a modified text in which the content's subject matter is unchanged, none of Cupp's methods, whether increasing or decreasing the reading level of written material to a given target, teaches or suggests that maintaining subject matter is an affirmative step of Cupp's methods or a requirement of Cupp's output.

As noted, Cappellucci_934 does not remedy Cupp's failure to disclose or suggest "maintaining subject matter" because the Board "agree[s] with Patent Owner that one of ordinary skill in the art may not view changing merely font size and color (provided as exemplary changes in paragraph 90 of Cappellucci_934) as changing 'informational content[.]'" *Id.* But not changing informational content when changing font size and color does not and cannot teach or suggest to maintain the subject matter when changing vocabulary and sentence length. Indeed, the Board erred in its determination that Cappellucci_934 nonetheless provides "a teaching . . . that students at different grade levels would receive the same 'informational content' even if it 'will appear different on each student's computer.'" *Id.* (citing Appx00830 (¶90)).

This determination by the Board in relation to changing reading level "while maintaining subject matter" is incongruous with the Board's reliance on the same text from Cappellucci_934 as teaching providing a plurality of aligned versions in which the informational content (*e.g.*, reading level) *is* changed. Appx00042-00045. The Board's inconsistent findings cannot stand. *Polygroup Ltd. MCO v. Willis Elec. Co.*, 780 F. App'x 880, 884 (Fed. Cir. 2019) ("We do not regard such internally inconsistent findings as supported by substantial evidence."); *Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. de C.V.*, 865 F.3d 1348, 1354 (Fed. Cir. 2017) (Board's analysis flawed due to internal inconsistencies).

In any event, as discussed *supra* at section IV.C.1, Cappellucci_934, at best, teaches that informational content is not modified at all. It, therefore, cannot be fairly interpreted to suggest that Cupp's teachings of changing reading level (*i.e.*, modifying the substantive content) should further be adapted to change the reading level "while maintaining subject matter" of the unmodified content.

In view of the foregoing, insubstantial evidence supports the Board's finding that it would have been obvious that Cupp's methods for changing the reading level of a written work, to further modify Cappellucci in combination with Cupp to modify the reading level of Cappellucci's materials, much less use a single piece of unmodified content to produce a plurality of pieces of aligned content at different reading levels, while maintaining the subject matter, in accordance with Limitation 1.5.

### D.     Limitation 1.9/8.9

Limitation 1.9 is a "wherein" clause that derives from "maintaining the same subject matter" for the plurality of aligned versions required by Limitation 1.5. Rather than present specific reasoning as to how, over and above Limitation 1.5, Limitation 1.9 also is disclosed and made obvious, the Board again simply relies on Mr. Vento's *ipse dixit,* specifically ¶273 of Mr. Vento's declaration (Appx00754), where he does nothing more than recite language from Cappellucci and Cupp and state without support what a POSITA would have understood as obvious.

Appx00061. For the same reasons discussed in connection with Limitation 1.5, that reliance was clear error, and the Board's finding that Limitation 1.9 was disclosed based on Cappellucci in view of Cupp should be reversed. *See Xerox v. Bytemark, Inc.*, IPR2022-00624, Paper 9 (PTAB Aug. 24, 2022) (Board denied institution where petitioner's arguments regarding inherency and obviousness were only supported by its expert's conclusory declaration).

## V.    CONCLUSION

Patent Owner respectfully requests that this Court reverse the Board's obviousness determinations with respect to claims 1-14.

Dated: June 26, 2023                Respectfully submitted,

                                    /s/ Robert M. Isackson
                                    Robert M. Isackson
                                    Henry A. Gabathuler
                                    One Barker Avenue
                                    White Plains, New York 10601
                                    (914) 288-0022
                                    isackson@leasonellis.com
                                    gabathuler@leasonellis.com

                                    *Counsel for Appellant*

# Addendum

## TABLE OF CONTENTS
## ADDENDUM

Judgment, Final Written Decision
    entered January 2, 2023………………………….………… Appx00001

U.S. Patent No. 9,652,993
    dated May 16, 2017………………………………………….Appx00098

Trials@uspto.gov                                          Paper 34
571-272-7822                                      Date: January 3, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

BEABLE EDUCATION, INC.,
Petitioner,

v.

ACHIEVE3000, INC.,
Patent Owner.

————————————

IPR2021-01169
Patent 9,652,993 B2

————————————

Before SCOTT C. MOORE, ERIC C. JESCHKE, and
MATTHEW S. MEYERS, *Administrative Patent Judges*.

JESCHKE, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*
Denying in Part and Dismissing in Part Patent Owner's Motion to Exclude
*37 C.F.R. § 42.64*

IPR2021-01169
Patent 9,652,993 B2

## I. BACKGROUND

Petitioner Beable Education, Inc. challenges claims 1–14 of U.S. Patent No. 9,652,993 B2 (Ex. 1001, "the '993 patent"), which is assigned to Patent Owner, Achieve3000, Inc. We have jurisdiction under 35 U.S.C. § 6, and we issue this Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons below, we conclude that Petitioner has proven, by a preponderance of the evidence, the unpatentability of claims 1–14 of the '993 patent.

### A. Procedural History

Petitioner filed a Petition to institute *inter partes* review of challenged claims 1–14. Paper 2 ("Pet."). Patent Owner filed a Preliminary Response. Paper 6. Upon review of the arguments and supporting evidence, we instituted *inter partes* review of all claims and grounds asserted in the Petition. Paper 7 ("Decision on Institution" or "Dec. Inst.").

After institution, Patent Owner filed a Response (Paper 16, "PO Resp."), Petitioner filed a Reply (Paper 23, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 24, "PO Sur-reply"). Patent Owner filed a motion to exclude evidence (Paper 28, "MTE"), which Petitioner opposed (Paper 29, "MTE Opp."), and Patent Owner filed a reply in support of the motion (Paper 30, "MTE Reply").

Petitioner relies on the declaration testimony of Mr. Christopher Vento, filed with the Petition. Ex. 1003 ("Vento Decl." or "Vento Declaration"). Patent Owner relies on the declaration testimony of Dr. Benjamin Bederson, Ph.D., filed with the Response. Ex. 2011 ("Bederson Decl."). An oral argument in this proceeding was held on October 4, 2022, and a copy of the transcript was entered into the record. Paper 33.

2

IPR2021-01169
Patent 9,652,993 B2

### B. Related Proceeding

The parties identify a stayed proceeding in the U.S. District Court for the District of New Jersey involving the '993 patent: *AC Holdco, Inc. v. Beable Education, Inc.*, No. 3-20-cv-09211 (MAS) (D.N.J.), filed July 21, 2020. Pet. 3; Paper 4 (Patent Owner Mandatory Notices) at 1.

### C. The '993 Patent

The '993 patent relates "to a web-based system and method for providing customized instructional material to a plurality of users, where the instructional material is modified to match each skill level of each user." Ex. 1001, 1:23–26.

Figure 1 is reproduced below:



Figure 1 depicts "a system for providing differentiated content based on multiple levels of skill." Ex. 1001, 5:16–17. Depicted system 100 includes differentiation engine 102, e-mail engine 104, standards engine

IPR2021-01169
Patent 9,652,993 B2

106, and feedback engine 108. *See id.* at 5:47–50. The '993 patent discloses that "memory 132 of the differentiation engine 102 comprises an assessment and differentiation application 140 comprising modules for obtaining aligned content and matching the aligned content to a skill level of a user 110, 112." *Id.* at 6:18–22.[1] Evaluator 114 "may use the e-mail engine 104 to provide lessons comprising modified content to a user 110, 112 or to a group of users." *Id.* at 6:59–61. Memory 136 of standards engine 106 includes (1) "at least one database 146 for storing a plurality of educational standards, such as state academic standards, local district academics standards, and the like," (2) "another database 148 for storing a plurality of intermediate content standards that the system uses to align unmodified content to the plurality of educational standards," and (3) "alignment application 144 that includes modules for aligning unmodified content to educational standards stored in database 146 using the intermediate content standards stored in database 148." *Id.* at 7:15–25. Memory 132 of feedback engine 108 (1) includes "performance database 150 that stores performance and progress data associated with each user 110, 112 of the system 100" and may also include (2) "feedback application 168 having modules for generating performance and progress data associated with a user 110, 112 of the system 100." *Id.* at 8:4–10.

---

[1]  In this Decision, we omit emphasis on reference numerals in quotations from the '993 patent and prior art references.

IPR2021-01169
Patent 9,652,993 B2

Figure 2 is reproduced below:



Figure 2 depicts "a method for differentiating content based on multiple levels of skill." Ex. 1001, 5:19–20. The '993 patent discloses that the method shown may be performed using system 100 shown in Figure 1. *Id.* at 9:15–19. A system performing the depicted method "delivers differentiated content to each user that is aligned to the user's skill level(s), maintaining the same content topics, main ideas and core elements, and thereby providing evaluators with the ability to engage whole-class learning using individually differentiated content." *Id.* at 13:4–9.

### D. Challenged Claims

Petitioner challenges claims 1–14, of which claims 1 and 8 are independent. Claims 2–7 depend from claim 1, and claims 9–14 depend from claim 8. Independent claim 1 is reproduced below, with bracketed letters and numbers added to identify each clause:

5

IPR2021-01169
Patent 9,652,993 B2

1. [1.p] A computer implemented method for providing differentiated content to a user of a plurality of users, comprising the steps of:

[1.1] obtaining in real-time, by a standards engine including one or more processors, a first unmodified content from at least one source using at least one computer;

[1.2] obtaining one or more educational standards using at least one computer;

[1.3] evaluating the one or more educational standards to produce a unique standards code by analyzing at least one of one or more statements of the one or more educational standards, a structure of the one or more educational standards, a core meaning of the one or more educational standards, a related and ancillary meaning of the one or more educational standards, a learning mode referenced by the one or more educational standards, an intent of the one or more educational standards, or related critical thinking, logical, philosophical, and pedagogical elements of the one or more educational standards using at least one computer;

[1.4] analyzing, by the standards engine, the first unmodified content to determine a reading difficulty level of the first unmodified content in accordance with each of the one or more educational standards;

[1.5] generating in real-time, by a differentiation engine including one or more processors, a plurality of aligned versions of the first unmodified content by transforming format and content of the first unmodified content, wherein each of the plurality of aligned versions is transformed, respectively, according to a reading difficulty level associated with corresponding one of the one or more educational standards, wherein generating the plurality of aligned versions of the first unmodified content further comprises breaking up the first unmodified content into sentences, selecting a different vocabulary and sentence length according to each reading difficulty level in accordance with the unique standards code while maintaining subject matter of the first unmodified content;

IPR2021-01169
Patent 9,652,993 B2

[1.6] transmitting, simultaneously, a first aligned version of the plurality of aligned versions of the first unmodified content to the user, wherein the first aligned version corresponds to a reading skill level of the user;

[1.7] generating, by the differentiation engine, one or more lesson plans for the user, the one or more lesson plans comprising questions associated with the first aligned version and subject matter of the first unmodified content, wherein the one or more lesson plans comprises a lesson comprising one or more of a specific spoken language, a particular font size and level-appropriate vocabulary and a particular graphical format based on the reading skill level of the user; and

[1.8] providing the one or more lesson plans questions associated with the first aligned version to the user via a communication system,

[1.9] wherein each of the plurality of aligned versions are equivalent substantially similar in subject matter, meaning and context to subject matter, meaning and context of the first unmodified content.

Ex. 1001, 20:2–62.[2]

---

[2]    We adopt and apply below Petitioner's designations for the elements of the challenged claims.  *See* Pet. 78–85 (showing numerical designations for the language in the challenged claims).

IPR2021-01169
Patent 9,652,993 B2

E.  *Instituted Grounds of Unpatentability*

We instituted *inter partes* review of the challenged claims based on the following ground asserted by Petitioner:

| Claim(s) Challenged | 35 U.S.C. §[3] | Reference(s)/Basis |
|---|---|---|
| 1–14 | 103(a) | Cappellucci_949,[4] Cappellucci_934,[5] Cupp,[6] Tudor[7] |

II. DISCUSSION

A.  *The Level of Ordinary Skill in the Art*

The level of ordinary skill in the art is "a prism or lens" through which we view the prior art and the claimed invention.  *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).  The person of ordinary skill in the art is a hypothetical person presumed to have known the relevant art at the time of the invention.  *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).  In determining the level of ordinary skill in the art, we may consider certain

---

[3]  The Leahy-Smith America Invents Act ("AIA") included revisions to 35 U.S.C. § 103 that became effective on March 16, 2013.  Pub. L. No. 112-29, §§ 3(c), 3(n)(1), 125 Stat. 284, 287, 293 (2011).  Because the challenged claims of the '993 patent appear to have an effective filing date before March 16, 2013, we apply the pre-AIA version of this statute.  *See* Ex. 1001, code (63).  We would reach the same outcome, however, under the AIA version of the statute.

[4]  US 2003/0039949 A1, published February 27, 2003 (Ex. 1005, "Cappellucci_949").

[5]  US 2003/0078934 A1, published April 24, 2003 (Ex. 1007, "Cappellucci_934").

[6]  US 2003/0068603 A1, published April 10, 2003 (Ex. 1009, "Cupp").

[7]  US 2003/0017442 A1, published January 23, 2003 (Ex. 1010, "Tudor").

factors, including the "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field." *Id.* (internal quotation marks and citation omitted).

Petitioner contends, with accompanying declaration testimony, that a person having ordinary skill in the art "would have had at least a bachelor's degree in electrical engineering, computer engineering, computer science, or a related degree and at least 3 to 5 years of experience working with eLearning platforms." Pet. 8 (citing Vento Decl. ¶¶ 101–103). Petitioner adds that "[e]xperience could take the place of some formal training, as domain knowledge and user interface design skills may be learned on the job" and that "[t]his description is approximate, and a higher level of education or skill might make up for less experience, and vice versa." *Id.*

In the Decision on Institution, we adopted Petitioner's proposed level of ordinary skill in the art, stating that it "appears consistent with the record at th[at] stage of the proceeding, including the prior art." Dec. Inst. 9. In the Response, Patent Owner does not address the issue and does not argue that Petitioner's proposal for the level of ordinary skill leads to an improper understanding of how a skilled artisan would have understood either the '993 patent or the prior art. We maintain the definition of the level of ordinary skill in the art adopted at institution.

*B. Claim Construction*

In *inter partes* reviews, the Board interprets claim language using the same claim construction standard that would be used in a civil action under 35 U.S.C. § 282(b), as described in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). *See* 37 C.F.R. § 42.100(b). Under that standard,

IPR2021-01169
Patent 9,652,993 B2

we generally give claim terms their ordinary and customary meaning, as would be understood by a person of ordinary skill in the art at the time of the invention, in light of the language of the claims, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1313–14. Although extrinsic evidence, when available, may also be useful when construing claim terms under this standard, extrinsic evidence should be considered in the context of the intrinsic evidence. *See id.* at 1317–19.

Petitioner discusses two claim terms: (1) "equivalent substantially similar" in claim 1 and (2) "algorithmically transforming" in claim 8. Pet. 9–11. Patent Owner does not address this issue. *See generally* PO Resp.; PO Sur-reply; *see also* Pet. Reply 1 (stating that Patent Owner "does not propose any claim constructions or dispute Petitioner's proposed claim constructions").

We discuss below the two terms identified by Petitioner. We do not, however, discern a need to construe explicitly any of the claim language discussed in this section or any other claim terms because doing so would not change the outcome of the analysis below. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (stating that "we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

Petitioner argues that both terms "are the results of typographical errors during prosecution, which the Board may correct through interpretation." Pet. 9. First, Petitioner asserts that "equivalent substantially similar" in claim 1 should be interpreted as "substantially similar." *Id.* (citing Vento Decl. ¶ 107). According to Petitioner, the applicant amended

10

IPR2021-01169
Patent 9,652,993 B2

claim 1 to replace "equivalent" with "substantially similar," but an Examiner's amendment with the Notice of Allowance "mistakenly reintroduced 'equivalent.'" Pet. 10 (citing Ex. 1002 at 26, 68).

Second, Petitioner asserts that "algorithmically transforming" in claim 8 should be interpreted as "transforming." Pet. 10 (citing Vento Decl. ¶ 108). According to Petitioner, the applicant amended claim 8 to delete "algorithmically," but the same Examiner's amendment with the Notice of Allowance discussed above "mistakenly reintroduced 'algorithmically.'" *Id.* (citing Ex. 1002 at 27, 70, 75).

A district court may "correct an error in a patent by interpretation of the patent where no certificate of correction has been issued . . . only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Novo Indus., LP v. Micro Molds Corp.*, 350 F.3d 1348, 1354 (Fed. Cir. 2003); *see Fitbit, Inc. v. Valencell, Inc.*, 964 F.3d 1112, 1119–20 (Fed. Cir. 2020) (suggesting the standard from *Novo* extends to corrections the Board may make in post-grant proceedings, and holding it was error to not correct a "conspicuous" and undisputed error related to antecedent basis). The Board has applied the same standard. *See Volkswagen Grp. of Am., Inc. v. Michigan Motor Techs. LLC*, IPR2020-00446, Paper 9 at 10–11 (PTAB Aug. 25, 2020) (collecting cases). For the reasons provided by Petitioner, as summarized above, we agree, based on the complete record, that the two terms at issue include typographical errors. For purposes of this proceeding, we interpret "equivalent substantially similar" in claim 1 as "substantially similar" and interpret "algorithmically transforming" in claim 8 as "transforming."

IPR2021-01169
Patent 9,652,993 B2

>C. *Asserted Obviousness of Claims 1–14 Based on Cappellucci_949,
>    Cappellucci_934, Cupp, and Tudor*

Petitioner asserts that claims 1–14 of the '993 patent would have been obvious under 35 U.S.C. § 103(a) based on Cappellucci_949, Cappellucci_934, Cupp, and Tudor. Pet. 5, 25–76. Patent Owner provides arguments addressing this asserted ground. PO Resp. 6–68; PO Sur-reply 1–21. We first summarize aspects of the prior art references.

>1. *The Asserted Prior Art*

>a. *Cappellucci_949*

Cappellucci_949 "is directed to a method and system for correlating information within a system that derives information from a plurality of disparate informational resources." Ex. 1005 ¶ 21. Cappellucci_949 discloses "an e-learning system for providing educational information to users, which can include administrators, teacher[s], students and parents." *Id.* ¶ 42. Cappellucci_949 incorporates by reference Cappellucci_934. *See id.* ¶¶ 2, 61; Pet. 26–27. Figure 2 of Cappellucci_949 is reproduced below:



**FIG. 2**

IPR2021-01169
Patent 9,652,993 B2

Figure 2 "is a diagram showing an information model in accordance with the invention of N=6 information resources." Ex. 1005 ¶ 30. Discussing Figure 2, Cappellucci_949 discloses various "categories or types of educational information resources" in the depicted e-learning system including: "Lesson Plans," "Standards," "Assessments," "Professional Development" resources, "Student Resources," "Text Books," and "Other resources." *Id.* ¶¶ 42–50.

Figure 4 is reproduced below along with a portion of Table 1:



**FIG. 4**

IPR2021-01169
Patent 9,652,993 B2

| M6 | REAL NUMBER SYSTEMS | |
|---|---|---|
| M6.2 | | Dramatizes number stories |
| M6.3 | | Explores the concept of addition using concrete materials |
| M6.4 | | Understands meaning: using concrete materials |
| M6.5 | | Understands meaning: using pictorial materials |
| M6.6 | | Compares and orders: whole numbers |
| M6.7 | | Understands/uses ordinal numbers |
| M6.8 | | Understands whole number place value |
| M6.9 | | Whole number properties: addition |
| M6.10 | | Whole number properties: subtraction |
| M6.11 | | Whole number properties: multiplication |
| M6.12 | | Whole number properties: division |
| M6.13 | | Understands/uses Roman numerals |
| M6.14 | | Understands/uses exponents |
| M6.15 | | Understands/uses scientific notation |
| M6.16 | | Understands/uses square numbers and square units |
| M6.16.1 | | Compares and orders: decimals |
| M6.16.2 | | Compares and orders: integers |

Figure 4, reproduced first, "is a diagram of how information objects and elements of diverse information resources can be correlated to the master learning objectives" ("MLOs"), and Table 1 (reproduced second) "provides a further sample of a set or subset of MLOs." Ex. 1005 ¶¶ 32, 54. Figure 4 and Table 1 together show that each learning objective or node in the tree may be assigned a unique numerical code, such as "M6" for "Real Number Systems" and "M6.13" for "Understands/uses Roman numerals." *Id.* ¶¶ 53–54, Fig. 4, Table 1.

14

IPR2021-01169
Patent 9,652,993 B2

Figure 5 is reproduced below:



# FIG. 5

Figure 5 depicts a system that "can be adapted for providing users, such as administrators, teachers, students and parents access to educational information resources over a global communication network such as the internet." Ex. 1005 ¶ 61. The depicted system includes data tier 52, application tier 54, and presentation tier 56. *Id.* ¶ 62.

IPR2021-01169
Patent 9,652,993 B2

### b. Cappellucci_934

Cappellucci_934 (Ex. 1007) discloses the system generally depicted in Figure 5 of Cappellucci_949. *See* Ex. 1005 ¶ 61. Cappellucci_934 explains that "the method and system are scalable and provide for a layered architecture that enables rapid application development, high availability and strong system security" and "can also provide the ability to customize the information provided by allowing the user to locate, assemble, format and combine information elements from diverse information resources." Ex. 1007 ¶ 22. Cappellucci_934 incorporates by reference Cappellucci_949. *See* Ex. 1007 ¶¶ 2, 69; Pet. 26–27.

Figure 6 of Cappellucci_934 is reproduced below:



**FIG. 6**

Figure 6 depicts a diagrammatic view of one embodiment of the system. Ex. 1007 ¶ 57. Cappellucci_934 discloses that "system 600 can

16

IPR2021-01169
Patent 9,652,993 B2

also include user information profiles that enable the system to customize, localize and personalize the information provide[d] to the user" and that "[t]his information can be used to select information that is presented to a user and how that information is presented to a user." *Id.* ¶ 90.

### c. Cupp

Cupp "is directed to systems and methods for creating reading materials written to target readability levels and including target percentages of sight words and/or target phonic skill levels." Ex. 1009 ¶ 10. Cupp discloses assessing readability levels "based on the Flesch-Kincaide scale," but explains that "any readability scale may be used and . . . reading programs may be written for any grade level in accordance with the present invention." *Id.*

IPR2021-01169
Patent 9,652,993 B2

Figure 1 of Cupp is reproduced below.



*FIG. 1*

Figure 1 "is a flow chart illustrating an exemplary method for creating a written work having a selected target readability level, a selected target percentage of sight words and a selected target phonic skill level." Ex. 1009

¶ 6. Steps 102, 104, 105, and 106 relate to drafting content. *Id.* ¶ 12. The remaining steps relate to editing the drafted content to achieve a target readability level and a target percentage of sight words. *Id.* ¶¶ 13–24.

### d. Tudor

Tudor "relates to an educational method and system that adapts to and measures the proficiency of an individual in a specific subject area and assesses those abilities against a specific set of varying local, state or national standards." Ex. 1010 ¶ 16. Specifically, Tudor discloses "standards-based adaptive measurement assessment" using, for example, "a large item bank of questions with difficulty indices." *Id.* Tudor also discloses that "[t]he item bank has a plurality of learning objectives ranging from grades two to twelve" that are "derived from district, state and national standards, and high-stakes tests." *Id.* ¶ 20.

### 2. Independent Claim 1

Petitioner contends that the proposed combination of Cappellucci_949, Cappellucci_934, Cupp, and Tudor discloses each limitation of independent claim 1. Pet. 26–63. To support its arguments, Petitioner identifies certain passages in the cited references and explains the significance of each passage with respect to the corresponding claim limitation. *Id.* Petitioner also articulates reasons to combine the relied-upon aspects of Cappellucci_949, Cappellucci_934, Cupp, and Tudor, and explains why one of ordinary skill in the art would have had a reasonable expectation of success in the combination. *Id.* at 26–35. We discuss in turn the subject matter of each element in claim 1, then address general arguments as to whether Petitioner has met its burden to demonstrate unpatentability, and then address objective indicia of nonobviousness.

IPR2021-01169
Patent 9,652,993 B2

### a. Element 1.p

In its preamble, claim 1 recites "A computer implemented method for providing differentiated content to a user of a plurality of users, comprising the steps of." Ex. 1001, 20:2–4. For this language, Petitioner relies on disclosures in Cappellucci_949 and Cappellucci_934 as to providing education information to several different users. *See* Pet. 35–36 (citing Ex. 1005 ¶¶ 40, 42, 60–64, Fig. 5; Ex. 1007 ¶¶ 42, 52, 90–94; Vento Decl. ¶¶ 197–200). In the alternative and to the extent Cappellucci_949 or Cappellucci_934 do not expressly disclose "differentiated content," Petitioner relies on the combination of "Cappellucci in view of Cupp"[8] for this language, with Cupp disclosing "differentiated content." Pet. 36–37 (citing Ex. 1009 ¶¶ 25, 33, 39, 42, Fig. 2, Fig. 3; Ex. 1005 ¶¶ 42, 61–64; Vento Decl. ¶ 203).

Patent Owner does not present arguments for this language. To the extent the preamble is limiting, we find, based on the complete record, that Petitioner has demonstrated by a preponderance of the evidence that the relied-upon combination of prior art satisfies this claim language.

### b. Element 1.1

Element 1.1 recites: "obtaining in real-time, by a standards engine including one or more processors, a first unmodified content from at least one source using at least one computer." Ex. 1001, 20:5–7. For this claim language, Petitioner relies on disclosures in Cappellucci_949 and

---

[8] We understand Petitioner to use "Cappellucci" to refer to Cappellucci_949 and Cappellucci_934, together. We do the same, as Cappellucci_949 incorporates Cappellucci_934 by reference, in its entirety. *See* Ex. 1005 ¶¶ 2, 61.

Cappellucci_934.  *See* Pet. 37–39 (citing Ex. 1005 ¶¶ 47–49, 63, 72–75, Figs. 7–9; Ex. 1007 ¶¶ 29, 39, 44–46, 65–67, 79, 81, 93, Fig. 8; Vento Decl. ¶¶ 206–210, 218).  In the alternative, Petitioner also relies on Cupp as disclosing "first unmodified content."  Pet. 37 (citing Ex. 1009, Fig. 1 (step 106).  Petitioner adds that one of ordinary skill in the art "would have understood, or it would have been obvious, that Cappellucci includes a '*standards engine including one or more processors*' and that '*standards engine*' performs the '*obtaining*' of the '*first unmodified content*.'"  Pet. 39–40 (citing Ex. 1001, 5:50–53, 5:58–62; Ex. 1005, Fig. 2; Ex. 1007, Fig. 7; Vento Decl. ¶¶ 211–212).

Patent Owner does not present arguments for this element.  We find, based on the complete record, that Petitioner has demonstrated by a preponderance of the evidence that the relied-upon combination of prior art satisfies this element.

### c. Element 1.2

Element 1.2 recites: "obtaining one or more educational standards using at least one computer."  Ex. 1001, 20:8–9.  For this claim language, Petitioner relies on disclosures in Cappellucci_949 and Cappellucci_934.  *See* Pet. 40–41 (citing Ex. 1005 ¶¶ 42, 44, Fig. 2; Ex. 1007 ¶¶ 46, 60, 62, Figs. 2 & 7; Vento Decl. ¶¶ 214–218).  Petitioner adds that one of ordinary skill in the art "would have understood, or it would have been obvious, that the educational standards stored in the data tier and new educational standards that may be added to the system would have been '*obtain[ed] . . . using at least one computer*.'"  Pet. 41 (citing Ex. 1005 ¶ 72, Fig. 7; Ex. 1007 ¶¶ 46, 79, Fig. 8; Vento Decl. ¶ 216).

IPR2021-01169
Patent 9,652,993 B2

Patent Owner does not present arguments for this element.  We find, based on the complete record, that Petitioner has demonstrated by a preponderance of the evidence that the relied-upon combination of prior art satisfies this element.

### d. Element 1.3

Element 1.3 recites:

> evaluating the one or more educational standards to produce a unique standards code by analyzing at least one of one or more statements of the one or more educational standards, a structure of the one or more educational standards, a core meaning of the one or more educational standards, a related and ancillary meaning of the one or more educational standards, a learning mode referenced by the one or more educational standards, an intent of the one or more educational standards, or related critical thinking, logical, philosophical, and pedagogical elements of the one or more educational standards using at least one computer.

Ex. 1001, 20:10–23.

Petitioner asserts that "Cappellucci in view of Tudor teaches or suggests" this element.  *See* Pet. 41 (citing Pet. 12–19, 23–25, 33–35; Vento Decl. ¶¶ 219–234); *see also* Pet. 41–46 (entire discussion).  Specifically, Petitioner asserts that Cappellucci_949 (1) teaches or suggests a "unique standards code" by disclosing MLOs, which are "related to and correlated with educational standards," and (2) "further teaches, or at least suggests, that the educational resources (including educational standards) are used to produce, or at least revise, the MLOs."  Pet. 42 (citing Vento Decl. ¶¶ 221–222), 43 (citing Ex. 1005 ¶¶ 24, 42, 51, 52, 72, Fig. 2, Fig. 7; Vento Decl. ¶¶ 223–224).  To the extent Cappellucci does not teach how the MLOs are produced, Petitioner relies on Tudor as "teach[ing] or suggest[ing] '*evaluating the one or more educational standards to produce*' learning

22

IPR2021-01169
Patent 9,652,993 B2

objectives." Pet. 43–44 (citing Vento Decl. ¶ 226). According to Petitioner, it would have been obvious to one of ordinary skill in the art "to '*evaluat[e] . . . one or more educational standards to produce*' essential learning objectives, as disclosed by Tudor, to produce the MLO's ('*a unique standards code*') disclosed in Cappellucci for at least the reasons" on pages 33–35 of the Petition. Pet. 44 (citing Vento Decl. ¶¶ 227–228).

    Patent Owner presents three arguments as to why Petitioner has allegedly failed to show that the relied-upon combination discloses or renders obvious this element (and similar element 8.6 in claim 8). *See* PO Resp. 47–53; PO Sur-reply 16–18. We address each in turn below.

    First, Patent Owner argues that Petitioner has not shown that Cappellucci teaches or suggests the recited "unique standards code." *See* PO Resp. 47–48. We disagree. As acknowledged by Patent Owner (PO Resp. 47), Petitioner takes the position that the master learning objectives ("MLOs") in Cappellucci_949 are "unique standards codes" and identifies "M6.17.1" shown in Table 1 (which is "Understands concept of addition") as an exemplary "unique standards code." *See* Pet. 41–43 (citing, e.g., Ex. 1005 ¶ 54 (Table 1); Vento Decl. ¶¶ 220–225). Patent Owner does not dispute this position,[9] but rather argues that the Vento Declaration should be "given no weight on this issue" because, *during his deposition*, Mr. Vento allegedly could not provide an example of a "unique standards code" and could not "identify an *MLO* in Cappellucci until prompted by Petitioner's

_____

    [9]  Moreover, as noted by Petitioner, Dr. Bederson, Patent Owner's declarant, does not dispute that that "M6.17.1" in Cappellucci_949 is an example of a "unique standards code." *See* Ex. 1044, 135:10–14, *cited at* Pet. Reply 21.

IPR2021-01169
Patent 9,652,993 B2

lawyer." PO Resp. 47–48 (citing Ex. 2012, 32:10–39:15, 75:10–78:19, 80:19–82:11, 119:14–120:21, 126:3–128:7).

Having considered the relevant section of the Petition (Pet. 41–46) and the deposition testimony highlighted by Patent Owner, we are persuaded by Petitioner's position as to Cappellucci_949 disclosing "unique standards codes." In his Declaration, Mr. Vento presents the *same position* presented by Petitioner—i.e., that the MLOs in Cappellucci_949 are "unique standards codes" and that "M6.17.1" is an example of a "unique standards code":

> In Figure 4 and Table 1, Cappellucci '949 describes MLOs having a unique numerical scheme where each node and leaf has a unique numerical code. EX1005, ¶¶54-59. For example, "The general category, 'Real Number Systems' (M6) is a learning objective even though it serves also as a categorization for more detailed and granular learning objectives, such as 'Understands concept of addition' (M6.17.1)." EX1005, ¶54. The Cappellucci references' MLOs are "*unique standards codes.*"

Vento Decl. ¶ 222, *cited at* Pet. 42. We do not view the fact that Mr. Vento could not recall that same example during his deposition as a reason to wholly discredit his (or Petitioner's) position, and Patent Owner cites to no case law or other support for such a proposition. As stated by counsel for Patent Owner, the purpose of Mr. Vento's deposition was to provide testimony "about" his Declaration (*see* Ex. 2012, 8:16–20), not to show that the Declaration had been committed to memory.

Second, Patent Owner argues that Petitioner has not shown that the relied-upon prior art satisfies the recited requirement of "evaluating the one or more educational standards to produce a unique standards code." *See* PO Resp. 48–51. Specifically, Patent Owner initially asserts that the MLOs in Cappullucci_949 are "not the same" as the recited "unique standards code" in that, "[a]n MLO, as described by Cappellucci itself, is a 'master learning

24

IPR2021-01169
Patent 9,652,993 B2

objective,' such as "understands concept of addition" whereas "the claimed unique standards code is a *code*, such as a 'unique numerical code.'" *Id.* at 48 (citing Ex. 1005 ¶¶ 51, 54; Ex. 1007 ¶ 72; Ex. 1001, 14:34–39; Ex. 2012, 28:7–13, 73:19–22; Bederson Decl. ¶ 89). We do not agree with this distinction. The record supports Petitioner's contrary position that "Cappellucci's MLOs include a unique numerical scheme." Pet. Reply 21. This is supported by Mr. Vento's testimony that, "[i]n Figure 4 and Table 1, Cappellucci '949 describes MLOs having a unique numerical scheme where each node and leaf has a unique numerical code." Vento Decl. ¶ 222 (citing Ex. 1005 ¶¶ 54–59), *cited at* Pet. 42. Further, in numerous instances, Cappellucci_949 refers to specific MLOs using both a textual description and a unique numerical code. *See, e.g.*, Ex. 1005 ¶ 54 (discussing "more detailed and granular learning objectives, such as 'Understands concept of addition' (M6.17.1)"), ¶ 57 (discussing how "the MLO, M6.14 from the table above, is the learning objective"), ¶ 58 (discussing "the MLO M6.14"), ¶ 59 (discussing "MLO number M6.14"); Pet. 42 (citing Ex. 1005 ¶¶ 54–59).

We agree, however, with Patent Owner that Cappellucci *alone* "does not disclose how codes like M6, M6.17/1 and the like ***are produced*** for Cappellucci's respective learning objectives" (as presented in the alternative to the reliance on Tudor for this claimed aspect). *See* Pet. 43–44. As argued by Patent Owner, the aspects of Cappellucci_949 relied on by Petitioner address the revising and existence of the MLOs, not how they are produced. *See* PO Resp. 49 (top paragraph) (citing Pet. 43 (citing Ex. 1005 ¶ 52; Vento Decl. ¶ 224)).

We turn now to Petitioner's alternative reliance on Tudor as to "evaluating the one or more educational standards to *produce*" learning

IPR2021-01169
Patent 9,652,993 B2

objectives.  *See* Pet. 43–45 ("But to the extent Cappellucci does not expressly disclose how the MLOs ('*unique standards code*') are produced, Tudor teaches, suggests, or renders obvious how the MLOs would have been produced.").  In this discussion, Petitioner highlights, for example, Tudor's disclosure that, "[b]y analyzing these standards and collating them with the learning objectives from a plurality of standardized tests, a common set of essential learning objectives and skills for each subject for all grade levels are generated to form the item bank." Ex. 1010 ¶ 35, *quoted at* Pet. 44.

Patent Owner argues that "Petitioner provides no meaningful explanation as to why [one of ordinary skill in the art] would have modified Cappellucci to produce an MLO when, according to Petitioner, Cappellucci *already has* MLOs" and also argues that "Petitioner says Tudor's teachings would have motivated [one of ordinary skill in the art] to modify Cappellucci, but does not explain why." PO Resp. 50 (citing Pet. 33–34, 43). We disagree. Petitioner's position is not that one of ordinary skill in the art would have incorporated the teachings of Tudor to produce MLOs *in addition to* the ones already in Cappellucci_949; instead, Petitioner expressly states that one of ordinary skill in the art, in developing the combined system, would have incorporated the teachings of Tudor to produce the MLOs already "disclosed in Cappellucci." *See* Pet. 44 (discussing how it would have been obvious to one of ordinary skill in the art "to '*evaluat[e] . . . one or more educational standards to produce*' essential learning objectives, as disclosed by Tudor, to produce the MLO's ('*a unique standards code*') disclosed in Cappellucci"), 33 (stating that one of ordinary skill in the art "would have been motivated to combine Tudor's teachings related to evaluating standards to produce a set of essential

26

IPR2021-01169
Patent 9,652,993 B2

learning objectives and lesson plans in the systems and methods disclosed by the Cappellucci references and in the systems and methods of the combined Cappellucci-Cupp system" and that "[t]o the extent Cappellucci does not expressly disclose how the MLOs are produced, [one of ordinary skill in the art] would have looked to Tudor, who teaches evaluating educational standards to produce a common set of essential learning objectives" (citing Vento Decl. ¶¶ 187–194; Ex. 1005 ¶¶ 51–59, Figs. 2–4; Ex. 1007 ¶¶ 25–26, Fig. 7; Ex. 1010 ¶¶ 20, 35, 37, 41, 50)).

Further, contrary to Patent Owner's assertion (PO Resp. 50), Petitioner *does* explain *why* a skilled artisan would have used Tudor's method to produce the MLOs in Cappellucci, stating, that one of ordinary skill in the art "would have recognized that deriving learning objectives from district, state, and national educational standards [(as expressly taught in Tudor)] would provide learning objectives that are commensurate with the standards mandated by the educational authorities." Pet. 34 (citing Vento Decl. ¶ 190) (discussing Ex. 1010 ¶¶ 20, 35). Patent Owner contends that this statement by Petitioner "does not address creation of a unique code" (PO Resp. 50), but it does; the "learning objectives" referenced in that statement would—in the proposed combination—be the MLOs from Cappellucci_949, which, as discussed above, *include* the recited "unique standards code[s]."

Third, Patent Owner argues that Petitioner has not shown that the proposed combination satisfies the requirement "to produce a unique standards code by analyzing at least one of" the seven options listed in element 1.3. *See* PO Resp. 51–53. Patent Owner argues that "the only discussion in Tudor is a generic direction to 'analyze standards,' stating

27

IPR2021-01169
Patent 9,652,993 B2

'[b]y analyzing these standards and collating them with the learning objectives from a plurality of standardized tests, a common set of essential learning objectives and skills for each subject for all grade levels are generated to form the item bank.'" *Id.* at 52–53 (quoting Ex. 1010 ¶ 35). According to Patent Owner, "there is no mention in Tudor of how [one of ordinary skill in the art] would accomplish the 'analy[sis]'" disclosed. *Id.* at 53 (citing Bederson Decl. ¶ 96). Patent Owner contends that "Petitioner presents no evidence [one of ordinary skill in the art] would have understood Tudor's standards analysis to be done in the way claimed." *Id.* (citing Bederson Decl. ¶ 96).

Petitioner responds that the requirement at issue "is satisfied by merely evaluating one educational standard to produce a unique standards code by analyzing one statement of the one educational standard" and states that it "explained that [one of ordinary skill in the art] 'would have understood, or it would have been obvious, that Tudor's disclosed analysis of educational standards to produce learning objectives' include analyzing at least 'one or more statements' in the educational standard, and such statements were well-known in educational standards." Pet. Reply 21–22 (citing Pet. 44–45; Vento Decl. ¶¶ 227–229). The complete record supports Petitioner's position.

As an initial matter, Patent Owner does not contest Petitioner's proposed construction of element 1.3 as requiring "analyzing" *only one* of the seven listed possibilities. We agree with Petitioner as to that construction, as element 1.3 expressly states "analyzing at least one of" before listing the seven options with a disjunctive "or" between the last two options. *See* Ex. 1001, 20:10–23. Further, to the extent argued by Patent

28

IPR2021-01169
Patent 9,652,993 B2

Owner, we agree with Petitioner (Pet. Reply 22) that although Tudor does not expressly disclose analyzing "one or more statements of the one or more educational standards" as recited, the disclosures of "analyzing these standards" (Ex. 1010 ¶ 35, *quoted at* Pet. 44)—i.e., the "district, state and national [educational] standards" (Ex. 1010 ¶ 20, *quoted at* Pet. 44; Ex. 1010 ¶ 30)—would have necessarily included "analyzing . . . *one or more statements* of the one or more educational standards."

Patent Owner's third argument focuses not on the construction of the language at issue, but on whether one of ordinary skill in the art would have known *how* to perform the analysis disclosed in Tudor. *See, e.g.*, PO Resp. 53 (arguing that "there is no mention in Tudor of how [one of ordinary skill in the art] would accomplish the 'analy[sis]'"). As an initial matter, element 1.3 recites "analyzing . . . one or more statement of the one or more educational standards" and Tudor discloses, e.g., "analyzing these standards" (Ex. 1010 ¶ 35); it is unclear why more than that is required to satisfy this aspect of element 1.3 and Patent Owner provides no evidence or argument supporting its contention that more is required. *See* Pet. Reply 22 ("Petitioner explained that [one of ordinary skill in the art] 'would have understood, or it would have been obvious, that Tudor's disclosed analysis of educational standards to produce learning objectives' include analyzing at least 'one or more statements' in the educational standard, and such statements were well-known in educational standards. Nothing more is required." (citing Pet. 44–45; Vento Decl. ¶¶ 227–229)).

Moreover, Petitioner discusses—for almost *two full pages* in the Petition—why one of ordinary skill in the art would have understood *how* to analyze educational standards to produce learning objectives. *See* Pet. 44–

29

IPR2021-01169
Patent 9,652,993 B2

46 (citing Ex. 1010 ¶¶ 31, 35, 50–51; Ex. 1017; Vento Decl. ¶¶ 229–233). In this discussion (for example), Petitioner states—in testimony supported by the Vento Declaration—that one of ordinary skill in the art "would have known to analyze the content of a given educational standard to understand the standard and how the standard would influence the learning objectives." Pet. 45 (citing Vento Decl. ¶ 229).

Patent Owner dismisses this statement as "not address[ing] how [one of ordinary skill in the art] would have read Tudor or address the particular claim limitations." PO Resp. 53. But the overall discussion in the Petition begins with, and squarely addresses (as phrased by Petitioner), why one of ordinary skill in the art "would have understood, or it would have been obvious, that Tudor's disclosed analysis of educational standards to produce learning objectives" would have included analyzing at least one of the seven options recited in element 1.3. Pet. 44–45 (citing Ex. 1010 ¶ 35; Vento Decl. ¶ 229); *see also* Pet. 44–46 (overall discussion). We find Petitioner's and Mr. Vento's discussion on this issue adequately supported by the record.

We also disagree with Patent Owner's assertion that "Petitioner provides no motivation to combine (including any explanation why or how Tudor would have been modified) or [reasonable expectation of success] to support obviousness beyond bald assertion." PO Resp. 53. Petitioner provides *at least ten pages* of discussion as to the reasons to combine Cappellucci with Cupp and Tudor. *See* Pet. 26–35. And those pages cite to approximately *fourteen pages* of testimony by Mr. Vento. *See* Vento Decl. ¶¶ 165–194. For example, Petitioner discusses, with support from Mr. Vento, why it would have been obvious to one of ordinary skill in the art "to use Cupp's methods to determine the readability level of a news article

IPR2021-01169
Patent 9,652,993 B2

obtained using Cappellucci's system and to edit the news article to generate
different versions written at second-, fourth-, and six grade reading levels to
accommodate different readers' abilities." Pet. 28 (citing Vento Decl.
¶ 176).

For the reasons above, we find, based on the complete record, that
Petitioner has demonstrated by a preponderance of the evidence that the
relied-upon combination of prior art discloses the subject matter of element
1.3. Further, we determine, in light of the complete record, that Petitioner
has shown by a preponderance of the evidence that one of ordinary skill in
the art at the time of the invention would have had reason to modify the prior
art as proposed to result in the subject matter of element 1.3.

### e. Element 1.4

Element 1.4 recites: "analyzing, by the standards engine, the first
unmodified content to determine a reading difficulty level of the first
unmodified content in accordance with each of the one or more educational
standards." Ex. 1001, 20:24–27. Petitioner asserts that "Cappellucci in view
of Cupp teaches or suggests" this element. *See* Pet. 46 (citing Pet. 12–23,
27–33; Vento Decl. ¶¶ 235–242); *see also* Pet. 46–49 (entire discussion).
Specifically, Petitioner discusses why Cupp's step 108 "teaches '*analyzing*'
content '*to determine a reading difficulty level*'" and why one of ordinary
skill in the art "would have further understood, or it would have been
obvious, that Cupp's '*reading difficulty level[s] . . . accord[] with each of
the one or more educational standards*.'" Pet. 47 (citing Ex. 1009 ¶ 13,
Fig. 1; Vento Decl. ¶¶ 237, 239). As to the latter, Petitioner highlights that
"Cupp discloses that readability levels may be 'based on the Flesch-
Kincaide scale' but also discloses that 'any readability scale may be used.'"

31

IPR2021-01169
Patent 9,652,993 B2

*Id.* (quoting Ex. 1009 ¶ 10). Petitioner adds that it would have been obvious to one of ordinary skill in the art "to use the readability routine disclosed by Cupp to determine a reading difficulty level of a news article disclosed by Cappellucci_934 in order to determine which users should be provided a copy of the news article (based on the article's reading difficulty level and the user's grade level)." Pet. 48 (citing Vento Decl. ¶ 238; Pet. 27–33).

Patent Owner argues that Petitioner has failed to show that the proposed combination discloses or renders obvious this element (and similar element 8.7). *See* PO Resp. 36–37; PO Sur-reply 14–15. Specifically, Patent Owner argues that

> Petitioner's argued motivation (*i.e.*, that POSITA would add Cupp to determine the reading difficulty level of the article to match it to the grade level of the user) does not make sense because in Petitioner's view Cappellucci's content is already matched to a grade level (such that it could be matched to the grade level of the student).

PO Resp. 37. Thus, according to Patent Owner, one of ordinary skill in the art "would have had no reason to modify Cappellucci with Cupp, which Petitioner relies on exclusively for determining the reading level of its news articles." *Id.*

This argument does not show an error in Petitioner's position. Here, Patent Owner argues that one of ordinary skill in the art would not have incorporated the aspects of Cupp relied on as to this element because the identified "first unmodified content" in Cappellucci *already has* a "reading difficulty level" associated with it. But element 1.4 recites the step of "analyzing . . . the first unmodified content *to determine* a reading difficulty level of the first unmodified content;" element 1.4 does not merely recite the presence of the *result* of that analysis. Thus, as argued by Petitioner,

IPR2021-01169
Patent 9,652,993 B2

although Cappellucci discloses the *result* of the analysis, Petitioner properly relied on Cupp to explain—and incorporate into the combination—*how* such a result would have been obtained (i.e., the step recited in element 1.4).  *See* Pet. Reply 15 ("Further, limitation 1.4/8.7 requires 'analyzing . . . the first unmodified content *to determine* a reading difficulty level.' Because Cappellucci does not expressly teach determining the reading difficultly level of content, the Petitioner correctly relied on Cupp to supply the missing teaching and explained how and why a POSA would have combined the references' teachings." (citing Pet. 46–49; Vento Decl. ¶¶ 235–242)).

We do not view Petitioner's reliance on Cupp as indicating mere "hindsight reconstruction" (PO Sur-reply 14), but rather using knowledge in the prior art to create a fully functioning system, which would include *how* to perform the "analyzing" step in element 1.4.  *See In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971) ("Any judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper.").

We find, based on the complete record, that Petitioner has demonstrated by a preponderance of the evidence that the relied-upon combination of prior art discloses the subject matter of element 1.4.  Further, we determine, in light of the complete record, that Petitioner has shown by a preponderance of the evidence that one of ordinary skill in the art at the time of the invention would have had reason to modify the prior art as proposed to result in the subject matter of element 1.4.

IPR2021-01169
Patent 9,652,993 B2

### f.  Element 1.5

Element 1.5 recites:

> generating in real-time, by a differentiation engine including one
> or more processors, a plurality of aligned versions of the first
> unmodified content by transforming format and content of the
> first unmodified content, wherein each of the plurality of aligned
> versions is transformed, respectively, according to a reading
> difficulty level associated with corresponding one of the one or
> more educational standards, wherein generating the plurality of
> aligned versions of the first unmodified content further
> comprises breaking up the first unmodified content into
> sentences, selecting a different vocabulary and sentence length
> according to each reading difficulty level in accordance with the
> unique standards code while maintaining subject matter of the
> first unmodified content.

Ex. 1001, 20:28–42.

Petitioner asserts that "Cappellucci in view of Cupp teaches or
suggests" this element.  *See* Pet. 49 (citing Pet. 12–23, 27–33; Vento Decl.
¶¶ 243–256); *see also* Pet. 49–56 (entire discussion).  Specifically, Petitioner
first discusses how "Cappellucci in view of Cupp teaches or suggests
'*generating . . . a plurality of aligned versions of the first unmodified content
by transforming format and content of the first unmodified content*'" by
highlighting  Cupp's teachings of, for example, "'edit[ing]' content 'until the
readability level of the work is equal to the target readability level, the
percentage of sight words in the work is equal to the target percentage of
sight words, and the phonic skill level of the work is equal to the target
phonic skill level.'"  Pet. 50 (quoting Ex. 1009, Abstract).

Petitioner then discusses why "it would have been obvious to [one of
ordinary skill in the art] to implement Cupp's method of Figure 1, beginning
at step 108, in the system disclosed by Cappellucci to, among other things,

34

IPR2021-01169
Patent 9,652,993 B2

'*generat[e] . . . a plurality of aligned versions of the first unmodified content*,' such as editing a news article to generate different versions written at second-, fourth-, and sixth-grade reading levels." Pet. 51 (citing Pet. 27–33; Vento Decl. ¶¶ 245–246). Petitioner adds that one of ordinary skill in the art "would have understood, or it would have been obvious, that Cupp's methods would '*generat[e] in real-time*' the '*aligned versions of the first unmodified content*'" and discusses why one of ordinary skill in the art "would have understood, or it would have been obvious, that Cappellucci in view of Cupp includes a '*differentiation engine including one or more processors.*'" Pet. 52–53 (citing Vento Decl. ¶¶ 248–249; Ex. 1009 ¶¶ 39, 42; Ex. 1007, Figs. 1, 6).

In addition, Petitioner states that "Cappellucci in view of Cupp further teaches or suggests that '*each of the plurality of aligned versions is transformed, respectively, according to a reading difficulty level associated with corresponding one of the one or more educational standards*'" because, according to Petitioner, one of ordinary skill in the art "would have understood, or it would have been obvious, that Cupp's methods would have been used to create different versions of a written text for any or all reading levels." Pet. 54–55 (citing Pet. 27–33, 46–49; Vento Decl. ¶ 251). Petitioner then addresses why Cupp teaches "breaking up the first unmodified content into sentences" and "selecting a different vocabulary and sentence length according to each reading difficulty level." Pet. 55–56 (citing Vento Decl. ¶¶ 252–253; Ex. 1009 ¶¶ 15, 25–38, Figs. 2–3). Further, Petitioner explains why one of ordinary skill in the art (1) "would have understood, or it would have been obvious, that Cupp's reading difficulty levels are '*in accordance with the unique standards code*'" and (2) "would

35

IPR2021-01169
Patent 9,652,993 B2

have understood, or it would have been obvious, that Cupp's methods
"*maintain[ ] subject matter of the first unmodified content*." Pet. 56 (citing
Vento Decl. ¶¶ 254–255; Ex. 1009 ¶¶ 22, 34, 35; Ex. 1007 ¶ 90).

Patent Owner presents four arguments as to why Petitioner allegedly
fails to prove the disclosure or obviousness of element 1.5 (and similar
element 8.8). *See* PO Resp. 6–36; PO Sur-reply 1–14. First, Patent Owner
argues that Cupp does not disclose or suggest that the generated "plurality of
aligned versions" "maintain[] subject matter of the first unmodified content"
as recited. PO Resp. 30–36; PO Sur-reply 10–14. In support, Patent Owner
highlights that, in relied-upon Figure 3, Cupp discloses "***deleting entire
sentences*** to reduce the reading level." PO Resp. 32–33 (citing Ex. 1009,
Fig. 3 (step 318 ("Delete Sentence"), ¶ 37)). According to Patent Owner,
any person of ordinary skill in the art would have understood this disclosure
"as expressing, at best, *complete indifference* to whether any particular
aspects of subject matter are maintained." *Id.* at 32 (citing Bederson Decl.
¶ 73). Patent Owner states that "Cupp certainly says nothing about deleting
the longest sentence only if it does *not* contain an important topic, an
important idea or an important element." *Id.* at 34.

This argument does not identify a deficiency in Petitioner's position.
As an initial matter, and as argued by Petitioner, the proposed combination
need not, in every instance, include Cupp's step of deleting sentences
highlighted by Patent Owner. *See* Pet. Reply 13. Specifically, as noted by
Petitioner and agreed upon by Patent Owner, claim 1 includes *both*
increasing *and* decreasing the "reading difficulty level" of the "first
unmodified content" when generating the "plurality of aligned versions." *Id.*
(citing PO Resp. 6 (discussing how element 1.5 "require[s] that each and

IPR2021-01169
Patent 9,652,993 B2

every aligned version must: (1) be adjusted to a reading difficulty level that is *increased or decreased* compared to the original unmodified content" (emphasis added))); Bederson Decl. ¶ 46 (same). Relied-upon Figure 3 of Cupp is a flow chart illustrating "an exemplary method for editing a written work to decrease its readability level" (Ex. 1009 ¶ 8), whereas Figure 2—*also* relied on by Petitioner as to element 1.5 (*see* Pet. 51–52)—is a flow chart illustrating "an exemplary method for editing a written work to increase its readability level" (Ex. 1009 ¶ 7). Thus, even assuming that deleting a sentence *would* fail to maintain the subject matter in the "plurality of aligned versions," that step would not be included in *all* of the possible instances of the proposed combination relied on by Petitioner. *See* Pet. Reply 13 ("It is thus undisputed that Cupp's method for increasing readability, which the Petition relied on, maintains the original content's subject matter and satisfies the claims."), 14 (discussing how deleting sentences need not be performed in Cupp); *see also ParkerVision, Inc. v. Qualcomm Inc.*, 903 F.3d 1354, 1363 (Fed. Cir. 2018) ("[A] prior art product that sometimes, but not always, embodies a claimed method nonetheless teaches that aspect of the invention."), *cited at* Pet. Reply 14.

In addition, we are persuaded that *even deleting an entire sentence* from the "first unmodified content" when generating one of the "plurality of aligned versions" (if included in the proposed combination) would not necessarily "change the original content's subject matter" (as phrased by Petitioner). Pet. Reply 13. Instead, we generally agree with Petitioner that "[o]mitting a sentence from an article doesn't change the article's subject matter—an article about terrorism is still about terrorism if a sentence is

IPR2021-01169
Patent 9,652,993 B2

deleted." *Id.*[10]  Patent Owner does not explain why omitting one sentence would necessarily change the "subject matter," but instead highlights that Cupp does not contain "any disclosure that modifications are made with specific regard to maintaining the subject matter of the original unmodified content." PO Sur-reply 12.  We do not find Cupp's *silence* on this issue to support Patent Owner's assertion that deleting a sentence from the "first unmodified content" would necessarily change the content's subject matter. Indeed, Cupp also lacks disclosure that deleting a sentence *does change* the subject matter.

Moreover, as noted by Petitioner, Cappellucci_934 discloses that students at different grade levels would receive "the same informational content." Pet. Reply 14 (quoting Ex. 1007 ¶ 90) (citing Pet. 31–32, 56, 63). Although we agree with Patent Owner that one of ordinary skill in the art may not view changing merely font size and color (provided as exemplary changes in paragraph 90 of Cappellucci_934) as changing "informational content" (PO Sur-reply 13), the fact remains that Cappellucci_934 provides a teaching—relied on by Petitioner (Pet. 31–32, 56, 63)—that students at different grade levels would receive the same "informational content" even if it "will appear different on each student's computer." Ex. 1007 ¶ 90.

---

[10]  As to the meaning of "maintaining subject matter," the '993 patent explains that the system in Figure 2 "delivers differentiated content to each user that is aligned to the user's skill level(s), maintaining the *same content topics, main ideas and core elements*, and thereby providing evaluators with the ability to engage whole-class learning use individually differentiated content." Ex. 1001, 13:6–9 (emphasis added).  Dr. Bederson agrees that these emphasized terms provide examples of "subject matter." *See* Bederson Decl. ¶ 77.

IPR2021-01169
Patent 9,652,993 B2

Second, Patent Owner argues that Petitioner fails to prove the disclosure or obviousness of "generating . . . a *plurality* of aligned versions of the first unmodified content" in element 1.5. *See* PO Resp. 15–24; PO Sur-reply 1–6. Specifically, Patent Owner initially argues that "[n]either Cupp nor Cappellucci discloses creating a *plurality* of versions *of the same content*, and Petitioner's obviousness argument does not fill this hole." PO Resp. 16. Patent Owner also asserts that Petitioner has not explained how or why one of ordinary skill in the art would have modified the prior art to arrive at the limitation at issue. *See id.* at 17–18. Although we agree with Patent Owner that neither Cupp nor Cappellucci *alone* teaches the entirety of the limitation at issue in element 1.5, we disagree that the Petitioner's discussion of the proposed combination fails to address this recitation. *See* Pet. Reply 7 (stating that, with this argument, Patent Owner's "attack on the references individually ignores the asserted combination").

In the discussion of the limitation at issue, Petitioner states that "it would have been obvious to [one of ordinary skill in the art] to implement Cupp's method of Figure 1, beginning at step 108, in the system disclosed by Cappellucci to, among other things, '*generat[e] . . . a plurality of aligned versions of the first unmodified content*,' such as editing a news article to generate different versions written at second-, fourth-, <u>and</u> sixth-grade reading levels." Pet. 51 (underlining added) (citing Pet. 27–33; Vento Decl. ¶¶ 245–246). With this and the citations to earlier portions of the Petition and the Vento Declaration, Petitioner posits that one of ordinary skill in the art would have implemented Cupp's process with a "plurality of aligned versions." Explaining this position further, in the relied-upon earlier portion of the Petition, Petitioner states:

IPR2021-01169
Patent 9,652,993 B2

> Based on Cupp's teachings, it would have been obvious to [one of ordinary skill in the art] to implement Cupp's method of Figure 1, beginning at step 108, in the system disclosed by Cappellucci to (i) determine the readability level of the content disclosed by Cappellucci and (ii) edit the content to generate one or more modified versions having different target readability levels.  For example, it would have been obvious to [one of ordinary skill in the art] to use Cupp's methods to determine the readability level of a news article obtained using Cappellucci's system and to edit the news article to generate different versions written at second-, fourth-, and six grade reading levels to accommodate different readers' abilities.

Pet. 28–29 (emphasis added) (citing Vento Decl. ¶ 176; Ex. 1007[11] ¶¶ 90, 93), *cited at* Pet. 51.  This position as to the view of one of ordinary skill in the art is supported by the cited testimony of Mr. Vento (*see* Vento Decl. ¶ 176) as well as by at least cited paragraph 90 of Cappellucci_934, which discloses a system with user profiles that include "grade level" and discloses modifying the presentation of information based on grade level without changing the "informational content."

Moreover, cited paragraphs 245 and 246 of the Vento Declaration (*see* Pet. 51) provides testimony supporting Petitioner's position:

> For example, it would have been obvious to [one of ordinary skill in the art] to use Cupp's methods to decrease the readability level of the text to generate versions at kindergarten and first-grade reading levels.  *See* EX1007, ¶90; EX1009, ¶4. It also would have been obvious to [one of ordinary skill in the art] to use Cupp's methods to increase the readability level of this text to generate versions at the third- and fourth-grade reading levels. *See* EX1007, ¶90; EX1009, ¶4.  Indeed, [one of ordinary skill in the art] would have understood, or it would have been obvious,

---

[11]  Although Petitioner cites paragraphs 90 and 93 of Cupp (Ex. 1009), we understand Petitioner to have intended to cite to Cappellucci_934 (Ex. 1007).  *See* Vento Decl. ¶ 176 (citing Ex. 1007 ¶¶ 90, 93).

IPR2021-01169
Patent 9,652,993 B2

> that Cupp's methods would have been used to create different
> versions of a written text for any or all reading levels.  It was well
> known at the time of the '993 patent that "not all students in the
> same class read at the same level" and that teachers "typically
> face a classroom of students with reading ability from the 2nd to
> the 12th grade."  EX1022, 4.   Using Cupp's methods to
> "*generat[e] … a plurality of aligned versions of the first
> unmodified content*" would permit a teacher in such a mixed-
> ability classroom to teach from the same text while
> accommodating different students' reading and comprehension
> abilities.

Vento Decl. ¶ 246; *see also* Pet. 30–31 & Pet. Reply 9 (both discussing how classrooms may include students with different reading abilities).  We view this discussion, along with the aspects of the record discussed above, as adequately explaining *why* one of ordinary skill in the art would have modified the relied-upon methods of Cupp in the context of the Cappellucci system to arrive at the limitation at issue—i.e., to permit a teacher to teach from the same text while accommodating the students' different reading and comprehension abilities in a single classroom.  *See* Pet. 28–29 (citing Vento Decl. ¶ 176; Ex. 1007 ¶¶ 90, 93); Vento Decl. ¶ 246, *cited at* Pet. 51; *cf.* PO Sur-reply 3 (contending that Petitioner and Mr. Vento fail to provide "any discussion of any motivation to modify Cupp such that [one of ordinary skill in the art] would want to achieve, let alone how to achieve, generating plurality of aligned versions from a first unmodified content").  For at least this reason, the editing methods of Cupp would have been performed to create a plurality of different versions of the unmodified content of Cappellucci, especially in light of the disclosures in Cappellucci as to providing differentiated content in mixed-ability classrooms.  *See* Pet. 31–32 (citing Ex. 1007 ¶¶ 42, 90; Vento Decl. ¶ 182).

IPR2021-01169
Patent 9,652,993 B2

On this issue, Patent Owner posits that Petitioner did not argue that
"*Cappellucci* teaches creating aligned content at different reading levels."
PO Resp. 16. As noted above, we agree that Cappellucci does not teach the
*entirety* of the limitation at issue; but for the reasons also discussed above,
Petitioner relies on Cupp for methods of "generating" aligned versions of
"first unmodified content" and relies on Cappellucci for providing students
in a mixed-ability classroom with a "plurality of aligned versions" of
content, once generated. Thus, although Cappellucci discusses the issue of
"*having content available at different reading levels*" (PO Resp. 18), Cupp is
relied on by Petitioner as to how to *create* such content for a mixed-ability
classroom. Thus, contrary to Patent Owner's argument, Petitioner does not
rely on Cappellucci *alone* to address the *entirety* of the limitation at issue in
element 1.5. *See id.* at 18–20.

As to Patent Owner's argument that Petitioner "fails to explain how,
in its proposed combination, the readability level for any version (let alone
multiple versions) would be selected so that the modifications described in
Cupp could even proceed" (PO Resp. 18), Patent Owner has not explained
or provided evidence to indicate why a "selection" of the reading difficulty
level for each of the "plurality of aligned versions" is required by element
1.5.

Patent Owner also argues that Petitioner has not adequately explained
why one of ordinary skill in the art "would have been motivated, based on
Cappellucci's disclosure of modifying the format of content, to look for
other ways to modify content." PO Resp. 21–22 (citing Pet. 31–32). We
disagree. As discussed above, in the highlighted discussion on pages 31 and
32 of the Petition, Petitioner presents certain *express* disclosures in

42

IPR2021-01169
Patent 9,652,993 B2

Cappellucci—as to providing differentiated content in mixed-ability classrooms—to explain *why* one of ordinary skill in the art would have looked elsewhere (such as to Cupp) to understand *how* to create different versions of unmodified content (so they could be provided as taught in Cappellucci). *See* Pet. 31 (discussing why "Cappellucci provides express teachings or suggestions that would have led [one of ordinary skill in the art] to Cupp's disclosures about modifying texts' readability to target levels"); *see also* Pet. Reply 9 (discussing how "Cappellucci teaches presenting content in different formats for different students but 'does not describe creating different versions that have *different reading levels* by changing, *e.g.,* 'vocabulary and sentence length,' as claimed" and that "Cupp supplies this missing teaching").

Patent Owner also asserts that "there would be no reasonable expectation of success . . . because the results in creating versions at different reading levels would not have been predictable given that Cupp changes or deletes sentences or change[s] vocabulary without any goal of maintaining the subject matter or having the same unique standards code . . . ." PO Resp. 22 (citing Bederson Decl. ¶ 61). This argument, however, does not actually address Petitioner's position as to why there would have been a reasonable expectation of success, which we find supported by the record. *See* Pet. 32–33 (citing Vento Decl. ¶ 185). Instead, this argument essentially restates the first argument above as to Cupp deleting sentences, which does not show a deficiency in Petitioner's positions.

Patent Owner also argues that Petitioner has not shown that, in the context of the proposed combination, the method of Cupp would have

IPR2021-01169
Patent 9,652,993 B2

modified content such that the "quality of the machine-produced version would have been reliably sufficient for educational purposes." PO Resp. 22–23 (citing Bederson Decl. ¶ 62). As an initial matter, the challenged claims do not recite a requirement as to a level of "quality" "sufficient for educational purposes." Thus, this argument does not distinguish the proposed combination based on a *claimed* feature. *See* Pet. Reply 10 (stating that this argument is "not commensurate with the claims' scope").

Moreover, to the extent Patent Owner contends that the proposed combination would have "quality" issues undermining "educational purposes," that draws into question how the applicant overcame such a problem when this issue is not discussed in the '993 patent in any passage identified by Patent Owner. *See Smith & Nephew, Inc. v. Rea*, 721 F.3d 1371, 1381–82 (Fed. Cir. 2013) (addressing a patent owner's argument as to an alleged technical issue in the proposed combination, stating that "[t]his naturally raises the question of how [patent owner] managed to make such a combination work").

Third, Patent Owner argues that Petitioner has failed to prove that, in the proposed combination, "each and every aligned version match[es] '*the unique* standards code'—a single, unique code produced (as specified in Limitation 1.3) by 'evaluating the one or more education standards.'" PO Resp. 25; *id.* at 24–30; PO Sur-reply 7–10. Throughout the relevant sections of the Response, Patent Owner consistently asserts that the generated "plurality of aligned versions" must "match" the recited "unique standards code." PO Resp. 25 (quoted above), 26 (stating that "the claims require that the aligned versions match a unique standards code"), 27. As noted by Petitioner, however, element 1.5 does not include the requirement that the

44

IPR2021-01169
Patent 9,652,993 B2

generated "plurality of aligned versions" *match* the recited "unique standards code." *See* Pet. Reply 10 (asserting that this argument "fails at least because it's not commensurate with the claims' scope").

Patent Owner and Dr. Bederson use "match" as a synonym for "in accordance with" (PO Resp. 25–27; PO Sur-reply 7; Ex. 1044 (Bederson Deposition), 137:12–138:6), but that is not supported by the record for two reasons. As the first, neither Patent Owner nor Dr. Bederson discuss why such a construction of "in accordance with" is supported by the intrinsic and extrinsic evidence of record. In addition, even if we were to replace "in accordance with" with "match[ing]" in element 1.5, we do not view the claim language as supporting Patent Owner's argument that the generated "plurality of aligned versions" must "match" the recited "unique standards code." Specifically, given the location of "in accordance with" in the "wherein" clause at issue, we view the phrase "in accordance with the unique standards code" to be part of the description of *how* the step of "selecting a different vocabulary and sentence length" is performed:

> wherein generating the plurality of aligned versions of the first unmodified content further comprises breaking up the first unmodified content into sentences, *selecting a different vocabulary and sentence length according to each reading difficulty level <u>in accordance with the unique standards code</u> while maintaining subject matter of the first unmodified content.*

Ex. 1001, 20:36–42 (emphasis added). In other words, the language of element 1.5 does not support the more direct relationship proposed by Patent Owner, in which the generated "plurality of aligned versions" must *match* the recited "unique standards code."

As to the phrase "in accordance with the unique standards code," Petitioner states in the Petition that one of ordinary skill in the art "would

IPR2021-01169
Patent 9,652,993 B2

have understood, or it would have been obvious, that Cupp's reading difficulty levels are '*in accordance with the unique standards code*'" because, as discussed with respect to element 1.4, "Cupp's readability levels relate to grade levels." Pet. 56 (citing Vento Decl. ¶ 254; Pet. 46–49). Petitioner continues that "Cappellucci's MLOs also relate to grade levels" as, "[f]or example, Cappellucci_949 discloses that the 'MLO data object' includes 'a grade level field' that associates the MLO with a grade level." *Id.* (quoting Ex. 1005 ¶ 76). According to Petitioner, because "both Cupp's readability levels and Cappellucci's MLOs relate to grade levels, they also accord with each other, at least via the grade levels." *Id.* (citing Vento Decl. ¶ 254).

Patent Owner asserts that this discussion "it is not a demonstration that Petitioner's cited art discloses or renders obvious 'generating' each aligned version 'in accordance with the unique standards code'" (PO Resp. 26) and does not show a "direct relationship" between the standards code and reading difficulty level (PO Sur-reply 8–9). We disagree with the premises of Patent Owner's argument. As to the part in the Response, for the reasons above, we view the phrase "in accordance with the unique standards code" as part of the description of *how* the step of "selecting a different vocabulary and sentence length" is performed: that is, "according to each reading difficulty level in accordance with the unique standards code." And, turning to the Sur-reply argument, as also discussed above, element 1.5 does not require a "direct relationship" between "reading difficulty level" and the "unique standards code" as argued. Based on the claim language actually recited in element 1.5, we view the relationship identified by Petitioner between Cupp's reading difficulty levels and

46

IPR2021-01169
Patent 9,652,993 B2

Cappellucci's MLOs—both of which relate to grade levels—as establishing, by a preponderance of the evidence, that the proposed combination satisfies the claim language at issue in the second "wherein" clause of element 1.5 ("according to each reading difficulty level in accordance with the unique standards code"). *See* Pet. 56; Pet. Reply 11.

Patent Owner also argues that the claims require, and Petitioner has allegedly failed to adequately show in the proposed combination, that the "plurality of aligned versions" "match the same educational standard" (rather than the "unique standards code" argued above). PO Resp. 27. We again agree with Petitioner that this argument is not commensurate in scope with the claims. *See* Pet. Reply 10 ("The claims don't require aligned versions that 'match' a unique standards code or an educational standard."). The relevant portion of element 1.5 recites: "wherein each of the plurality of aligned versions is transformed, respectively, according to a reading difficulty level *associated with corresponding one of the one or more educational standards*." Ex. 1001, 20:32–35 (emphasis added). Neither Patent Owner nor Dr. Bederson discuss why construing "associated with" as "match[ing]" is supported by the intrinsic and extrinsic evidence of record. In addition, even if were to replace "associated with" with "match[ing]" in the relevant portion of element 1.5 (quoted above), the claim language does not support Patent Owner's position. Specifically, we view the phrase "associated with corresponding one of the one or more education standards" as part of the description of *how* the "plurality of aligned versions is transformed":

> wherein each of the plurality of aligned versions is transformed, respectively, *according to a reading difficulty level associated*

IPR2021-01169
Patent 9,652,993 B2

> *with corresponding one of the one or more educational standards*.

Ex. 1001, 20:32–35 (emphasis added). In other words, the claim language at issue does not support the more direct relationship proposed by Patent Owner, in which the generated "plurality of aligned versions" must *match* the recited "educational standards."

Next, Patent Owner repeats its argument—discussed above as to element 1.3—that "Petitioner cannot meet its burden because at deposition Petitioner's expert could not identify *any* 'unique standards code' in Cappellucci" and thus "Petitioner cannot prove (as it argued in the Petition) that Cappellucci teaches a unique standards code." PO Resp. 28; *id.* at 28–30 (entire argument); Pet. Reply 11–12 (addressing this argument). As discussed above in the context of Patent Owner's first argument as to element 1.3, we do not view Mr. Vento's deposition testimony as undermining Petitioner's position as to "unique standards code."

We do not address Patent Owner's argument as to the reasonable expectation of success, which was raised for the first time in the Sur-reply. *See* PO Sur-reply 10 (citing PO Resp. 26–29); *see also* Consolidated Trial Practice Guide 74 (Nov. 2019), https://www.uspto.gov/TrialPracticeGuide Consolidated ("Generally, a reply or sur-reply may only respond to arguments raised in the preceding brief. . . . While replies and sur-replies can help crystalize issues for decision, a reply or sur-reply that raises a new issue or belatedly presents evidence may not be considered.").

Fourth, Patent Owner contends that Petitioner conflates certain distinct claim terms in element 1.5 (PO Resp. 6–14) and "effectively reads the unique standards code requirement out of the Challenged Claims" (*id.* at 6). We do not agree with Patent Owner that Petitioner conflated any

IPR2021-01169
Patent 9,652,993 B2

claim terms. In the discussion at issue (PO Resp. 6–14), Patent Owner does not cite to the Petition, or identify any *specific* example to support its general assertion. In addition, for the reasons discussed above (in this section and that addressing element 1.3) and as addressed by Petitioner (Pet. Reply 5–6 (summarizing positions as to this language)), we do not agree with Patent Owner that Petitioner fails to adequately address the phrase "unique standards code" recited in claim 1, including in element 1.5.

For the reasons above, we find, based on the complete record, that Petitioner has demonstrated by a preponderance of the evidence that the relied-upon combination of prior art discloses the subject matter of element 1.5. Further, we determine, in light of the complete record, that Petitioner has shown by a preponderance of the evidence that one of ordinary skill in the art at the time of the invention would have had reason to modify the prior art as proposed to result in the subject matter of element 1.5.

### g. Element 1.6

Element 1.6 recites: "transmitting, simultaneously, a first aligned version of the plurality of aligned versions of the first unmodified content to the user, wherein the first aligned version corresponds to a reading skill level of the user." Ex. 1001, 20:43–46. Petitioner relies on "Cappellucci in view of Cupp" for this element. *See* Pet. 57; *see also* Pet. 57–59 (citing Ex. 1005 ¶¶ 40, 60; Ex. 1007 ¶¶ 28, 39, 52, 90–93; Vento Decl. ¶¶ 257–261) (entire discussion). Specifically, Petitioner states that Cappellucci "discloses transmitting content to users based on a user profile that includes information about the student's grade level, proficiency or ability level, location, and interest" and states that one of ordinary skill in the art "would have understood, or it would have been obvious, to use Cappellucci's system

IPR2021-01169
Patent 9,652,993 B2

and methods to transmit the '*first aligned version . . . to the user*' because
providing content to users is a primary objective of Cappellucci."  Pet. 57
(citing Ex. 1005 ¶ 40; Ex. 1007 ¶¶ 39, 90–93; Vento Decl. ¶ 258).  In
addition, Petitioner discusses why "[t]he Cappellucci-Cupp combination
further teaches, suggests, or renders obvious '*wherein the first aligned
version corresponds to a reading skill level of the user*.'"  Pet. 58–59 (citing
Ex. 1005 ¶ 60; Ex. 1007 ¶¶ 28, 90–93; Vento Decl. ¶ 260).  As to the term
"simultaneously," Petitioner notes, for example, that "Cappellucci_934
discloses that content 'can be . . . delivered to large groups of users in real
time,' and the system can 'accommodate hundreds of thousands or millions
of users.'"  Pet. 57 (quoting Ex. 1007 ¶¶ 39, 52).  According to Petitioner,
one of ordinary skill in the art "thus would have understood that
Cappellucci's system and network support a plurality of users, and would
have provided access to and transmitted content to users using the system at
the same time ('*simultaneously*')."  Pet. 57–58 (citing Vento Decl. ¶ 259).

     Patent Owner first discusses claim construction and then argues
Petitioner has failed to prove disclosure or obviousness of this element (or of
similar element 8.9).  *See* PO Resp. 41–47; PO Sur-reply 15–16.  We begin
with claim construction.  There are two possible understandings of what is
required from element 1.6 based on the term "simultaneously."  As the first
possibility, the relevant portion of element 1.6 may require "transmitting"
the recited "first aligned version" to *two or more* users at essentially the
same time.  We discussed this possibility in the Decision on Institution.  *See*
Dec. Inst. 35–36.  As the second possibility, Patent Owner proposes that the
relevant portion of element 1.6 requires "transmitting" "*aligned versions* at
multiple skill levels simultaneously."  *See* PO Resp. 41–46; PO Sur-reply

IPR2021-01169
Patent 9,652,993 B2

15–16; *see, e.g.*, PO Resp. 45 (stating that "the key component of the invention is the ability to deliver differentiated lessons containing the same content, but at different reading levels, to multiple users at essentially the same time").  In other words, under Patent Owner's construction, each of at least two "aligned versions," each at different "reading skill levels," must be sent to at least one user at essentially the same time.  Although Patent Owner's proposed construction does appear to align with aspects of the Specification[12] and the prosecution history,[13] it would essentially require rewriting element 1.6, for example, as: "transmitting, simultaneously, ~~a first aligned version of~~ the plurality of aligned versions of the first unmodified content to ~~the~~ a plurality of user~~s~~, wherein ~~the~~ a first aligned version corresponds to a reading skill level of ~~the~~ at least one user."  This we cannot do.  *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee."); *Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) ("[C]ourts can neither broaden nor narrow claims to give the patentee something different than what he has set forth.") (internal quotes omitted).  Because we determine that Petitioner has shown that the proposed combination satisfies element 1.6 under *either* possibility

---

[12]  Ex. 1001, 10:52–56 ("The method of this embodiment provides for an unmodified learning content to be provided at multiple skill levels simultaneously, thereby providing for collaborative learning from the same unmodified learning content by many users of varying skill levels."), *discussed at* PO Resp. 42, 45.

[13]  Ex. 1002 at 77 ("Further, the aligned versions in Applicants' claim 1 [] are transmitted <u>simultaneously</u> and are graphically modified automatically according to user skill level . . . ."), *discussed at* PO Resp. 42, 45.

IPR2021-01169
Patent 9,652,993 B2

(for the reasons discussed below), however, we need not determine which of these two possibilities is correct. *See Nidec*, 868 F.3d at 1017.

We turn now to applying the two possibilities. As noted above, Petitioner states that "Cappellucci_934 discloses that content "can be . . . delivered to large groups of users in real time,' and the system can 'accommodate hundreds of thousands or millions of users.'" Pet. 57 (quoting Ex. 1007 ¶¶ 39, 52). According to Petitioner, one of ordinary skill in the art "thus would have understood that Cappellucci's system and network support a plurality of users, and would have provided access to and transmitted content to users using the system at the same time ('*simultaneously*')." Pet. 57–58 (citing Vento Decl. ¶ 259). Patent Owner argues that these disclosures in Cappellucci_934 do "not even describe sending different content to different users, let alone simultaneously." PO Resp. 46–47 (citing Bederson Decl. ¶ 86; Pet. 57; Ex. 1007 ¶¶ 39, 52). We disagree. As an initial matter, for the reasons discussed above as to element 1.5, the proposed combination satisfies the requirement for "generating . . . a plurality of aligned versions of the first unmodified content . . . ." Further, we find that the relied-upon aspects of Cappellucci_934 disclose or suggest element 1.6. For example, the disclosure in paragraph 39 that the system delivers its content to "large groups of users in real time" supports that the generated "plurality of aligned versions" (from element 1.5) would be provided "simultaneously," which Patent Owner views as "at essentially the same time." PO Resp. 45. Supporting this, we note that, in another paragraph cited by Petitioner, Cappellucci_934 elaborates on the prior disclosure in paragraph 39, stating that the content at issue can be "delivered to the user in or near real time and typically, in less than 0.2 seconds."

52

IPR2021-01169
Patent 9,652,993 B2

Ex. 1007 ¶ 81, *cited at* Pet. 39, 59.  Taken together, these disclosures, along with other disclosures relied upon by Petitioner as to the system "accommodat[ing] hundreds of thousands or millions of users" (Ex. 1007 ¶¶ 50, 52, *cited at* Pet. 57; Vento Decl. ¶ 259), support a finding that each of the "aligned versions" of the "plurality of aligned versions"—including the "first aligned version" would be delivered to two or more users at essentially the same time (i.e., "simultaneously").  This finding is also supported by the testimony of Mr. Vento.  *See* Vento Decl. ¶ 259 (stating that the "Cappellucci references' system and network support a plurality of users, and would have provided access to and transmitted content to users using the system at the same time ('*simultaneously*')"), *cited at* Pet. 57–58.  In this way, the relied-upon disclosures satisfy element 1.6 under both understandings of "simultaneously."

　　We find, based on the complete record, that Petitioner has demonstrated by a preponderance of the evidence that the relied-upon combination of prior art discloses the subject matter of element 1.6.  Further, we determine, in light of the complete record, that Petitioner has shown by a preponderance of the evidence that one of ordinary skill in the art at the time of the invention would have had reason to modify the prior art as proposed to result in the subject matter of element 1.6.

### h.  Element 1.7

　　Element 1.7 recites "generating, by the differentiation engine, one or more lesson plans for the user, the one or more lesson plans comprising questions associated with the first aligned version and subject matter of the first unmodified content, wherein the one or more lesson plans comprises a lesson comprising one or more of a specific spoken language, a particular

IPR2021-01169
Patent 9,652,993 B2

font size and level appropriate vocabulary and a particular graphical format based on the reading skill level of the user." Ex. 1001, 20:47–55. Petitioner relies on "Cappellucci in view of Cupp" for this element. *See* Pet. 59; *see also* Pet. 59–62 (citing Ex. 1005 ¶ 43; Ex. 1007 ¶¶ 42, 61, 81–87, 90–91; Ex. 1009 ¶¶ 5, 19, 25–38; Vento Decl. ¶¶ 262–269) (entire discussion).

As to the "differentiation engine" and "the first aligned version," Petitioner refers to the discussions of elements 1.5 and 1.6. *See* Pet. 59. As to the rest of the first clause in element 1.7 (i.e., before the "wherein" clause), Petitioner first discusses how Cappellucci discloses "Lesson Plans" comprising "questions" and also how, for example, "Cappellucci_934 discloses that 'a teacher can create or customize a lesson plan by locating and assembling one or more activities, assignments, and reading materials that correspond to the learning objective of the lesson.'" *Id.* (citing Ex. 1007 ¶¶ 42, 81–87). Petitioner states that, "[t]o meet the needs of a student at a second-grade reading level, it would have been obvious to generate a lesson plan and questions derived from the second-grade version of the article, which would nevertheless be based on the subject matter of the article" because "[t]his would permit evaluating the student's comprehension of the article based on the student's current reading level, as well as other benefits." Pet. 60 (citing Vento Decl. ¶ 265). Petitioner also discusses why one of ordinary skill in the art "would have understood, or it would have been obvious, to generate the lesson plan using '*the differentiation engine*.'" Pet. 60–61 (citing Vento Decl. ¶ 267; Ex. 1007 ¶¶ 85, 90). For the "wherein" clause, Petitioner discusses why "[t]he Cappellucci-Cupp combination further teach, suggest, or render obvious" those aspects. *See*

54

IPR2021-01169
Patent 9,652,993 B2

Pet. 61–62 (citing Vento Decl ¶ 268; Ex. 1007 ¶¶ 90–91; Ex. 1009 ¶ 5, 19, 25–38).

Patent Owner presents two arguments as to this element (and similar element 8.10), which we address in turn below.  *See* PO Resp. 37–41.  First, Patent Owner asserts that "Petitioner interprets this claim element as requiring all aspects of 'generating, by the differentiation engine, one or more lesson plans . . . ' to be done by a computer without any human intervention," but argues that "Cappellucci certainly does not disclose a *computer* generating an entire lesson plan without receiving content from a human source like a teacher, the Petition points to no such disclosure, and thus Petitioner's argument fails."  *Id.* at 38–41.

As an initial matter, we do not view Petitioner as taking the position that element 1.7 should be construed to *exclude* "any human intervention" at all, as asserted by Patent Owner.  PO Resp. 38.  For example, in the discussion of the claim language "generating . . . one or more lesson plans for the user . . . comprising questions associated with the first aligned version and subject matter of the first unmodified content," Petitioner highlights disclosures in Cappellucci_934 of a teacher's involvement in creating a lesson plan:

> Cappellucci_934 discloses that "<u>a teacher can create or customize a lesson plan</u> by locating and assembling one or more activities, assignments, and reading materials that correspond to the learning objective of the lesson." EX1007, ¶42; *see* EX1007, ¶¶ 81–87. Cappellucci_934 further discloses that <u>a teacher, to "meet the needs of her students," may "create a customized version of [an] information object" (such as a lesson plan)</u> using "any of the educational information resources available within the system," EX1007, ¶82, which, in the Cappellucci-Cupp

55

IPR2021-01169
Patent 9,652,993 B2

> combination, includes "*the first aligned version*," *see* Section VIII.A.4.g. EX1003, ¶264.

Pet. 59–60 (underlining emphasis added).

Regardless of how Patent Owner characterizes Petitioner's interpretation of this limitation, Patent Owner agrees that it does not exclude human intervention. *See* PO Resp. 38 (characterizing Petitioner's interpretation as requiring the generating step "be done by a computer without human intervention); *id.* n.24 (disagreeing with that interpretation). We agree with that understanding. Although element 1.7 requires "generating, by the differentiation engine, one or more lesson plans for the user" (with the "lesson plans" having certain recited features), we do not see a basis to construe this limitation as *excluding* "any human intervention." Thus, with this first argument, and as discussed below, Patent Owner is arguing against a position that neither party has taken and that has not been shown by either party to be supported by the record.

As one example of a step allegedly improperly performed by a human in Cappellucci showing the proposed combination is outside of the scope of this element, Patent Owner asserts that "Cappellucci certainly does not disclose a *computer* generating an entire lesson plan <u>without receiving content from a human source like a teacher</u>, the Petition points to no such disclosure, and thus Petitioner's argument fails." PO Resp. 40–41 (underline emphasis added). But element 1.1, which recites "obtaining . . . a first unmodified content" does not *exclude* the involvement of a human being to, for example, identify the desired "source" (such as "academic textbook[s], news sources, library databases, pre-developed lesson databases, and the like" (Ex. 1001, 9:64–67)) such that the "at least one computer" can then "obtain[]" the "first unmodified content" from that "source."

56

IPR2021-01169
Patent 9,652,993 B2

Similarly, we see no reason (and Patent Owner identifies none) that the step of element 1.7 "generating, by the differentiation engine, one or more lesson plans for the user" cannot have *some* human involvement, for example, before or after the "generating" step as long as the "generating" step is performed "by the differentiation engine." *See, e.g.*, Ex. 2012, 85:14–86:1 (Counsel for Patent Owner: "Why are you talking about what a teacher can create or customize here, if the claim requires that it all be computerized?" Mr. Vento: "Again, I think this is – this is just saying that there's – there may be a final step where once the lesson plan is generated, the instructor may be able to override it potentially as a manual task, if needed. But I don't think this precludes or invalidates that that is generated via computer.") (cited at PO Resp. 38–39).

And Petitioner addresses why, in the context of the proposed combination, one of ordinary skill in the art "would have understood, or it would have been obvious, to generate the lesson plan using '*the differentiation engine*'" as recited. Pet. 60–61 (citing, e.g., Vento Decl. ¶ 267). We are persuaded by Petitioner's discussion and the relied-upon testimony of Mr. Vento, and do not agree with Patent Owner's contrary argument that "Cappellucci does not teach computerized *generation* of content such as the claimed lesson plan" (PO Resp. 39). For example, Petitioner asserts that "Cappellucci_934 discloses that the system uses information in a user's profile, such as grade level, 'to select information that is presented to a user and how that information is presented to a user'" and states that "[t]his information in 'a student profile can be used to filter questions in a practice assessment test delivered to a student.'" Pet. 60 (quoting Ex. 1007 ¶ 90). Petitioner adds that "Cappellucci_934 discloses

IPR2021-01169
Patent 9,652,993 B2

generating customized lesson plans using the 'custom publishing tools,' which may include a '*differentiation engine*.'" Pet. 60–61 (quoting Ex. 1007 ¶ 85;[14] Pet. 49–57).  On this issue, Mr. Vento highlights the discussion in paragraph 91 of Cappellucci_934 as to how "the system may . . . provide a teacher with different lesson plans because a lesson plan which includes counting snowballs may create problems for teachers in southern climates which don't receive any snow."  Vento Decl. ¶ 267, *cited at* Pet. 60–61 (quoting Ex. 1007 ¶ 91).  Petitioner also states that "Cappellucci's e-learning '*system* can use information in a student's profile to customize the user interface and *information* provided to the student' and the '*system* can automatically provide *easier activities or assignments* to below average students.'"  Pet. Reply 16–17 (quoting Ex. 1007 ¶ 42) (citing Pet. 59).  Having reviewed these disclosures, we are persuaded that one of ordinary skill in the art would have understood, or it would have been obvious, to generate the "lesson plan" using the "differentiation engine" in the proposed combination, even if a human is involved in some way before or after the "generating" step occurs by the "differentiation engine."  This finding is supported by the testimony of Mr. Vento.  *See* Vento Decl. ¶ 267 ("These teachings confirm my opinion that [one of ordinary skill in the art] would have understood, or it would have been obvious, that the Cappellucci references' '*differentiation engine*' would '*generat[e] . . . lesson plans for*

---

[14]  Patent Owner argues that these "custom publishing tools" require interaction by a "user" to "revise." PO Resp. 39.  But, for the reasons above, human intervention to "revise" a lesson plan is not precluded by element 1.7 as long as the "generating" step is performed "by the differentiation engine."

IPR2021-01169
Patent 9,652,993 B2

*the user . . . comprising questions*' based at least on the user's profile." (first bracketed text added)), *cited at* Pet. 60–61.

Similar to Patent Owner, Dr. Bederson highlights various functions before or after the "generating" step that may be performed by a teacher in the proposed combination) but does not take the position that a human performs the "generating" step. *See* Bederson Decl. ¶ 81. For the reasons above, we are persuaded by Petitioner's (and Mr. Vento's) discussion that the "differentiation engine" would perform the step of *actually* "generating . . . one or more lessons plans" such that the teacher would not usurp that specific recited task. *See, e.g.*, Ex. 2012, 85:14–86:1.

Second, Patent Owner argues that Petitioner's position on element 1.7 must fail because, "at deposition Petitioner's expert repeatedly insisted on the need to include Tudor . . . to satisfy this" element. PO Resp. 38 (citing Ex. 2012, 84:7–98:10; PO Resp. 20 n.14). We disagree with Patent Owner's characterization of Mr. Vento's testimony. Although Mr. Vento did discuss Tudor when questioned about this element (*see, e.g.*, Ex. 2012, 86:13–88:21), as acknowledged by counsel for Patent Owner during the deposition, Mr. Vento relies on "the Cappellucci references, in view of Cupp" as to element 1.7 in the Vento Declaration. *See* Ex. 2012, 88:22–89:10 (discussing Vento Decl. ¶ 262). As noted by Petitioner, Mr. Vento also stated during his deposition that Cappellucci teaches or suggests "generating, by the differentiation engine, one or more lesson plans" as recited in part of element 1.7. Pet. Reply 16 (citing Ex. 2012, 86:2–12, 90:12–91:18, 122:10–123:21). We are not persuaded that Mr. Vento's statements about Tudor renders *all* of his testimony "not credible" and entitled to "no weight," as argued by Patent Owner. PO Resp. 38.

59

IPR2021-01169
Patent 9,652,993 B2

We find, based on the complete record, that Petitioner has demonstrated by a preponderance of the evidence that the relied-upon combination of prior art discloses the subject matter of element 1.7. Further, we determine, in light of the complete record, that Petitioner has shown by a preponderance of the evidence that one of ordinary skill in the art at the time of the invention would have had reason to modify the prior art as proposed to result in the subject matter of element 1.7.

### i. Element 1.8

Element 1.8 recites: "providing the one or more lesson plans questions associated with the first aligned version to the user via a communication system." Ex. 1001, 20:56–58. Petitioner relies on Cappellucci in view of Cupp for this element.[15] *See* Pet. 62–63 (citing Ex. 1005 ¶¶ 40, 61–63, Fig. 5; Ex. 1007 ¶¶ 39, 42, 90–94; Vento Decl. ¶¶ 270–271). Referencing the discussion in the Petition of element 1.7, Petitioner states that "the Cappellucci-Cupp combination includes '*lesson plans questions associated with the first aligned version*'" and that "Cappellucci discloses '*providing*' content, including '*lesson plans . . . to the user via a communication system,*' such as the Internet." Pet. 62 (citing Ex. 1005 ¶¶ 40, 61–63, Fig. 5; Ex. 1007 ¶¶ 39, 42, 90–94). According to Petitioner, one of ordinary skill in the art "would have understood, or it would have been obvious, that Cappellucci's system would provide the lesson plan and associated questions discussed in [element] 1.7, to the user via a communication system, such as the Internet,

---

[15] Although the first sentence in the section of the Petition addressing element 1.8 provides that "Cappellucci in view of [sic] teaches or suggests limitation 1.8," the *next sentence* states, "[a]s demonstrated for limitation 1.7, *the Cappellucci-Cupp combination* includes" certain features. Pet. 62.

IPR2021-01169
Patent 9,652,993 B2

in order to support and evaluate the user's understanding of the '*first aligned version.*'" Pet. 62–63 (citing Vento Decl. ¶ 271).

Patent Owner does not present arguments for this element. We find, based on the complete record, that Petitioner has demonstrated by a preponderance of the evidence that the relied-upon combination of prior art discloses the subject matter of element 1.8. Further, we determine, in light of the complete record, that Petitioner has shown by a preponderance of the evidence that one of ordinary skill in the art at the time of the invention would have had reason to modify the prior art as proposed to result in the subject matter of element 1.8.

*j. Element 1.9*

Element 1.9 recites: "wherein each of the plurality of aligned versions are equivalent substantially similar in subject matter, meaning and context to subject matter, meaning and context of the first unmodified content." Ex. 1001, 20:59–62. Petitioner relies on "Cappellucci in view of Cupp" for this element. *See* Pet. 63 (citing Ex. 1007 ¶ 90; Ex. 1009 ¶¶ 22, 28, 34, 35; Vento Decl. ¶¶ 272–273). Petitioner states that "Cupp's methods replace words with synonyms and combine or separate sentences" and that one of ordinary skill in the art "would have understood that such edits modify the content without substantially changing the subject matter, meaning, and context." Pet. 63 (citing Ex. 1007 ¶ 90; Ex. 1009 ¶¶ 22, 28, 34, 35; Vento Decl. ¶ 273).

For this element, Patent Owner relies on the same discussion presented as the first argument with respect to element 1.5—relating to "maintaining subject matter of the first unmodified content." *See* PO Resp. 30 n.22. For the reasons discussed above, Patent Owner's first

argument with respect to element 1.5 does not identify a deficiency in Petitioner's positions.

We find, based on the complete record, that Petitioner has demonstrated by a preponderance of the evidence that the relied-upon combination of prior art satisfies element 1.9. Further, we determine, in light of the complete record, that Petitioner has shown by a preponderance of the evidence that one of ordinary skill in the art at the time of the invention would have had reason to modify the prior art as proposed to result in the subject matter of element 1.9.

### k. General Arguments as to why Petitioner Allegedly Has not Met its Burden

#### (1) Alleged Lack of Clarity as to Petitioner's Positions

Patent Owner presents two general arguments as to why Petitioner allegedly failed to sufficiently explain its positions. *See* PO Resp. 63–67. First, Patent Owner asserts as improper Petitioner's statements as to what one of ordinary skill in the art "would have understood." PO Resp. 63–64. In the Decision on Institution, based on Patent Owner's similar pre-institution argument, we stated that we understood these statements by Petitioner as presenting "a theory based on implicit disclosure." Dec. Inst. 20 (citing *IXI IP, LLC v. Samsung Elecs. Co.*, 903 F.3d 1257, 1262–65 (Fed. Cir. 2018) (analyzing an implicit disclosure theory in an appeal from the PTAB); *In re Burckel*, 592 F.2d 1175, 1179 (CCPA 1979) ("Under 35 U.S.C. § 103, a reference must be considered not only for what it expressly teaches, but also for what it fairly suggests."); *In re Lamberti*, 545 F.2d 747, 750 (CCPA 1976) ("[T]he question under 35 U.S.C. § 103 is not merely what the references expressly teach, but what they would have

suggested to one of ordinary skill in the art at the time the invention was made.")). Patent Owner contends that our preliminary understanding, as reflected in the Decision on Institution, is "neither clear from nor supported by the Petition." PO Resp. 63. We disagree. Petitioner's position was sufficiently clear for the Board to arrive at the preliminary understanding discussed in the Decision on Institution (Dec. Inst. 19–21), which Patent Owner does not undermine with this conclusory argument. We maintain our preliminary understanding of Petitioner's statements as to what one of ordinary skill in the art "would have understood," which Petitioner confirms in the Reply. Pet. Reply 26 (citing *In re Preda*, 401 F.2d 825, 826 (CCPA 1968) ("[I]n considering the disclosure of a reference, it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom.")).

Patent Owner also argues that "it was Petitioner's burden to prove and explain why the disclosure is implicit" and that, "[e]ven if the Board could interpret Petitioner's vague arguments as implicit disclosure theories, it is insufficient merely to assert a disclosure is implicit without more." PO Resp. 64 (citing Bederson Decl. ¶ 109). We disagree with Patent Owner's characterization of Petitioner's positions.

Patent Owner and Dr. Bederson provide a long list of allegedly improper statements by Petitioner relying on implicit disclosure (PO Resp. 64 n.35; Bederson Decl. ¶ 109), but neither Patent Owner nor Dr. Bederson substantively discuss *any* of them. We will not develop specific arguments based on Patent Owner's general assertion of failure by Petitioner. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed.

IPR2021-01169
Patent 9,652,993 B2

Cir. 2006) ("Judges are not like pigs, hunting for truffles buried in briefs."
(quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

Patent Owner and Dr. Bederson assert error in Petitioner's statement
that one of ordinary skill in the art "would have understood, or it would have
been obvious, to use Cappellucci's system and methods to transmit the '*first
aligned version . . . to the user*' because providing content to users is a
primary objective of Cappellucci." Pet. 57 (citing Vento Decl. ¶ 258); *see
also* PO Resp. 64 n.35 (citing Pet. 57); Bederson Decl. ¶ 109 (citing Vento
Decl. ¶ 258). But Petitioner and Mr. Vento explain why one of ordinary
skill in the art would have understood Cappellucci as discussed, expressly
stating that it is "because providing content to users is a primary objective of
Cappellucci." Pet. 57; Vento Decl. ¶ 258. Thus, contrary to Patent Owner's
argument (PO Resp. 64), Petitioner does not merely state implicit disclosure
positions without support.

Second, Patent Owner argues that "Petitioner repeatedly fails to
establish why limitations would have been understood to be disclosed or to
provide meaningful analysis of ***whether, how, and why a POSITA would
have modified*** the references it cites." PO Resp. 65; *see also id.* at 64–67
(entire argument). As the first of three alleged examples, Patent Owner
highlights the discussion of limitations 1.1 and 8.4. *See id.* at 65–66.
According to Patent Owner, Petitioner contends that these limitations
"'would have been obvious' from Cappellucci, but without any explanation"
and takes the alternative position that Cupp discloses "first unmodified
content" but Petitioner fails to explain how "'*obtaining . . .* first unmodified
content' is rendered obvious in connection with any Cappellucci-Cupp
combination." *Id.* at 65–66 (citing Pet. 37, 39, 63–64).

IPR2021-01169
Patent 9,652,993 B2

We do not agree with Patent Owner as to this first example. As an initial matter, the discussion of limitation 1.1 focusing on Cappellucci spans more than three pages and cites to five pages of testimony by Mr. Vento. *See* Pet. 37–40 (citing Vento Decl. ¶¶ 205–213). This discussion cannot be dismissed as "without any explanation." PO Resp. 65. Further, Petitioner clearly relies on Cupp *in the alternative* as to "first unmodified content." *See* Pet. 37 ("Alternatively, Cupp discloses the '*first unmodified content*.' *See* EX1009, FIG. 1 (step 106)."); *see also* Pet. Reply 26–27 & Dec. Inst. 20–21 (discussing how alternative theories are not prohibited if they are supported). We do not rely on this alternative position as to elements 1.1 and 8.4, for which Patent Owner does not present any specific arguments.

As the second of three alleged examples, Patent Owner highlights the discussion of limitations 1.2 and 8.5. *See* PO Resp. 66–67. Patent Owner states that "[t]he Petition first asserts 'Cappellucci teaches or suggests' the Limitation (Pet. 40), but then asserts the Limitation 'would have been obvious' without explaining how or why, or what additional teaching or modification would have rendered the Limitation obvious." *Id.* at 67 (quoting Pet. 41) (citing Bederson Decl. ¶ 110).

We do not agree with Patent Owner as to this second example. The statement on page 41 of the Petition does not state that the *entire* element would have been obvious; instead, it provides that one of ordinary skill in the art "*would have understood, or it would have been obvious*, that the educational standards stored in the data tier and new educational standards that may be added to the system would have been '*obtain[ed] . . . using at least one computer*.'" Pet. 41 (emphasis added) (citing Vento Decl. ¶ 216). Again, Petitioner's position challenged by Patent Owner is provided *in the*

*alternative*. Patent Owner does not challenge Petitioner's implicit disclosure position (i.e., as to what one of ordinary skill in the art "would have understood") with any specific argument. We do not rely on Petitioner's alternative position—as to what "would have been obvious"—as to limitations 1.2 and 8.5, for which Patent Owner does not present any specific arguments.

As to the third example, Patent Owner highlights the discussion of limitations 2.1–2.3 and 9.1–9.3. *See* PO Resp. 67. According to Patent Owner, "Petitioner asserted it would have been obvious 'to combine Tudor's computer-based educational system . . . in the system disclosed in Cappellucci'" but "Petitioner did not explain specifically what would be combined or how." *Id.* (quoting Pet. 65) (citing Bederson Decl. ¶ 111).

We do not agree with Patent Owner. The discussion of limitations 2.1–2.3 and 9.1–9.3 spans approximately two pages and cites four pages of testimony by Mr. Vento. *See* Pet. 64–66 (citing Vento Decl. ¶¶ 292–298). As part of this discussion, Petitioner states that "[i]t would have been obvious to [one of ordinary skill in the art] to combine Tudor's computer-based educational system, such as computer system 200 of Figure 2, in the system disclosed in Cappellucci." Pet. 65 (citing Vento Decl. ¶ 297; Pet. 33–35 (addressing combining Cappellucci/Cupp with Tudor). We determine that this discussion is adequate to explain Petitioner's position as to limitations 2.1–2.3 and 9.1–9.3, for which Patent Owner does not present any specific arguments. For these reasons, these general arguments do not undermine Petitioner's positions as to the challenged claims.

IPR2021-01169
Patent 9,652,993 B2

### (2) Alleged Improper Mixing of Embodiments in the Cappellucci References

Patent Owner argues that Petitioner improperly mixes different embodiments from the Cappellucci references without providing an adequate obviousness analysis. *See* PO Resp. 60–63. Specifically, Patent Owner asserts that "Petitioner repeatedly mixes paragraphs on an '*alternative e*mbodiment' regarding '**news information**' (EX1007, ¶¶92–93) with *other* sections of Cappelluci_934 describing another (main) embodiment related to an '**e-learning**' system." *Id.* at 61 (citing Pet. 37–38, 48, 51, 57–58, 60, 74, 75–76). According to Patent Owner, "Petitioner has not provided a motivation to combine the news system with the e-learning system" because the "two-page discussion of the motivation to combine the Cappellucci references the Board identified at institution ([Dec. Inst.] 40–41 (citing Pet. 26–27)) never mentions the 'news information' embodiment that, under Petitioner's theories, would have to be combined with the 'e-learning' embodiment that is the focus of both Cappellucci references." PO Resp. 62 (citing Pet. 27–28; Bederson Decl. ¶ 105).

Patent Owner also argues that, "with respect to the Cappellucci-Cupp combination, Petitioner again provides no motivation to combine the news information embodiment of Cappellucci with Cupp." PO Resp. 62. According to Patent Owner, "while Petitioner's Cappellucci cites regarding this motivation to combine argument include the news embodiment cites (EX1007, ¶¶92–93), Petitioner's argument does not address the news system." PO Resp. 63 (citing Bederson Decl. ¶¶ 106–107).

We do not agree with either argument. We first address the arguments as to the Cappellucci references. Paragraph 92 and the beginning of paragraph 93 of Cappellucci_934 describe system 600:

IPR2021-01169
Patent 9,652,993 B2

[0092] In an alternative embodiment, the system 600 can be used to deliver other kinds of information to a user. System 600 can [be] used in any environment in which it is desirable to enable to the user to customize the information that many users can obtain access to.

[0093] For example, the system in accordance to the present invention can be used to provide customized news information from many diverse news information resources to a diverse user base.

Ex. 1007 ¶¶ 92, 93. Although paragraph 92 does use the term "alternative embodiment," the discussion quoted above makes clear that the "news information" aspect can be a feature of *the same* "system 600" that is disclosed as part of the e-learning system relied on by Petitioner, which Patent Owner refers to as the "main" embodiment. Other disclosures support this understanding. *See* Ex. 1007 ¶ 60 ("In accordance with one embodiment of the invention, the system 600 of the invention can be [used] as part of an online learning or e-learning system."), *cited at* Pet. 16, 40; *see also* Pet. Reply 25–26 (noting that "in paragraphs 92–93, Cappellucci_934 expressly discloses that the same 'system 600'—that is described throughout the disclosure—'can be used to deliver other kinds of information to a user,' including 'customized news information'" (citing Ex. 1007 ¶¶ 57–69, 92–93)). Thus, we agree with Petitioner that "paragraphs 92–93 do not describe a different system; rather, they simply explain that *the same system* can deliver different types of information." Pet. Reply 26 (emphasis added) (citing Ex. 1007 ¶¶ 92–93).

Moreover, even assuming paragraphs 92 and 93 of Cappellucci_934 *did* disclose an entirely different embodiment, Mr. Vento expressly discusses—in a paragraph cited in the Petitioner's section on reasons to

68

IPR2021-01169
Patent 9,652,993 B2

combine the Cappellucci references—a reason to incorporate the news information feature into the proposed combination:

> Additionally, by incorporating Cappellucci '934's ability "to provide customized news information from many diverse news information sources to a diverse user base," the resulting combination would have vastly more resources to draw from. EX1007, ¶93. The resulting combination would allow teachers to design more diverse, engaging, and topical lesson plans than with Cappellucci '949's teachings alone. A POSA would have recognized these benefits of making the combination.

Vento Decl. ¶ 171, *cited at* Pet. 27 & Pet. Reply 26; *cf.* PO Resp. 62 (arguing that "Petitioner has not provided a motivation to combine the news system with the e-learning system" (citing Bederson Decl. ¶ 105)). Patent Owner does not address this discussion in the Response or the Sur-reply.

As to Patent Owner's separate argument about the Cappellucci-Cupp modification (PO Resp. 62–63), for the reasons above, Petitioner has provided a reason to incorporate the news information feature from Cappellucci_934 into the proposed combination overall, and Patent Owner has not substantively addressed that reasoning, except to incorrectly assert that "no motivation" at all has been provided. *Id.* at 62. Indeed, in several statements in the lengthy discussion of combining "Cappellucci with Cupp," Petitioner discusses why the resulting combination would have used a "news article" as exemplary information delivered to the users:

> (1) "For example, it would have been obvious to [one of ordinary skill in the art] to use Cupp's methods to determine the readability level of a news article obtained using Cappellucci's system and to edit the news article to generate different versions written at second-, fourth-, and six-grade reading levels to accommodate different readers' abilities." Pet. 28–29 (citing Vento Decl. ¶ 176; Ex. 1007 ¶¶ 90, 93);

IPR2021-01169
Patent 9,652,993 B2

(2) "Because Cupp's editing methods would create new content (e.g., different versions of a news article written for different reading levels) to be added to the system disclosed by Cappellucci, it would have been obvious to include Cupp's methods in Cappellucci's content creation tools." Pet. 29–30 (citing Vento Decl. ¶ 177);

(3) "[One of ordinary skill in the art] would have known of the need in the educational field, particularly in web-based applications, for differentiating content and would have looked to teachings, such as Cupp, to differentiate reading material, such as the content stored in Cappellucci's data tier and from the other sources (e.g., news sources) disclosed by Cappellucci, such that this content would be readable when provided to users (e.g., students)." Pet. 31 (Vento Decl. ¶¶ 180–181);

(4) "Cappellucci and Cupp describe computer-based education technology in the predictable arts, and thus [one of ordinary skill in the art] would have had a reasonable expectation that she would successfully modify Cappellucci's content, such as textbooks and news articles, using Cupp's methods." Pet. 32–33 (citing Vento Decl. ¶ 185).

For the reasons discussed above, Petitioner's reliance on the news information feature of Cappellucci's e-learning system does not undermine Petitioner's obviousness analysis.

*l.  Objective Indicia of Nonobviousness*

We next turn to Patent Owner's objective evidence of nonobviousness. Objective evidence of nonobviousness, when present, must be considered as part of an obviousness inquiry. *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012). Notwithstanding what the teachings of the prior art would have suggested to one of ordinary skill in the art, the totality of the evidence submitted, including objective evidence of nonobviousness, may lead to a conclusion that one or more of the challenged claims would not have been

IPR2021-01169
Patent 9,652,993 B2

obvious to one of ordinary skill in the art. *In re Piasecki*, 745 F.2d 1468, 1471–72 (Fed. Cir. 1984).

"In order to accord substantial weight to secondary considerations in an obviousness analysis, the evidence of secondary considerations must have a nexus to the claims, i.e., there must be a legally and factually sufficient connection between the evidence and the patented invention." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019), *cert. denied*, 141 S. Ct. 373 (2020). Applying *Fox Factory*, the Board uses a two-step analysis in evaluating nexus between the claimed invention and objective evidence of nonobviousness. *Lectrosonics, Inc. v. Zaxcom, Inc.*, IPR2018-01129, Paper 33 at 33 (PTAB Jan. 24, 2020) (precedential). We first consider whether the patent owner has demonstrated "that its products are coextensive (or nearly coextensive) with the challenged claims," resulting in a rebuttable presumption of nexus. *Id.* If not, that does not end the inquiry; "the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* (quoting *Fox Factory*, 944 F.3d at 1373–75).

Patent Owner produces evidence directed to alleged industry praise. PO Resp. 55–60; PO Sur-reply 18–20. Petitioner responds. *See* Pet. Reply 23–25. We address nexus and then the evidence of alleged industry praise.

### (1) Nexus

"The patentee bears the burden of showing that a nexus exists." *Fox Factory*, 944 F.3d at 1373 (quoting *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999)). Patent Owner references "nexus" in the Response but, as noted by Petitioner, does not clearly address either of

IPR2021-01169
Patent 9,652,993 B2

the two options under *Fox Factory*. *See* Pet. Reply 24 (arguing that Patent Owner "doesn't allege that the claims are entitled to a presumption of a nexus or that the objective indicia are a direct result of novel features of the claims"). In the Sur-reply, Patent Owner does not directly address this issue, but only references "the presumption of nexus." PO Sur-reply 18 ("Petitioner's Reply is unable to overcome the presumption of nexus that arises from PO's establishing 'that the asserted objective evidence is tied to a specific product and that product "is the invention disclosed and claimed in the patent."'" (quoting *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1329 (Fed. Cir. 2016)). We determine that Patent Owner has only asserted a presumption of nexus; we address below whether Patent Owner is entitled to the asserted rebuttable presumption of nexus on the record here.

As stated in *Fox Factory*, "presuming nexus is appropriate when the patentee shows that the asserted objective evidence is tied to a specific product and that product embodies the claimed features, and is coextensive with them." *Fox Factory*, 944 F.3d at 1373 (quotations omitted). Patent Owner asserts that its Achieve3000 Literacy product is entitled to a presumption of nexus. *See* PO Resp. 56. Patent Owner's position fails for several reasons. We first discuss general failings with Patent Owner's position and then address issues with the specific evidence relied upon.

First, even assuming as correct Patent Owner's *unsupported* position that it owns only one other patent—U.S. Patent 8,714,896—in addition to the '993 patent in this proceeding (*see, e.g.*, PO Resp. 57), statements regarding, for example, a "patented platform" (*see* Ex. 2019 at 11) *certainly could* reference a system allegedly embodying the claims of the '896 patent, and *not* embodying the claims of the '993 patent at issue in this proceeding.

72

IPR2021-01169
Patent 9,652,993 B2

Second, as discussed further below, Patent Owner fails to show that statements as to, for example, their "patented platform" relate to the Achieve3000 Literacy product because the record does not support that the Achieve3000 Literacy product was Patent Owner's *only* product.

Third, we question the adequacy and reliability of the statements of listed inventor Saki Dodelson—former CEO of Patent Owner and current CEO of Petitioner—as supporting that the Achieve3000 Literacy product is (for example) a "patented platform" that practices a claim of the '993 patent. Indeed, neither Patent Owner nor Dr. Bederson provide an analysis demonstrating that the Achieve3000 Literacy product actually embodies *any* claim of the '993 patent; instead, Patent Owner seeks to rely on statements by Ms. Dodelson as *alleged admissions* on this issue. We are not aware of any case law, and Patent Owner does not identify any, that statements by an inventor—even one working for an entity now challenging the validity of that patent—can adequately demonstrate that a certain product embodies the claims of the patent in the context of a presumption of nexus analysis. With these generalized failings in mind, we now discuss each specific piece of evidence highlighted by Patent Owner. *See* PO Resp. 55–60.

Exhibit 2019 is a document from Patent Owner's website, provided by the Wayback Machine. Patent Owner relies on this Exhibit to assert that Ms. Dodelson "asserts today [that] the '993 claimed invention is embodied by Patent Owner's product Achieve 3000 Literacy." PO Resp. 56. Exhibit 2019, however, does not mention the Achieve3000 Literacy product or the '993 patent at all, but rather discusses features of an unidentified "patented platform." Ex. 2019 at 11.

IPR2021-01169
Patent 9,652,993 B2

Exhibit 2015 is a document that discusses certain alleged features of the Achieve3000 Literacy product, but Patent Owner does not explain, and we do not find from our review, that this exhibit discusses the product practices *any* patent, including the '993 patent. *See* PO Resp. 56 (discussing Ex. 2015).

Exhibit 2005 is a press release touting the issuance of the '896 patent, but it does not mention the '993 patent—at issue in this proceeding—at all. *See* Ex. 2005, *cited at* PO Resp. 56–57.

Exhibit 2001 is Ms. Dodelson's biography from her current position, as CEO of Petitioner, in which she states that she was the founder and CEO of Patent Owner, which "introduced online differentiated learning and patented its breakthrough methodology." Ex. 2001 at 1, *cited at* PO Resp. 58. Exhibit 2007, Ms. Dodelson's professional networking profile, provides that when she was the CEO for Patent Owner she "pioneered online differentiated learning and co-developed its patented method of differentiation." Ex. 2007 at 1, *cited at* PO Resp. 58. Neither of these exhibits mention the '993 patent or the Achieve3000 Literacy product.

Exhibits 2013 and 2014 are press releases announcing alleged industry praise relied on by Patent Owner. *See* Exs. 2013 & 2014, *cited at* PO Resp. 59–60. Exhibit 2013 mentions the Achieve3000 Literacy product but does not mention *any* patent, including the '993 patent. Exhibit 2014 does not mention the Achieve3000 Literacy product or the '993 patent (but does generally reference a "patented method"). We find that none of these exhibits demonstrate that the Achieve3000 Literacy product embodies *any* claim of the '993 patent.

IPR2021-01169
Patent 9,652,993 B2

In his discussion of objective indicia, Dr. Bederson also does not demonstrate that the Achieve3000 Literacy product embodies *any* claim of the '993 patent. Instead, Dr. Bederson, like Patent Owner, relies on the evidence discussed above as showing that Ms. Dodelson "treated the Achieve3000 Literacy product as embodying the claimed invention in Patent Owner's patents." Bederson Decl. ¶ 100 (citing Exs. 2005, 2007, 2019); *see also* Pet. Reply 24 (arguing that "Dr. Bederson's opinion that Achieve3000's product embodied the claimed invention is based solely on general statements online and in marketing material that he attributes to inventor Dodelson"). As noted by Petitioner, Dr. Bederson acknowledged in his deposition that he had "not analyzed the actual Achieve 3000 product separately" to determine whether it embodies any claim of the '993 patent. Ex. 1044, 72:11–20, *cited at* Pet. Reply 24. For the reasons above, the evidence cited by Patent Owner and Dr. Bederson does not establish that the Achieve3000 Literacy product embodies *any* claim of the '993 patent.

Moreover, in the context of the presumption of nexus analysis, the Federal Circuit has made clear that the "coextensiveness requirement" is *separate* from the requirement that the product or process embodies the claims. *See Fox Factory*, 944 F.3d at 1377 ("We reject [the patent owner's] attempt to reduce the coextensiveness requirement to an inquiry into whether the patent claims broadly cover the product that is the subject of the evidence of secondary considerations."). Here, Patent Owner does not even mention, let alone provide evidence supporting, satisfying the *separate* coextensiveness requirement.

We determine that Patent Owner has not established a presumption of nexus as to the Achieve 3000 Literacy product because (1) Patent Owner has

IPR2021-01169
Patent 9,652,993 B2

not adequately demonstrated that the Achieve3000 Literacy product embodies *any* claim of the '993 patent and (2) has not adequately shown that the Achieve 3000 Literacy product is coextensive (or nearly coextensive) with the challenged claims. Thus, on the record here, we determine that Patent Owner has not established a nexus to the Achieve 3000 Literacy product. Regardless, to present a full discussion of the issues, we discuss the objective indicia evidence below as if Patent Owner *had* established nexus.

## (2) Industry Praise

We now discuss the specific evidence relied upon by Patent Owner, assuming that nexus had been established to the Achieve 3000 Literacy product. Patent Owner presents evidence related to industry praise and "public recognition." PO Resp. 55–60; PO Sur-reply 18–20. Praise from industry participants, especially competitors, is probative of nonobviousness because such participants "are not likely to praise an obvious advance over the known art. Thus, if there is evidence of industry praise of the claimed invention in the record, it weighs in favor of the nonobviousness of the claimed invention." *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1053 (Fed. Cir. 2016) (en banc). We first discuss statements by Ms. Dodelson and Patent Owner and then address alleged "public recognition."

As to the statements by Ms. Dodelson, Patent Owner highlights some from her time as CEO of Patent Owner, and some from after her transition to a role as CEO of Petitioner. Even assuming the laudatory statements from her time as CEO of Patent Owner had a nexus to the claims of the '993 patent, we do not view such statements as evidence of praise *from the industry. See Bayer Healthcare Pharms., Inc. v. Watson Pharms., Inc.*, 713 F.3d 1369, 1377 (Fed. Cir. 2013) (discussing how "self-referential

76

IPR2021-01169
Patent 9,652,993 B2

commendation fall[s] well short of demonstrative true industry praise"); *In re Cree, Inc.*, 818 F.3d 694, 702 (Fed. Cir. 2016) (rejecting patentee's reliance on "self-serving statements from researchers about their own work" as alleged evidence of praise); *see also* PO Resp. 55–59 (citing Ex. 2019). Similarly, Patent Owner's *own* press release—including statements from then-CEO Ms. Dodelson—touting the issuance of the '896 patent is not praise *from the industry* as to the '993 patent at issue in this proceeding. *See* Ex. 2005, *cited at* PO Resp. 56–57. Further, Patent Owner's *own* laudatory comments in marketing materials for the Achieve3000 Literacy product are not praise *from the industry*. *See* Ex. 2015, *cited at* PO Resp. 56.

Further, statements from *after* Ms. Dodelson's move to a position as CEO of Petitioner provide no praise specific to the '993 patent *at all*, and provide only indirect praise to Ms. Dodelson's former company (i.e., Patent Owner) as a "pioneering company" that "patented its breakthrough methodology." Ex. 2001, *cited at* PO Resp. 58 (also citing Ex. 2007 (similar indirect statements of praise)). We do not view these statements as evidence supporting the patentability of any claim of the '993 patent.

We turn now to the alleged evidence of "public recognition": Exhibits 2013 and 2014. *See* PO Resp. 59–60. Patent Owner highlights Exhibit 2013 to support its contention that, "[i]n March 2021, Patent Owner's Achieve3000 Literacy product earned Research-Based Design product certifications from Digital Promise, which is awarded based on research demonstrating the efficacy of these products and Patent Owner was one of seven awarded this certification in 2021." *Id.* at 59. Although this evidence does show "recognition" of some kind from the industry for the Achieve3000 Literacy product, as noted by Petitioner, the document makes

IPR2021-01169
Patent 9,652,993 B2

clear that this was a "product certification" rather than praise of the Achieve3000 Literacy product. Ex. 2013; *see* Pet. Reply 24–25 (arguing that Patent Owner "fails to explain how an unexplained industry accreditation is commensurate with industry praise"). Moreover, Patent Owner—rather than an entity in the industry—submitted the evidence to Digital Promise to receive the certification. Ex. 2013 ("To receive consideration for this product certification, Achieve3000 submitted evidence to Digital Promise confirming a link between research on how students learn and the design of its products.").

As the second of two documents on this issue, Patent Owner highlights Exhibit 2014 to support its contention that "[t]he Center for Research and Reform in Education at John Hopkins University School of Education recognized Achieve3000 for providing strong evidence of efficacy in improving literacy." PO Resp. 59. Assuming for purposes of this discussion that nexus had been established to the Achieve3000 Literacy product, we would view Exhibits 2013 and 2014 as being entitled to some, but not considerable, weight of nonobviousness.

*m. Conclusion as to Claim 1*

For the reasons discussed above (§ II.C.2.a–k), the evidence presented by Petitioner strongly indicates that claim 1 would have been obvious over the combination of Cappellucci_949, Cappellucci_934, Cupp, and Tudor. For the reasons also discussed above (§ II.C.2.l), Patent Owner has not demonstrated a nexus; and, even if we were to assume a nexus, Patent Owner's objective evidence would still not weigh strongly in favor of nonobviousness. When considering all the evidence of obviousness and nonobviousness together (*see In re Cyclobenzaprine Hydrochloride*

78

IPR2021-01169
Patent 9,652,993 B2

*Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1079 (Fed. Cir. 2012)), we find Petitioner's strong evidence of obviousness would outweigh Patent Owner's objective evidence of nonobviousness, even if Patent Owner had demonstrated a nexus. Thus, we conclude Petitioner has demonstrated by a preponderance of the evidence that claim 1 would have been obvious over the combination of Cappellucci_949, Cappellucci_934, Cupp, and Tudor.

### 3. Independent Claim 8

Petitioner contends that the proposed combination of Cappellucci_949, Cappellucci_934, Cupp, and Tudor discloses each limitation of independent claim 8. Pet. 63–64. Petitioner states that "[c]laim 8 is a system claim that recites '*a) at least one processor; b) at least one input device coupled to at least one network; and c) at least one storage device storing processor executable instructions which, when executed by the at least one processor, performs*' nearly identical steps as claim 1." Pet. 63–64. In support, Petitioner provides a comparison of claims 1 and 8. *See* Ex. 1019, *cited at* Pet. 63–64. Petitioner also references the discussion of claim 1. *See* Pet. 64 (citing Pet. 35–63; Vento Decl. ¶¶ 274–289).

Patent Owner argues the similar subject matter of independent claim 8 together with the subject matter of independent claim 1 and does not provide arguments addressing the subject matter of claim 8 separate from those presented above as to claim 1. *See, e.g.*, PO Resp. 6–53.

For the same reasons discussed above as to independent claim 1, we find, based on the complete record, that Petitioner has demonstrated by a preponderance of the evidence that the proposed combination of

79

IPR2021-01169
Patent 9,652,993 B2

Cappellucci_949, Cappellucci_934, Cupp, and Tudor satisfies each of the
elements of independent claim 8.

As to claim 8, Petitioner relies on the same articulated reasons to
combine the relied-upon aspects of Cappellucci_949, Cappellucci_934,
Cupp, and Tudor, and the same explanation as to why one of ordinary skill
in the art would have had a reasonable expectation of success in the
combination provided for claim 1.  Pet. 26–35.

For the same reasons discussed above as to independent claim 1, we
find, based on the complete record, that Petitioner has demonstrated by a
preponderance of the evidence that one of ordinary skill in the art at the time
of the invention would have had reason to combine Cappellucci_949,
Cappellucci_934, Cupp, and Tudor, as proposed, and would have had a
reasonable expectation of success.

The analysis of Patent Owner's objective evidence of nonobviousness
is the same for claim 8 in the context of this asserted ground as for claim 1.
*See supra* § II.C.2.l.

For the reasons discussed above (§ II.C.2.a–k), the evidence presented
by Petitioner strongly indicates that claim 8 would have been obvious over
the combination of Cappellucci_949, Cappellucci_934, Cupp, and Tudor.
For the reasons also discussed above (§ II.C.2.l), Patent Owner has not
demonstrated a nexus; and, even if we were to assume a nexus, Patent
Owner's objective evidence would not weigh strongly in favor of
nonobviousness.  When considering all the evidence of obviousness and
nonobviousness together (*see In re Cyclobenzaprine*, 676 F.3d at 1079), we
find Petitioner's strong evidence of obviousness would outweigh Patent
Owner's objective evidence of nonobviousness, even if Patent Owner had

IPR2021-01169
Patent 9,652,993 B2

shown a nexus. Thus, we conclude Petitioner has demonstrated by a preponderance of the evidence that claim 8 would have been obvious over the combination of Cappellucci_949, Cappellucci_934, Cupp, and Tudor.

### 4. *Dependent Claims 2 and 9*

Claims 2 and 9 depend from independent claims 1 and 8, respectively. To address these claims, Petitioner discusses why the proposed combination of Cappellucci_949, Cappellucci_934, Cupp, and Tudor satisfies the additional limitations in these claims and discusses why one of ordinary skill in the art at the time of the invention would have had reason to combine the references as proposed with a reasonable expectation of success. *See* Pet. 64–68; Vento Decl. ¶¶ 290–304.

The record evidence, as presented, supports Petitioner's position as to the additional limitations in these dependent claims. Patent Owner does not present arguments addressing these claims. We find, based on the complete record, that Petitioner has demonstrated by a preponderance of the evidence that the proposed combination of Cappellucci_949, Cappellucci_934, Cupp, and Tudor satisfies the additional limitations in claims 2 and 9. We also determine that Petitioner has adequately explained why one of ordinary skill in the art would have combined the references as proposed and that there would have been a reasonable expectation of success. Based on the complete record and having weighed the underlying factual findings in the overall obviousness assessment (including in light of the objective indicia discussed above), we determine, that Petitioner has demonstrated by a preponderance of the evidence that claims 2 and 9 would have been obvious based on Cappellucci_949, Cappellucci_934, Cupp, and Tudor.

IPR2021-01169
Patent 9,652,993 B2

### 5. *Dependent Claims 3 and 10*

Claim 3 depends from claim 1, and claim 10 depends from claim 9, with both claims 3 and 10 adding the requirement: "further comprising facilitating communications among the plurality of users within a same reading level group using at least one computer." Ex. 1001, 21:13–15, 22:47–49. Petitioner argues that Cappellucci teaches or suggests "facilitating communications among the plurality of users . . . using at least one computer" based on the disclosure in Cappellucci_934 of "an 'email application' that allows users to email other users." Pet. 69 (citing Ex. 1005 ¶ 63; Ex. 1007 ¶¶ 48, 58, 87, Fig. 1; Vento Decl. ¶¶ 305–309).

According to Petitioner, one of ordinary skill in the art "would have understood, or it would have been obvious, that Cappellucci's email application *facilitates* communications among any group of users having access to the application, including users '*within a same reading level group*'" in that Cappellucci_949 discloses "table definitions storing information about classes, including the students/users in the class, demonstrating an association between similarly situated users." Pet. 69 (citing Vento Decl. ¶ 307; Ex. 1005, Fig. 13).

Patent Owner argues that Petitioner "makes the unsupported assertion that it would have been obvious to facilitate communications for the 'same reading level group' but never explains how Cappellucci would have been modified to accomplish this or why, and never asserts any reasonable expectation of success." PO Resp. 53–54 (citing Pet. 69–71; Bederson Decl. ¶ 97; Ex. 2012, 105:10–106:1).

Patent Owner's argument does not address Petitioner's position as to claims 3 and 10. As an initial matter, in the context of this asserted ground

IPR2021-01169
Patent 9,652,993 B2

overall, Petitioner provides a lengthy and thorough discussion as to the reasons to modify the relied-upon prior art and how it would have been modified, and also discusses why there would have been a reasonable expectation of success. *See* Pet. 26–35. That discussion applies to this entire asserted ground. Petitioner does not propose *further* modification to the relied-upon prior art to address the additional limitations of claims 3 and 10. *See* Pet. 69–71. Instead, Petitioner takes the position that, in the context of this proposed modification to the prior art, *one of ordinary skill in the art would have understood* the features and teachings *already present* in that proposed modified system as satisfying the requirement regarding facilitating communications for "the same reading level group":

> In light of the fact that Cappellucci allows users to both (1) send email to others users, EX1007, ¶87, and (2) track classroom information reflecting students having the "*same reading level group*," *see* EX1005, FIG. 13. [One of ordinary skill in the art] would have understood, or it would have been obvious, that the email application in Cappellucci would facilitate communications among similarly situated users, e.g., students in the same classroom with the same reading level.

Pet. 70–71 (citing Vento Decl. ¶ 308). As discussed in the Decision on Institution, we continue to understand Petitioner's statements as to what one of ordinary skill in the art "would have understood"—such as this discussion—as presenting (often in the alternative) a theory based on implicit disclosure. *See* Dec. Inst. 19–20 (citing *IXI IP*, 903 F.3d at 1262–65; *In re Burckel*, 592 F.2d at 1179; *In re Lamberti*, 545 F.2d at 750).

This discussion by Petitioner as to the understanding of one of ordinary skill in the art is supported by the testimony of Mr. Vento. *See* Vento Decl. ¶ 308; *see also* Pet. Reply 23 (asserting that "[t]he Petitioner relied on both Cappellucci's teachings and Mr. Vento's testimony to confirm

IPR2021-01169
Patent 9,652,993 B2

the basic concept that email facilitates communications between similarly situated students" (citing Vento Decl. ¶¶ 306–308)).  Dr. Bederson does not provide a contrasting view of the understanding of one of ordinary skill in the art, but rather parrots Patent Owner's argument as to the lack of explanation of the alleged further modification that Petitioner does not, in fact, rely upon.  *See* Bederson Decl. ¶ 97, *cited at* PO Resp. 53–54.

We find, based on the complete record, that Petitioner has demonstrated by a preponderance of the evidence that the proposed combination of Cappellucci_949, Cappellucci_934, Cupp, and Tudor satisfies the additional limitations in claims 3 and 10.  We also determine that Petitioner has adequately explained why one of ordinary skill in the art would have combined the references as proposed and that there would have been a reasonable expectation of success.  Based on the complete record and having weighed the underlying factual findings in the overall obviousness assessment (including in light of the objective indicia discussed above), we determine, that Petitioner has demonstrated by a preponderance of the evidence that claims 3 and 10 would have been obvious based on Cappellucci_949, Cappellucci_934, Cupp, and Tudor.

### 6. *Dependent Claims 4, 5, 7, 11, 12, and 14*

Claims 4, 5, and 7 depend from claim 1 and claims 11, 12, and 14 depend from claim 8.  To address these claims, Petitioner discusses why the proposed combination of Cappellucci_949, Cappellucci_934, Cupp, and Tudor satisfies the additional limitations and discusses why one of ordinary skill in the art would have had reason to combine the references as proposed. *See* Pet. 71–76; Vento Decl. ¶¶ 310–316, 320–331.

The record evidence, as presented, supports Petitioner's position as to the additional limitations in these dependent claims. Patent Owner does not present arguments addressing these claims. We find, based on the complete record, that Petitioner has demonstrated by a preponderance of the evidence that the proposed combination of Cappellucci_949, Cappellucci_934, Cupp, and Tudor satisfies the additional limitations in these claims. We also determine that Petitioner has adequately explained why one of ordinary skill in the art would have combined the references as proposed and that there would have been a reasonable expectation of success. Based on the complete record and having weighed the underlying factual findings in the overall obviousness assessment (including in light of the objective indicia discussed above), we determine, that Petitioner has demonstrated by a preponderance of the evidence that claims 4, 5, 7, 11, 12, and 14 would have been obvious based on Cappellucci_949, Cappellucci_934, Cupp, and Tudor.

### 7. Dependent Claims 6 and 13

Claim 6 depends from claim 1 and claim 13 depends from claim 8, with claims 6 and 13 each adding, "wherein aligning the first unmodified content further comprises mapping words within the first unmodified content to a content standard." Ex. 1001, 21:24–26, 22:59–61. Petitioner addresses claims 6 and 13 together, contending that the proposed combination of Cappellucci_949, Cappellucci_934, Cupp, and Tudor discloses the additional limitation. Pet. 73. Specifically, Petitioner states that "Cupp discloses '*aligning*' by '*mapping words within the . . . content to*' grade level" and that, as discussed as to elements 1.3 and 1.4, "MLOs, educational standards, and grade levels are related to and accord with each other."

IPR2021-01169
Patent 9,652,993 B2

Pet. 73 (citing Ex. 1009 ¶¶ 21–24; Pet. 41–49).  Petitioner adds that one of ordinary skill in the art "would have understood, or it would have been obvious, to map words in the first unmodified content to a content standard, such as an educational standard." *Id.* (citing Vento Decl. ¶ 318[16]; Ex. 1001, 17:4–7).

Patent Owner argues that "Petitioner argues only that content standards are related to grade levels, and does not argue that Cupp discloses mapping words to a content standard" and that, "[i]nstead, Petitioner baldly asserts doing so would have been obvious." PO Resp. 54 (citing Bederson Decl. ¶ 98; Pet. 73; Vento Decl. ¶ 18).  According to Patent Owner, "Petitioner provides no how or why for any modification, and does not present any argument regarding [reasonable expectation of success]." *Id.* at 54–55 (citing Bederson Decl. ¶ 98).

Patent Owner's argument does not address Petitioner's position.  As an initial matter, in the context of this asserted ground overall, Petitioner provides a lengthy and thorough discussion of the reasons to modify the relied-upon prior art and how it would have been modified, and also discusses why there would have been a reasonable expectation of success. *See* Pet. 26–35.  That discussion applies to this entire asserted ground. Petitioner does not propose *further* modification to the relied-upon prior art to address the additional limitations of claims 6 and 13.  *See* Pet. 73. Instead, Petitioner takes the position that, in the context of this proposed modification to the prior art, *one of ordinary skill in the art would have*

---

[16]  Based on the citation to paragraphs 317–319 of Mr. Vento's Declaration as to claims 6 and 13 overall, we understand the cite to "¶ 18" to have been intended as a reference to paragraph 318. *See* Pet. 73.

IPR2021-01169
Patent 9,652,993 B2

*understood* the features and teachings *already present* in that proposed modified system as satisfying the additional limitation in these claims. *See* Pet. 73 (citing Vento Decl. ¶¶ 317–319; Ex. 1009 ¶¶ 21–24; Pet. 41–49; Ex. 1001, 17:4–7). As discussed in the Decision on Institution, we continue to understand Petitioner's statements as to what one of ordinary skill in the art "would have understood"—such as in this discussion—as presenting (often in the alternative) a theory based on implicit disclosure. *See* Dec. Inst. 19–20 (citing *IXI IP*, 903 F.3d at 1262–65; *In re Burckel*, 592 F.2d at 1179; *In re Lamberti*, 545 F.2d at 750).

The discussion by Petitioner as to the understanding of one of ordinary skill in the art is supported by the testimony of Mr. Vento. *See* Vento Decl. ¶ 318; *see also* Pet. Reply 23 (summarizing its position and stating that, "[b]ased on these teachings and known-relationships, Petitioner explained it was obvious to align content by mapping words to a content standard"). Dr. Bederson does not provide a contrasting view of the understanding of one of ordinary skill in the art, but rather parrots Patent Owner's argument as to the lack of explanation of the alleged further modification that Petitioner does not, in fact, rely upon. *See* Bederson Decl. ¶ 98, *cited at* PO Resp. 54–55.

We find, based on the complete record, that Petitioner has demonstrated by a preponderance of the evidence that the proposed combination of Cappellucci_949, Cappellucci_934, Cupp, and Tudor satisfies the additional limitations in claims 6 and 13. We also determine that Petitioner has adequately explained why one of ordinary skill in the art would have combined the references as proposed and that there would have been a reasonable expectation of success. Based on the complete record and

IPR2021-01169
Patent 9,652,993 B2

having weighed the underlying factual findings in the overall obviousness assessment (including in light of the objective indicia discussed above), we determine, that Petitioner has demonstrated by a preponderance of the evidence that claims 6 and 13 would have been obvious based on Cappellucci_949, Cappellucci_934, Cupp, and Tudor.

### D. Patent Owner's Motion to Exclude

Patent Owner filed a Motion to Exclude certain exhibits and testimonial evidence. *See* MTE; MTE Reply. Petitioner opposes Patent Owner's Motion. *See* MTE Opp. We address each argument in turn below.

#### 1. Exhibits 1017, 1018, 1021, 1022, 1024–1028 and 1032–1041

Patent Owner argues that Exhibits 1017, 1018, 1021, 1022, 1024–1028 and 1032–1041 should be excluded in their entirety as (1) not relevant as "Petitioner failed to establish that they are printed publications or that they were publicly available" under 35 U.S.C. § 311(b), (2) not relevant in that Exhibits 1032–1035 and 1037 are "dated or were printed from the Internet after August 31, 2006," (3) inadmissible in that any copyright dates on these exhibits are hearsay not falling into any exception, and (4) not properly authenticated. *See* MTE 2–5.

As an initial matter, we dismiss as moot the Motion as to Exhibits 1018, 1021, 1024–1028 and 1032–1041 because we do not rely on them in this Decision. *See* TPG 79–80 ("In the Board's experience, consideration of the objected-to evidence is often unnecessary to resolve the patentability of the challenged claims, and the motion to exclude is moot."). Exhibits 1017 and 1022 are referenced above in this Decision. We address Patent Owner's arguments as to these two exhibits.

IPR2021-01169
Patent 9,652,993 B2

We are not persuaded by Patent Owner's first argument. As an initial matter, as noted by Petitioner, a motion to exclude is not the proper mechanism to challenge the prior art or printed publication status of an exhibit. MTE Opp. 4 (citing *Arista Networks, Inc. v. Cisco Sys., Inc.*, IPR2016-00303, Paper 53 at 9 (PTAB May 25, 2017) ("A motion to exclude is the wrong vehicle to challenge public availability, which is a substantive issue that goes to the sufficiency of the evidence, not to admissibility at issue here."); *Accord Healthcare, Inc., USA v. Daiichi Sankyo Co.*, IPR2015-00864, Paper 104 at 33–34 (PTAB Sept. 12, 2016).

Moreover, even assuming Patent Owner's Motion were the proper mechanism to address this issue, as argued by Petitioner, the Federal Circuit has held that non-prior art evidence may be used—as Exhibits 1017 and 1022 are used here—to show the state of the art and the knowledge of one of ordinary skill in the art. *See Yeda Research v. Mylan Pharm. Inc.*, 906 F.3d 1031, 1041 (Fed. Cir. 2018) ("[N]on-prior art evidence of what was known cannot be applied, independently, as teachings separately combinable with other prior art, but can be relied on for their proper supporting roles, e.g., indicating the level of ordinary skill in the art, what certain terms would mean to one with ordinary skill in the art, and how one with ordinary skill in the art would have understood a prior art disclosure." (quotation and citation omitted)), *cited at* MTE Opp. 4–5; *see also* MTE 2 (admitting that Exhibits 1017 and 1022 were "documents relied upon by Petitioner or its expert, Christopher Vento, for their contentions relating to what [one of ordinary skill in the art] would have been familiar with and the state of the art at the time of the invention"). In the Reply Brief, Patent Owner does not address the *Yeda Research* decision, and instead, simply states the opposite

IPR2021-01169
Patent 9,652,993 B2

proposition without support.  *See* MTE Reply 1 ("To be relevant to show the state of the art and the knowledge of [one of ordinary skill in the art], such information must be accessible and known to [one of ordinary skill in the art] prior to the '993 Patent's priority date, August 31, 2006.").

We need not address Patent Owner's second argument because, as mentioned above, we dismiss as moot the Motion as to Exhibits 1032–1035 and 1037.

 We turn now to Patent Owner's third argument, that Exhibits 1017 and 1022 are inadmissible in that any copyright dates on these exhibits are hearsay not falling into any exception.  MTE 3–4.  We are not persuaded by this argument.  As an initial matter, for the same reasons discussed as to the first argument, the copyright date goes to public availability, which, under *Yeda Research*, is not a basis to exclude these two exhibits.  *See* MTE Opp. 7 (relying on the prior discussion as to this argument).  Thus, Petitioner need not rely on the date in the copyright marks for the truth of the matter asserted—i.e., the years.[17]  *See id.* (arguing that "the dates listed on the disputed evidence are not hearsay because Petitioner is not relying on them 'to prove the truth of the matter asserted'" (quoting Fed. R. Evid. 801(c)(2)).  Accordingly, the copyright marks in Exhibits 1017 and 1022 are not hearsay in the context of how they are relied on by Petitioner in this proceeding.

We turn now to Patent Owner's fourth argument, that Exhibits 1017 and 1022 are not properly authenticated and thus, inadmissible under Federal Rules of Evidence 602 and 901.  MTE 4.  According to Patent Owner,

---

[17]  Exhibit 1017 has a mark of "© June 1995" (Ex. 1017 at 3) and Exhibit 1022 has a mark of "© 2004 William H. DuBay.  All Rights Reserved" (Ex. 1022 at 2).

IPR2021-01169
Patent 9,652,993 B2

"Petitioner fails to submit evidence from a witness with knowledge to support a finding that these documents are what the Petitioner contends they are" and fails to provide "any evidence relating to the authenticity of the dates in these documents." *Id.* We are not persuaded by this argument.

As discussed by Petitioner, Federal Rule of Evidence 901 provides a non-exhaustive list "of evidence that satisfies the requirement" as to authentication, including "(1) Testimony of a Witness with Knowledge," and "(3) Comparison by an Expert Witness or the Trier of Fact." Fed. R. Evid. 901. In his Declaration, Mr. Vento states that Exhibits 1017 and 1022 (among others) "are true and accurate copies of what they purport to be and that an expert in the field would reasonably rely on them to formulate opinions such as those set forth in this declaration." Vento Decl. ¶ 7. And, in a declaration filed with Petitioner's Opposition,[18] a library expert authenticated by comparison Exhibits 1017 and 1022. *See* Ex. 1043 ¶¶ 2, 5. In the Reply, Patent Owner focuses on the "authenticity of th[e] dates" on these Exhibits rather than the authenticity of the identity and content of the documents overall. *See* MTE Reply 2–3. For these reasons, we deny Patent Owner's Motion to Exclude as to Exhibits 1017 and 1022.

> *2. Exhibits 1011–1015, 1023, 1024, 1026, 1027, and 1029–1041*

Patent Owner argues that Exhibits 1011–1015, 1023, 1024, 1026, 1027, and 1029–1041 should be excluded in their entirety as uncited by Petitioner in either the Petition or Reply, although Patent Owner acknowledges they are cited in the Vento Declaration. MTE 4–5. Petitioner

---

[18] Patent Owner also does not contest the timing of the filing of the Fields Declaration. *See* MTE Reply.

IPR2021-01169
Patent 9,652,993 B2

opposes.  MTE Opp. 9–10.  We dismiss as moot the Motion as to these exhibits because we do not rely on them in this Decision.  *See* TPG 79–80.

### 3. The Vento Declaration

Patent Owner asserts that we should exclude paragraphs 7, 45–79, 81, 95–99, 101–103, 144, and 161–331 of the Vento Declaration because those paragraphs "are not relevant, are conclusory, lack foundation, conflict with other evidence, and are merely *ipse dixit*."  MTE 5; *see id.* at 5–15.  We address each of Patent Owner's arguments below.

### a. Testimony Allegedly Not Based on the Knowledge of One of Ordinary Skill in the Art

Patent Owner presents several arguments as to why certain paragraphs of Mr. Vento's testimony should be excluded as allegedly not based on the knowledge of one of ordinary skill in the art.  *See* MTE 5–10.  First, Patent Owner argues that we should exclude paragraphs 45–79 of the Vento Declaration because those paragraphs allegedly "constitute improper expert testimony beyond Vento's expertise about the education system from the perspective of a seasoned educator."  MTE 5; *see also id.* at 5–9 (entire argument).  We dismiss as moot the Motion as to these paragraphs because we do not rely on them in this Decision.  *See* TPG 79–80.

Second, Patent Owner argues that we should exclude paragraphs 46–47, 49–54, 57–64, 66, 70–72, 74, 75, 77, 180, 230, 239, 246, 265, 266, 290, 293, 312, 314, and 315 because those paragraphs cite to Exhibits 1017, 1018, 1021, 1022, 1024–1028, and 1032–1041, which Patent Owner argues are inadmissible.  *See* MTE 9–10.  For the reasons discussed above, we deny or dismiss as moot Patent Owner's Motion as to the listed Exhibits, and thus, do not exclude the listed paragraphs of the Vento Declaration on this basis.

IPR2021-01169
Patent 9,652,993 B2

### b. *Testimony Allegedly Relying on Hindsight*

Patent Owner argues that paragraphs 161–331 of the Vento Declaration should be excluded because they "lack factual support, conflict with other evidence, and constitute impermissible hindsight." MTE 10; *see also id.* at 10–14 (entire argument). We are not persuaded to exclude these paragraphs because, as argued by Petitioner, the bases identified go to the *weight* of the evidence, not its *admissibility*. *See* TPG 79 ("A motion to exclude is not a vehicle for addressing the weight to be given evidence."); MTE Opp. 13 (stating that "all the issues go to weight and sufficiency of the evidence, not to admissibility").[19] "Vigorous cross-examination [and] presentation of contrary evidence . . . are the traditional and appropriate means of attacking shaky but admissible evidence" (*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993)), not a motion to exclude the evidence. We deny the Motion as to this basis.

### c. *Testimony as to the '993 Patent's Prosecution History*

Next, Patent Owner argues that we should exclude paragraphs 95–99 of the Vento Declaration because, according to Patent Owner, Mr. Vento "does not have any expertise to opine on the prosecuting of patents." MTE 14. We dismiss as moot the Motion as to these paragraphs because we do not rely on them in this Decision. *See* TPG 79–80.

---

[19] We agree with Petitioner that Patent Owner mischaracterizes the Federal Circuit's decision in *InTouch Technologies, Inc. v. VGo Communications, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014) as involving "excluding" evidence, when, in fact, the discussion addressed the *weight* of the expert's testimony. *See* MTE Opp. 13–14 (discussing MTE 10).

### d. Testimony Allegedly Outside the Petition

Patent Owner presents two arguments as to why certain paragraphs of Mr. Vento's testimony should be excluded as allegedly "outside the Petition." MTE 15. First, Patent Owner argues that we should exclude paragraphs 46, 47, 66–68, 71, 72, 74, and 76 of the Vento Declaration because those paragraphs allegedly "cite[] over 22 documents that are not presented against patentability in the Petition or Decision Granting Institution." *Id.* We dismiss as moot the Motion as to these paragraphs because we do not rely on them in this Decision. *See* TPG 79–80.

Second, Patent Owner argues that we should exclude "additional arguments that are not presented in the Petition, including in Paragraphs 171, 180, 181, 246, 297 relating to [one of ordinary skill in the art's] combination of Cappellucci and Cupp." MTE 15. We are not persuaded by this argument. As an initial matter, Patent Owner does not actually identify any *specific* "additional arguments" in the highlighted paragraphs. Moreover, an allegedly improper incorporation by reference is a regulatory issue, not an evidentiary one, and thus, not within the proper scope of a motion to exclude. *See* MTE Opp. 14 (noting that this argument by Patent Owner was "without citation to or reliance on any Federal Rule of Evidence"). We deny the Motion as to this basis.

### III. CONCLUSION

Upon consideration of the briefing and the evidence of record, we determine that Petitioner has proven by a preponderance of the evidence that claims 1–14 would have been obvious based on Cappellucci_949,

IPR2021-01169
Patent 9,652,993 B2

Cappellucci_934, Cupp, and Tudor.[20]  We deny in part and dismiss in part as moot Patent Owner's Motion to Exclude Evidence.

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–14 | 103(a) | Cappellucci_949, Cappellucci_934, Cupp, Tudor | 1–14 | |
| Overall Outcome | | | 1–14 | |

---

[20]  Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding, 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices.  *See* 37 C.F.R. §§ 42.8(a)(3), (b)(2).

IPR2021-01169
Patent 9,652,993 B2

## IV.    ORDER

For the reasons above, it is:

ORDERED that Petitioner has proven by a preponderance of the evidence that claims 1–14 are unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude Evidence is denied in part and dismissed in part as moot; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2021-01169
Patent 9,652,993 B2

FOR PETITIONER:

Robert E. Sokohl
Richard M. Bemben
Byron Pickard
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
rsokohl-PTAB@sternekessler.com
rbemben-PTAB@sternekessler.com
bpickard-PTAB@sternekessler.com


FOR PATENT OWNER:

Robert Isackson
Henry Gabathuler
LEASON ELLIS LLP
Isackson@leasonellis.com
Gabathuler@leasonellis.com
lelitdocketing@leasonellis.com

97



US009652993B2

(12) **United States Patent**
Dodelson et al.

(10) **Patent No.:** US 9,652,993 B2
(45) **Date of Patent:** *May 16, 2017

(54) **METHOD AND APPARATUS FOR PROVIDING DIFFERENTIATED CONTENT BASED ON SKILL LEVEL**

(71) Applicant: **Achieve3000, Inc.**, Lakewood, NJ (US)

(72) Inventors: **Saki Dodelson**, Lakewood, NJ (US); **Susan Gertler**, Teaneck, NJ (US); **Rivki Locker**, Lakewood, NJ (US)

(73) Assignee: **ACHIEVE3000, INC.**, Lakewood, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/180,179**

(22) Filed: **Feb. 13, 2014**

(65) **Prior Publication Data**

US 2014/0193796 A1      Jul. 10, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 11/920,087, filed as application No. PCT/US2006/034231 on Aug. 31, 2006, now Pat. No. 8,714,986.

(51) **Int. Cl.**
| | |
|---|---|
| *G09B 5/10* | (2006.01) |
| *G09B 7/00* | (2006.01) |
| *G09B 7/08* | (2006.01) |

(52) **U.S. Cl.**
CPC ................ *G09B 5/10* (2013.01); *G09B 7/00* (2013.01); *G09B 7/08* (2013.01)

(58) **Field of Classification Search**
CPC ..................................... G09B 5/10

USPC ....................................................... 434/323
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,606,480 | B1 * | 8/2003 | L'Allier et al. | .............. 434/362 |
| 6,626,679 | B2 | 9/2003 | Skeans et al. | |
| 7,493,077 | B2 | 2/2009 | Coleman et al. | |
| 7,677,896 | B1 * | 3/2010 | Sonwalkar | .................... 434/236 |
| 2003/0054328 | A1 | 3/2003 | Stuppy et al. | |
| 2003/0152894 | A1 * | 8/2003 | Townshend | .............. G09B 7/04 434/178 |
| 2003/0175676 | A1 * | 9/2003 | Theilmann et al. | .......... 434/350 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| KR | 20000030514 A | 6/2000 |
| KR | 20020048679 A | 6/2002 |

OTHER PUBLICATIONS

International Search Report Mailed on Jun. 1, 2007 for PCT Application No. PCT/US2006/034231.

(Continued)

*Primary Examiner* — Thomas Hong
(74) *Attorney, Agent, or Firm* — Moser Taboada

(57) **ABSTRACT**

A system and method is disclosed for providing differentiated content to a user comprising determining a skill level of the user, obtaining unmodified content, aligning the unmodified content to a set of content standards, modifying the aligned content in accordance with the user's skill level, providing the modified aligned content to the user, reassessing the user's skill level based on a response from the user to the modified aligned content, and modifying new aligned content in accordance with the re-assessed user's skill level.

**14 Claims, 12 Drawing Sheets**



Beable EX1001
U.S. Patent No. 9,652,993

**US 9,652,993 B2**

Page 2

(56)         **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2003/0212541 A1 * | 11/2003 | Kinder | G06F 17/27 |
| | | | 704/4 |
| 2004/0110119 A1 | 6/2004 | Riconda et al. | |
| 2004/0152062 A1 * | 8/2004 | Adams | 434/336 |
| 2005/0158697 A1 | 7/2005 | Nelson et al. | |
| 2005/0196730 A1 * | 9/2005 | Kellman | 434/118 |
| 2005/0239032 A1 * | 10/2005 | Hartenberger | G09B 7/00 |
| | | | 434/322 |
| 2005/0287509 A1 | 12/2005 | Mohler | |
| 2006/0121433 A1 * | 6/2006 | Adams | G09B 7/02 |
| | | | 434/323 |
| 2006/0147890 A1 * | 7/2006 | Bradford et al. | 434/362 |
| 2006/0234201 A1 | 10/2006 | Pierson et al. | |
| 2007/0231780 A1 | 10/2007 | Shulman | |
| 2008/0131863 A1 | 6/2008 | Stuppy | |

OTHER PUBLICATIONS

Written Opinion of the International Searching Authority Mailed on
Jun. 1, 2007 for PCT Application No. PCT/US2006/034231.
International Preliminary Report on Patentability Mailed on Mar. 3,
2009 for PCT Application No. PCT/US2006/034231.

* cited by examiner



FIG. 1

100
USER
110
USER
112
EVALUATOR
114
170
E-MAIL ENGINE
104
SUPPORT CIRCUITS
MEMORY
E-MAIL APPLICATION
O/S
CPU
154
126
134
142
118
FEEDBACK ENGINE
108
SUPPORT CIRCUITS
130
CPU
158
MEMORY
FEEDBACK APPLICATION
168
PERFORMANCE DATABASE
138
O/S
122
150
DIFFERENTIATION ENGINE
102
SUPPORT CIRCUITS
124
MEMORY
132
O/S
116
160
PROFILE DATABASE
ASSESSMENT/ DIFFERENTIATION APPLICATION
140
CPU
152
STANDARDS ENGINE
106
CPU
156
SUPPORT CIRCUITS
128
MEMORY
136
ALIGNMENT APPLICATION
144
INTERMEDIATE STANDARDS DATABASE
148
O/S
120
EDUCATIONAL STANDARDS DATABASE
146
162
NEWS DATABASE
164
ACADEMIC LESSON DATABASE
166
ALIGNED CONTENT DATABASE



FIG. 2

200

START
202
USER(S) REGISTER(S) WITH SYSTEM
204
DEVELOP PROFILE(S)
206
ASSESS USER(S) SKILL LEVEL(S)
208
MAP ASSESSED SKILL LEVEL(S) TO PROFILE(S)
210
OBTAIN UNMODIFIED LEARNING CONTENT
212
A
ANALYZE UNMODIFIED LEARNING CONTENT TO ALIGN TO STANDARDS
214
MATCH VERSION OF LEARNING CONTENT TO A SINGLE USER
216
MATCH MULTIPLE VERSIONS OF LEARNING CONTENT TO DIFFERENT USERS
218
PREPARE LEARNING CONTENT AS LESSON(S) TO USER(S)
220
DELIVER LESSON(S) TO USER(S)
222
USER(S) RECEIVE LEARNING CONTENT AND COMPLETE RELATED LESSON(S)
224
RECEIVE COMPLETED LESSON(S) AND RE-ASSESS SKILL LEVEL(S)
226
GRADE COMPLETED LESSON(S)
228
EVALUATE COMPLETED LESSON(S) AND PROVIDE FEEDBACK TO USER(S)
230
USER(S) MODIFY ANSWERS TO LESSON(S) AND SUBMIT FINAL COMPLETED LESSON(S)
232
CHANGE IN SKILL LEVEL(S)?
234
NO
LEAVE SKILL LEVEL(S) OF USER(S) AS IS
236
YES
ADJUST SKILL LEVEL(S) OF USER(S)
238
REPORT GRADED LESSON(S) AND ADJUSTMENT/NON-ADJUSTMENT OF SKILL LEVEL(S) TO EVALUATOR
240
EVALUATOR ACCEPTS ADJUSTMENT TO USER(S) SKILL LEVEL(S) ?
242
YES
MODIFY NEW LEARNING CONTENT TO ADJUSTED SKILL LEVEL(S)
244
NO
MODIFY NEW LEARNING CONTENT TO NON-ADJUSTED SKILL LEVEL(S)
246
CONTINUE SESSION?
248
NO
END
250
YES
A



300
START
302
OBTAIN AND STORE EDUCATIONAL STANDARDS
304
ASSESS SYSTEM COMPETENCIES
306
ANALYZE EDUCATIONAL STANDARDS FOR CONTENT AND STRUCTURE TO CREATE STANDARDS CODES
308
MATCH SYSTEM COMPETENCIES TO STANDARDS CODES TO PRODUCE INTERMEDIATE STANDARDS
310
OBTAIN UNMODIFIED LEARNING CONTENT AND STORE
312
ALIGN UNMODIFIED CONTENT TO EDUCATIONAL STANDARDS USING INTERMEDIATE STANDARDS
314
MATCH ALIGNED CONTENT TO EACH USER
316
END
318

FIG. 3



FIG. 4

400

START — 402

PREPARE LESSON E-MAIL TO GROUP OF USERS — 404

406 — MODIFY LESSON AND SEND VERSIONS OF LESSON E-MAIL TO EACH USER, WHERE EACH VERSION IS ALIGNED TO EACH USER'S SKILL LEVEL

408 — USERS RECEIVE AND OPEN VERSIONS OF LESSON E-MAIL TO ACCESS LESSON(S)

412

410 — USER(S) E-MAIL OTHER USER(S) TO DISCUSS LESSON

COPY USERS' E-MAILS TO EVALUATOR

USER(S) E-MAIL EVALUATOR NOTIFICATION OF COMPLETED LESSON(S) — 414

416 — SEND E-MAIL TO EVALUATOR UPON COMPLETION OF LESSON(S) BY USER(S)

E-MAIL EVALUATOR OF CHANGE IN USER(S) SKILL LEVEL(S) — 418

YES

REPEAT? — 420

NO

END — 422

500

FIG. 5A

**Schools Are Getting Healthy**

— 502

**ST. PAUL, Minnesota**  A new law says that schools must
help kids eat good foods and exercise. The schools must set
goals before this fall.

— 504

Why was the new law made? Kids who eat unhealthy foods may
be overweight. They may also miss more school. Also, some
kids eat too much sugar. Then, they have trouble paying
attention at achool. The law does not tell schools what to
change. Each school district can decide what to change.

— 504

Some schools are making changes in the lunchroom. They will
serve only healthy foods. Others are doing more. St. Paul,
Minnesota, has new drink machines. They will only hold water,
fruit juice, and milk. Schools in Cape Girardeau, Missouri, will
no longer have candy. In Farmington, Utah, schools will have
recess before lunch. Then, kids won't rush through lunch to go
play. Some districts will not allow teachers to keep kids in at
recess. Why not? They say that kids need time to play.

Schools see some promblems with the new law. The schools
did not reveive any money to make the changes. Also, many
schools say that they will lose money. Why? They can no
longer sell candy and soda. In addition, nothing happens to
schools that do not meet the new goals.

Will the new law help kids be healthier? People must wait and
see.

*Information for this story came from AP.*

**Dictionary**

attention  *(noun)* ⬡  looking or listening carefully

district  *(noun)* ⬡  a group of schools in one area

goal  *(noun)* ⬡  something that a person wants to get done

} — 506

0007

FIG. 5B

File Edit View Favorites Tools Help
News
> Home
> News
> Mailbox
> Stock
> Technology
> Writing
> Contests
> Kids Constributions
> Teacher Resources
> Research
> Games
Privacy / Contact
Activity
Instructions
Select the letter of the correct answer.
Do It!
506
508
Some schools think that what the kids are doing in the picture is important. These people would **most** likely say that ________ .
510
A Teachers should not keep kids in at recess.
B Only healthy foods should be served at school.
C Candy should no longer be sold at school.
D Drink machines should sell water, juice, and milk.
512
Question 1 of 8
Refer to Article



FIG. 5C

File Edit View Favorites Tools Help
News
Activity
> Home
> News
> Mailbox
> Stock
> Technology
> Writing
> Contests
> Kids Constributions
> Teacher Resources
> Research
> Games
Privacy / Contact
Schools Are Getting Healthy
THOUGHT ? QUESTION
514
526
STANDARD
RUBRIC
Think about the law talked about in the news story. What changes could the school make to follow the law?
INCLUDE IN YOUR ANSWER
528
Type your answer in the box below.
516
518
CHECK YOUR WORK
520
522
524
Check Spelling
Finish Later
Submit Now



530

FIG. 5D

News

## Standards

**Schools Are Getting Healthy**

**NJ Core Curriculum Content Standards**

**Language Arts Literacy**

3.1: Reading. All students will understand and apply the knowledge of sounds, letters, and words in written English to become independent and fluent readers, and will read a variety of materials and texts with fluency and comprehension.

- 3.1.4.A: Concepts about Print/Text
  - 3.1.4.A.3: Identify and locate features that support text meaning (e.g., maps, charts, illustrations).
- 3.1.4.D: Fluency
  - 3.1.4.D.2: Read at different speeds using scanning, skimming, or careful reading as appropriate.
- 3.1.4.E: Reading Strategies (before, during, and after reading)
- 3.1.4.F: Vocabulary and Concept Development
  - .3.1.5.F.2: Infer specific word meanings in the context of reading passages.
  - .3.1.4.F.3: Identify and correctly use antonyms, synonyms, homophones, and homographs
  - .3.1.4.F.4: Use a grade-appropriate dictionary (independently) to define unknown words.
- 3.1.4.G: Comprehension Skills and Response to Text
  - .3.1.4.G.3: Cite evidence from text to support conclusions.
  - 3.1.4.G.13: Read regularly in materials appropriate for their independent reading level.
  - 3.1.4.G.2: Distinguish cause and effect, fact and opinion, main idea and supporting details in nonfiction texts (e.g., science, social studies).

3.2: Writing. All students will write in clear, concise, organized language that varies in content and form for different audiences and purposes.

- 3.2.4.A: Writing as a Process (prewriting, drafting, revising, editing, and postwriting)

FIG. 5E

File Edit View Favorites Tools Help
Schools Are Getting Healthy
ST. PAUL, Minnesota Get ready for some changes at school. A new federal law requires schools to encourage exercise and good nutrition, and many states are making changes in classrooms as well as in cafeterias.
534
The law, which went into effect on July 1, orders schools to adopt nutrition and exercise goals before classes resume in the fall. The law's objective is to fight rising childhood obesity rates and help kids do better in school. Experts say that kids who maintain an unhealthy diet are not only more likely to be overweight but are also more likely to miss school. In addition, kids who eat too much sugar find it more difficult to focus in the classroom.
The law is broad enough so that each school district can determine which changes are necessary. Some schools are requiring changes in the cafeteria, while others go beyond this. In St. Paul, Minnesota, for example, new vending machines will dispense water, fruit juice, and milk instead of soft drinks. In Farmington, Utah, schools will hold recess before lunch so that kids eat slowly and carefully instead of racing through their meals to get to the playground. Many school districts will no longer permit teachers to withhold recess as a punishment. Outdoor activity, these schools argue, is a necessary part of fitness and should never be taken away.
534
Some schools are extending the changes to classroom. Teachers in Cape Girardeau, Missouri, cannot give out certain treats, including lollipops and soft drinks. District elementary school principal Rhonda Dunham wants to try other rewards for well-behaved students. Dunham is considering elegant lunches, where kids get specially prepared meals at tables with linen tablecloths, china, and glassware. "They feel a bit more grown-up that way," Dunham said.
Classroom candy also is being banished in Perham Dent, Minnesota. "The truth is, one Jolly Rancher isn't bad, but 13 years of several Jolly Ranchers a day is a bad habit to learn,"said superintendent Tamara Uselman, referring to a type of hard candy. Uselman's district is asking teachers to get their students moving during class time. One geography teacher is setting up stations in her classroom so that students move to a new station every 20 minutes.
Schools agree that it is important for them to promote fitness and good nutrition, but they have concerns about the law. Congress did not give schools any money to make the changes or to make up for income the schools will lose if they get rid of their vending machines. In addition, schools are already pressed for time because another law requires them to meet certain academic standards. School officials say it is not easy to find even more time to work on these new goals. Also, the law contains no punishments for schools that do not live up to it..
"I don't think the federal government put enough teeth into [ the new law]," elementary school principal Dunham said. "We are accountable basically only to ourselves. In some school districts, I could see [following the law] going by the wayside."
534
532
The Associated Press contributed to this story.
Dictionary
accountable (adjective) responsible
dispense (verb) to supply a product, such as food or money
nutrition (noun) study of food and how it relates to health
obesity (noun) the state of being very overweight
withhold (verb) to refuse to do or give something
536
Related Links:
Learn more about food and fitness
538



600

Class: Grade6 — 602

| User (604) | Read Level (606) | Sep 05 | | Oct 05 | | Nov 05 (Grade6) | | Dec 05 | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total MC News Activities | Average Monthly Score | Total MC News Activities | Average Monthly Score | Total MC News Activities | Average Monthly Score | Total MC News Activities | Average Monthly Score |
| 1 Boyd, Frances | 5.2 / 815L | 27 | 55% | 21 | 47% | 36 | 74% | 32 | 80% * |
| 2 Boyd, Scott | 6.1 / - | 21 | 41% | 21 | 45% | 20 | 50% | 20 | 66% |
| 3 Brock, Zander | 3.2 / 537L | 21 | 47% | 22 | 50% | 21 | 53% | 20 | 58% * |
| 4 Heuser, Ashley | 9-10 / 1200L | 21 | 47% | 21 | 49% | 20 | 52% | 21 | 64% * |
| 5 Perez, Sierra | 6.1 / 857L | 14 | 52% | 13 | 52% | 12 | 53% | 13 | 64% * |
| 6 Test, Test | 4.1 / - | 21 | 47% | 21 | 49% | 20 | 52% | 20 | 54% |
| 7 User, New | 4.1 / - | 21 | 47% | 21 | 49% | 20 | 52% | 20 | 54% |
| Class: Grade6 - Total Users: 7 | | 146 | 48% | 140 | 49% | 149 | 55% | 146 | 63% |

610  612  616  614

FIG. 6

700

**Snapshot of all standards**
*Jan 5, 2006 - Feb 5, 2006*

| Curriculum: Language Arts — 702 | | | Sections: Language Arts | | Level: Performance Objective |
|---|---|---|---|---|---|
| Class: Grade6 — 704 | | | Grade6 | | Room No: Grade6 — 716 |
| 706 | 708 | 710 | 712 | 714 | |
| User | Read Level | Questions Completed | Student has demonstrated mastery Score: 80 - 100% | Additional practice recommended Score: 65 - 80% | Aggressive intervention strongly recommended Score: < 65% |
| Boyd, Frances | 5.2 / 815L | 579 | Concept 1: | | |
| Boyd, Scott | 6.1 / - | 381 | Concept 1: | | |
| Brock, Zander | 3.2 / 537L | 419 | Concept 4: Concept 1: | | |
| Heuser, Ashley | 9-10 / 1200L | 472 | Concept 1: | | |
| Perez, Siarra | 6.1 / 857L | 403 | Concept 1: | | Concept 4: |
| Test, Test | 4.1 / - | 269 | Concept 4: | | Concept 1: |
| User, New | 4.1 / - | 290 | Concept 4: | | Concept 1: |

FIG. 7

Export to Excel    Print Report

**Analysis of a particular standard**
Jan 5, 2006 - Feb 5, 2006

Curriculum: Language Arts ——— 802    Sections: Language Arts

Standard: READING
**Concept:** Strand 3:: Comprehending Informational Text
**Performance Objective:** Concept 3: **Persuasive Text**
Explain basic elements of argument in text and their relationship to the author's purpose and use of persuasive strategies.    } 804

Class: Grade6 ——— 806    Grade: 6    Room No: Grade6

| User 808 | Read Level 810 | Questions Completed 812 | Average Score* 814 | Recommendation 816 | Additional Activities that cover this Performance Objective click *Article* to preview - Click *Assign* to assign article to student 818 |
|---|---|---|---|---|---|
| Boyd, Frances | 5.2 / 815L | 661 | 77 | Additional practice recommended. | News > Demo > Essay Packing Up   Assign |
| Boyd, Scott | 6.1/ .- | 391 | 63 | Aggressive intervention strongly recommended. | |
| Brock, Zander | 3.2 / 537L | 464 | 60 | Aggressive intervention strongly recommended. | |

800

**FIG. 8**

US 9,652,993 B2

1

# METHOD AND APPARATUS FOR PROVIDING DIFFERENTIATED CONTENT BASED ON SKILL LEVEL

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of pending U.S. patent application Ser. No. 11/920,087, entitled "System and Method for Providing Differentiated Content Based on Skill Level" filed on Nov. 8, 2007, which claims benefit of PCT Patent Application, International Application No. PCT/ US2006/034231, International Filing Date 31 Aug. 2006. Each of the aforementioned related patent applications is herein incorporated in its entirety by reference.

## BACKGROUND

### Field of the Invention

Embodiments of the present invention generally relate to a system and method for providing instructional material to users, and more specifically, to a web-based system and method for providing customized instructional material to a plurality of users, where the instructional material is modified to match each skill level of each user.

### Description of the Related Art

Existing instructional methods and tools available today are rigid and not structured to meet the requirements of a particular user. For example, in most classroom settings, a student is placed in a grade level that is initially based on the age of the student. An assessment test may be given to determine where to place the student within a particular subject level if the course offers multiple levels within one grade. For example, an English course may include a remedial level, an average or "regular" level, and an advanced or "honor" level. Once the student is placed within a particular course level, the student, along with the rest of the class, is given a series of lessons taken from a lesson plan chosen by the instructor, which may or may not be approved by a faculty head. The student may be tested periodically and, at the end of a school year, the instructor, or evaluator, will give the student a grade, which should be indicative of the student's proficiency in the course.

If the student receives a passing grade, then he or she may advance to the next level. If the student fails the course, then the student must repeat the course. If the student fails too many courses, the student may be required to repeat the grade. In some grade school systems, the student may take remedial courses during the summer break between school years which, if successfully completed, allow the student to continue to the next level. A lesson plan is rarely, if ever, modified to accommodate the proficiency or skill level of a particular student, or even for a small group of students.

Because of the sheer number of students and the lack of resources available, class sizes typically prevent meaningful one-on-one interaction between an instructor and a student. The more fortunate students who are struggling with the subject matter may get private tutoring or help from family or friends. The students who excel in a particular subject matter typically receive the top grades and usually have to wait until the following school year to advance to the next grade level. These gifted students may lose interest in the certain courses because of the lack of intellectual stimulation. In addition, in today's schools, many students come from different cultural and social backgrounds and English may not be their first language. Thus, a language barrier may

2

exist, adding another level of difficulty and frustration for both the English-speaking and non-English speaking students, and their instructor.

Educators take these factors into consideration, in addition to others, in developing instructional and educational programs. For example, various governing bodies, such as state and local school boards, establish educational requirements or recommendations. The educational requirements or recommendations are typically embodied in formal guidelines or standards. Such requirements or recommendations will be referred to herein as "educational standards." Educators are encouraged, or required, to incorporate the educational standards in their educational plans.

To assist the educators, educational resource providers, such as textbook providers, generate resources that substantially correlate to the educational standards. The resource providers presently attempt to perform this correlation by obtaining the educational standards and, in a subjective determination by the resource provider, design resources correlated to the educational standards. For example, a textbook company creates social studies textbooks for a sixth grade skill level in accordance with state educational standards for sixth grade students. However, these resources may not include all the material preferred by an educator for a specific subject. In addition, resources quickly become outdated and do not take into account differences in skill levels between students within a grade level. Although the resources may be aligned to the appropriate educational standards, not all students in a class may be at the same education skill level. Thus, teaching from one textbook for a particular grade level may not be an efficient method of teaching, and may leave some students behind. Teachers do not have time to allow students to repeatedly practice the skills necessary to advance their skill levels, since the teachers must progress through a range of subject matter in accordance with educational standards. Thus, students do not necessarily receive enough time to perform exercises to increase their skill levels.

Additionally, students often are pressured to meet educational requirements to advance to the next grade level, regardless of whether the students' skill levels have advanced. However, in a given grade level of students, a majority of the students may test lower in skill levels than the given grade. Thus, a teacher will provide learning material that is aligned to the lower skill level, which may not necessarily meet the educational requirements specified for grade level.

With the vast use of networked technologies, such as the Internet and the World Wide Web, new teaching tools and methods have been created to assist educators. Some classrooms are equipped with computer workstations. However, most of the teaching tools and methodologies used with computers today adopt the classic classroom paradigm described above.

The LEXILE Framework for Reading (MetaMetrics, Inc.) includes a method for analyzing reading material using, primarily, the word frequency and sentence lengths in a pre-determined block of text. LEXILE then assigns a LEXILE Score to the text based on a predetermined scale. The LEXILE Framework also provides assessment tests for students and provides a LEXILE score for each student. Educators may use the LEXILE system to match a student's LEXILE score to appropriate reading material with the same LEXILE score. However, this system merely matches specific reading content to students with certain skill levels. An educator using the LEXILE system typically cannot use one learning resource or textbook for a class, but rather has to

US 9,652,993 B2

3

provide multiple materials to meet each student's assessed skill level. This is a burdensome task for the educator.

Thus, there is a need for a learning tool that allows a user to progress in the learning of a subject matter in a manner suited, customized or adapted for that particular user. There is a need for such a learning tool that does not demand the extensive resources required for one-on-one or small class-room settings. There is also a need for a learning tool that continuously assesses the learning progress of an individual user and customizes learning content suited the particular user while also aligning the learning content with applicable educational standards.

SUMMARY

An embodiment of the present invention includes a method for providing differentiated content to a user, comprising the steps of providing a first set of questions to the user, receiving a first set of answers related to the first set of questions from the user, analyzing the first set of answers to produce a first skill level associated with the user, obtaining a first unmodified content from at least one source, modifying the first unmodified content in accordance with the first skill level of the user to produce a first modified content, generating a second set of questions related to the first modified content, presenting the first modified content and the second set of questions to the user, receiving a second set of answers related to the second set of questions from the user, analyzing the second set of answers to produce a second skill level associated with the user, obtaining a second unmodified content from at least one source, and modifying the second unmodified content in accordance with the second skill level to produce a second modified content.

Another embodiment of the present invention includes a method for providing content to a plurality of users, where the content provided to each user is the same in information but customized in presentation in accordance with a skill level of each user, comprising the steps of providing a first set of questions to the plurality of users, receiving a plurality of first sets of answers related to the first set of questions, wherein each first set of answers is associated with each user of the plurality of users, analyzing each first set of answers of the plurality of first sets of answers to produce a plurality of first skill levels, wherein each first skill level is associated with each user, obtaining a first unmodified content from at least one source, modifying the first unmodified content to produce a plurality of versions of first modified content, wherein each version of first modified content is associated with each first skill level associated with each user, generating a plurality of second sets of questions wherein each second set of questions is related to each version of first modified content, matching each version of first modified content and each second set of questions to each first skill level associated with each user, and presenting each matched version of first modified content and each matched second set of questions to each user of the plurality of users.

Another embodiment of the present invention includes a computer system for providing differentiated content to a user comprises at least one central processing unit, at least one set of support circuits, a first server comprising a differentiation engine, wherein the differentiation engine comprises a profile database for storing a user profile, and an assessment application to perform the functions of developing a user profile, wherein the user profile comprises learning characteristics of the user, assessing a plurality of skill levels associated with the user, and preparing custom-

4

ized content based on the plurality of skill levels, and a second server comprising a standards engine communicatively connected with the differentiation engine, wherein the standards engine comprises a standards database for storing a plurality of sets of content standards, an intermediate standards database for storing a plurality of sets of intermediate standards, and an alignment application to perform the functions of obtaining unmodified content, and applying a set of intermediate standards to align the unmodified content to a set of content standards from the plurality of sets of content standards.

In yet another embodiment of the present invention, a computer system for providing differentiated content to a user comprising a central processing unit, a set of support circuits, and a server, wherein the server stores and maintains a memory comprising, at least one operating system, a differentiation engine, a communication engine interfacing with the differentiation engine, a standards engine interfacing with the differentiation engine, and a feedback engine interfacing with the differentiation engine, the communications engine, and the standards engine, is provided.

Another embodiment of the present invention includes a computer-readable memory medium storing executable code for implementing a method to provide differentiated content to a user on a computer, wherein the method comprises the steps of providing a first set of questions to the user, receiving a first set of answers related to the first set of questions from the user, analyzing the first set of answers to produce a first skill level associated with the user, obtaining a first unmodified content from at least one source, modifying the first unmodified content in relation to first skill level of the user to produce a first modified content, generating a second set of questions related to the first modified content, presenting the first modified content and the second set of questions to the user, receiving a second set of answers related to the second set of questions from the user, analyzing the second set of answers to produce a second skill level associated with the user, obtaining a second unmodified content from at least one source, and modifying the second unmodified content in relation to the second skill level to produce a second modified content.

Another embodiment of the present invention includes a computer-readable memory medium storing executable code for implementing a method to provide content to a plurality of users, where the content provided to each user is the same in information but customized in presentation in accordance with a skill level of each user, wherein the method comprises the steps of providing a first set of questions to the plurality of users, receiving a plurality of first sets of answers related to the first set of questions, wherein each first set of answers is associated with each user of the plurality of users, analyzing each first set of answers of the plurality of first sets of answers to produce a plurality of first skill levels, wherein each first skill level is associated with each user, obtaining a first unmodified content from at least one source, modifying the first unmodified content to produce a plurality of versions of first modified content, wherein each version of first modified content is associated with each first skill level associated with each user, generating a plurality of second sets of questions wherein each second set of questions is related to each version of first modified content, matching each version of first modified content and each second set of questions to each first skill level associated with each user, and presenting each matched

US 9,652,993 B2

5

version of first modified content and each matched second set of questions to each user of the plurality of users.

BRIEF DESCRIPTION OF THE DRAWINGS

So the manner in which the above recited features of the present invention may be understood in more detail, a more particular description of the embodiments of the present invention, briefly summarized above, may be had by reference to embodiments, some of which are illustrated in the appended drawings. It is to be noted, however, the appended drawings illustrate only typical embodiments of the present invention and are therefore not to be considered limiting of its scope, for the present invention may admit to other equally effective embodiments, in which:

FIG. **1** is a system for providing differentiated content based on multiple levels of skill, in accordance with an embodiment of the present invention;

FIG. **2** presents a method for differentiating content based on multiple levels of skill, in accordance with an embodiment of the present invention;

FIG. **3** presents a method for aligning content to multiple sets of content standards, in accordance with an embodiment of the present invention;

FIG. **4** presents a method for providing differentiated content to users, in accordance with an embodiment of the present invention;

FIGS. **5A-5E** illustrate user interfaces associated with a system for providing differentiated content, based on multiple levels of skill, in accordance with an embodiment of the present invention;

FIG. **6** is a progress report of multiple users using differentiated learning content, based on multiple levels of skill, in accordance with an embodiment of the present invention;

FIG. **7** is a progress report of multiple users' performance in relation to different educational standards; and

FIG. **8** is a report of multiple users' performance in relation to a single educational standard, in accordance with an embodiment of the present invention.

DETAILED DESCRIPTION

FIG. **1** presents an embodiment of the present invention depicting a system **100** for providing differentiated content to a plurality of users based on associated levels of skill. System **100** comprises a differentiation engine **102**, an electronic mail ("e-mail") engine **104** to function as a communications engine, a standards engine **106**, and a feedback engine **108**. Each engine **102**, **104**, **106**, and **108** comprises a central processing unit (CPU) **152**, **154**, **156**, and **158**, support circuits **124**, **126**, **128**, and **130**, and a memory **132**, **134**, **136**, and **138**, respectively. The CPU **152**, **154**, **156**, **158** may comprise one or more conventionally available microprocessors. The support circuits **124**, **126**, **128**, **130** are well known circuits that comprise power supplies, clocks, input/output interface circuitry, and the like. Embodiments of the present invention encompass each engine **102**, **104**, **106**, and **108** maintained on a single server, or on multiple servers, where a server may be any type of computing device adapted to distribute data and process data requests.

Memory **132**, **134**, **136**, **138** may comprise any random access memory, read only memory, removable disk memory, flash memory, and various combinations of these types of memory. The memory **132**, **134**, **136**, **138** is sometimes referred to as main memory and may in part be used as cache

6

memory or buffer memory. The memory **132**, **134**, **136**, **138** stores various software packages and components, such as an operating system (O/S) **116**, **118**, **120**, and **122**, respectively. The memory may be stored on any computer-readable medium, including, but not limited to, any data storage device readable by a computer, whether volatile, non-volatile, or implemented electronically or otherwise, known in the art, including floppy disks, hard disks, CD-ROMs, DVDs, flash memories, non-volatile ROMs, and RAMs.

The assessment and differentiation application **140** comprises modules for assessing and re-assessing skill levels of users who interact with the system **100**. The memory **132** also may include a database **160** for storing and maintaining user profiles. Each user profile may include user identification information, learning characteristics of a user, interests of a user, and an assessment of skill levels in a multiple subject matter areas.

The memory **132** of the differentiation engine **102** comprises an assessment and differentiation application **140** comprising modules for obtaining aligned content and matching the aligned content to a skill level of a user **110**, **112**. The assessment and differentiation application **140** also includes a module for preparing lesson plans for each user **110**, **112**, where each lesson plan includes the aligned content and lesson exercises appropriate for the skill level(s) of the user **110**, **112**. An embodiment of the present invention includes the assessment and differentiation application **140** obtaining the aligned content and matching it to the user's skill level in real-time, where the application **140** obtains the aligned content as soon as it is available, and matches the aligned content substantially immediately. Another embodiment of the present invention includes the assessment and differentiation application **140** obtaining the aligned content and matching the content to the user's skill level at preset periods of time, such as hourly, daily, monthly, and the like.

Aligned content is based upon unmodified content that is aligned to applicable content standards, for example, educational standards. The application **140** obtains the aligned content and modifies the aligned content to match at least one skill level associated with a user profile stored in database **160**. The differentiation engine **102** may obtain the aligned content from a database **166** internal or external to the system **100**. In another embodiment, the differentiation engine **102** may obtain aligned content by interfacing with the standards engine **106**. In yet another embodiment of the present invention, the memory **132** comprises a database (not shown) for storing the modified aligned content.

The memory **134** of the e-mail engine **104** comprises an e-mail application **142** including modules for e-mailing content to users of the system **100**. Users **110** and **112** and evaluators **114** may access the system **100** through the e-mail engine **104**. Users **110** and **112** may communicate with each other using the e-mail engine **104** and may communicate with any other user associated with a group associated with the user **110**, **112**. For example, a student may e-mail any other student in his or her grade, his or her school, or his or her school district, depending on the communication boundaries set by the evaluator **114**. Further, the evaluator **114** may use the e-mail engine **104** to provide lessons comprising modified content to a user **110**, **112** or to a group of users.

The e-mail application **142** may edit the content and format of an e-mail using a skill level of the intended recipient to prepare and deliver a customized e-mail message. The e-mail application **142** may prepare a plurality of customized e-mail messages covering the same subject matter for delivery to multiple recipients. For example, the

US 9,652,993 B2

7

evaluator **114** may compose an e-mail message to be sent to both users **110** and **112**, each having different associated skill levels. The e-mail engine **104** interfaces with the differentiation engine **102** to obtain the skill levels associated with users **110** and **112**, and edits the content and format of the original e-mail from the evaluator **114** to produce a customized version of the evaluator's original e-mail for each user **110**, **112**, where the presentation of the e-mail is appropriate for the skill level of each user **110**, **112**. Thus, user **110** will receive an e-mail from evaluator **114** modified to meet his or her specific skill level, and user **112** will receive an e-mail from evaluator **114** modified to meet his or her specific skill level.

The memory **136** of the standards engine **106** comprises at least one database **146** for storing a plurality of educational standards, such as state academic standards, local district academics standards, and the like. The memory **136** comprises another database **148** for storing a plurality of intermediate content standards that the system uses to align unmodified content to the plurality of educational standards.

The memory **136** of the standards engine **106** also comprises an alignment application **144** that includes modules for aligning unmodified content to educational standards stored in database **146** using the intermediate content standards stored in database **148**.

The standards engine **106** interacts with at least one content source to query for and obtain unmodified content, such as, for example, news articles, textbook excerpts, library journals, and the like. For example, the standards engine **106** may interact with a news database **162** and an academic lessons database **164**. In an embodiment of the present invention, the alignment application **144** queries the news database **162** to obtain news articles to be aligned to the educational standards stored in the database **146** and developed into differentiated learning lessons by the differentiation engine **102**. An aspect of this embodiment includes the alignment application **144** querying for and obtaining news articles, on a periodic basis, such as a daily basis, to create new aligned content. Another embodiment of the present invention includes the alignment application **144** querying for and obtaining unmodified content substantially continuously and aligning the unmodified content to the applicable educational standards in real-time. Another embodiment of the present invention includes the alignment application **144** periodically updating the educational standards stored in the database **146**.

Upon obtaining the unmodified content, the alignment application **144** may align the unmodified content to the applicable content standards stored in database **146** using the intermediate content standards stored in database **148**. The aligned content then may be stored in a database **166**. The database **166** may be maintained external to the system **100**, such as, for example, on a storage area network. In another embodiment of the present invention, a database **166** for storing aligned content is maintained within the memory **136** of the standards engine **106**. The standards engine **106** interacts with the differentiation engine **102** to provide access to the aligned content database **166**, which the differentiation engine further modifies using the assessment and differentiation application to customize the aligned content in accordance with different skill levels of users, such as, users **110** and **112**.

In another embodiment of the present invention, a standards engine **106** includes a memory **136** with a database for storing both the educational standards and the intermediate standards. In yet another embodiment, at least one content standards database is maintained externally to the system

8

**100**, such as, for example, on a storage area network. A standards engine **106** interfaces with this external database to utilize the stored content standards data.

The memory **132** of the feedback engine **108** comprises a performance database **150** that stores performance and progress data associated with each user **110**, **112** of the system **100**. The memory **138** also may comprise a feedback application **168** having modules for generating performance and progress data associated with each user **110**, **112** of the system **100**. For example, an embodiment of the present invention includes the feedback application **168** generating a progress report of a user **110**, **112** regarding the user's performance on a customized lesson provided by the differentiation engine **102**. The progress report also may track the user's **110**, **112** performance in each subject matter in relation to the educational standards stored in the database **146**, and in relation to other users **110**, **112**, using feedback and performance data stored in the performance database **150**.

Via the feedback application **168**, the feedback engine **108** may interface with the standards engine **106** to access the standards database **146** for tracking the performance of a user **110**, **112** in comparison with one or more educational standard stored in the database **146**. The feedback engine **108** also interfaces with the differentiation engine **102** to access the profile database **160** and associate performance reports of a user **110**, **112** with the user's stored profile. The feedback application also includes modules for providing performance and progress data to a user **110**, **112** or evaluator **114** of the system using the e-mail engine **104**.

A user **110**, **112** may access the system **100** via the e-mail engine **104** through a communications network **170**. A user may use a common computer or any communications device to access the system **100** and the communications network **170** may be any conventional network, such as an Ethernet network, a fiber channel network, or a wide area network (WAN) that provides either a direct, or indirect (e.g., Internet access via a wired or wireless connection, or public switched telephone network (PSTN)) connection between the user **112** and the system **100**.

In the present embodiment, the system **100** is a standalone system maintained using one or more servers and one or more computing devices. Other embodiments of the present invention comprise incorporating system **100** into another system, such as, for example, a local school district system or a statewide educational system. The system is not limited to a specific operating system, but may be adapted to run on any operating system, including, but not limited to, LINUX and Microsoft WINDOWS.

Although the system **100** of this particular embodiment is described to be used as an educational tool, the scope of the present invention encompasses other embodiments comprising a system **100** to be used as an assessment and learning tool in any area of skill. Embodiments of the present invention encompass multiple types of users, such as, an educational student using the system **100** to receive educational lessons, a job applicant using the system for job training, or any person being assessed for a certain level of skill and receiving content based on their level of skill. An evaluator may be a teacher, an employer, or any person overseeing the utilization of the system **100** by a user **110**, **112**.

For example, an embodiment of the present invention comprises a differentiation system for assessing skill levels of job candidates and providing differentiated job training lessons aligned to applicable industry standards, where each lesson is customized to the learning levels of each job candidate of the system.

US 9,652,993 B2

9 | 10

FIGS. **2** through **8** describe embodiments of the present invention related to a system for providing differentiated content where the content is used for teaching school-aged children. However, one of ordinary skill in the art would readily recognize that the scope of the present invention is not limited to embodiments pertaining to academic educational systems, but rather may encompass any system where differentiated content is provided to a user based on the assessed skill level(s) of the user.

FIG. **2** illustrates a flow diagram of a method **200** for using a system that provides differentiated academic content, in accordance with an embodiment of the system. The steps need not be in the sequence illustrated, and some steps may occur essentially simultaneously. This method may be performed using the system **100**, including the differentiation engine **102**, the e-mail engine **104**, the standards engine **106**, and the feedback engine **108**, as described in the embodiment of FIG. **1**. Using the system **100**, the steps of the method **200** may occur in real-time, or the steps may occur at preset periodic intervals of time.

The method **200** begins at step **202** and progresses to step **204** where one or more users registers with the system **100**. In this step, the user(s) may enter information such as, for example, grade level, contact information, personal interests, school district, and specific learning characteristics, such as, subject matter preferences, for example. The user(s) may access the system **100** using e-mail, such as, for example, through the email engine **104** described in the embodiment of FIG. **1**, or may access the system **100** directly using, for example, an Internet web page associated with the system **100**.

Upon receiving the entered information, at step **206**, the system **100** develops a student profile associated with each user, and stores the profile in a database, such as, for example, the profile database **160** described in the embodiment of FIG. **1**. At step **208**, the system **100** assesses the skill level of the user(s) in one or more subject matters. To perform this step, the system **100** may, for example, deliver a set of questions to the user(s) in different subject matters, such as literacy, reading comprehension, vocabulary, and mathematics, and assess a skill level in each subject area based on a predetermined skill-level scale. For example, the system **100** may use the LEXILE Framework to assess a reading level associated with a number of users. The system **100** would then assign a LEXILE reading score to each user. In another embodiment of the present invention, the system **100** also assesses the fluency of each user in a specific language.

At step **210**, the system **100** maps the assessed skill level(s) to each user's associated profile generated in step **206**. The system **100** also may report the assessed users' skill levels to an evaluator associated with the user(s). The assessed skill level(s) may account for learning disabilities, handicaps, and any other conditions particular to a specific student.

Once the system **100** has assessed the skill level(s) of the users, the system **100** may create customized lesson plans for each user based upon each user's skill level(s). At step **212**, the system **100** obtains unmodified (or raw) content to be developed into a lesson plan. The system **100** obtains the unmodified content from sources. The unmodified content includes, but is not limited to, textbook excerpts, periodical articles, news articles, literary excerpts, and the like. The unmodified content may come from any source, such as for, for example, academic textbook, news sources, library databases, pre-developed lesson databases, and the like.

At step **214**, the system **100** analyzes the difficulty level of the unmodified content in accordance with one or more educational standards, and aligns the unmodified content to the educational standards using a set of intermediate standards. In the present embodiment, the educational standards include, but are not limited to, state academic standards, local school district standards, and the like. At step **214**, the system **100** produces multiple versions of the unmodified content, referred to herein as aligned content versions, each of which is substantially similar to the unmodified content in subject, meaning and context, but where each version of aligned content is aligned to a specific skill level associated with the educational standards.

For example, an embodiment of the present invention comprises a method for obtaining a news article on terrorism and aligning the news article to a set of educational standards for social studies by modifying the format and content of the original news article to produce aligned versions of the news article, where each version is associated with a specific skill level of the educational standards. For example, the system **100** may first obtain the news article and analyze the article against a set of state educational standards to determine the news article is appropriate for a high school reading comprehension level. The system **100** then creates an aligned content version of the unmodified news article for a second grade reading comprehension level by breaking up the article into shorter sentences and paragraphs, and rewriting the article using grade-appropriate vocabulary. In contrast, another example includes the system **100** creating an aligned content version of the unmodified news article for an eighth grade reading comprehension level by keeping the sentence layers in the original article, but simplifying the vocabulary using appropriate grade level terms.

At step **216**, the system **100** matches a specific version of the aligned content to a user using the user's pre-assessed skill level(s). The system **100** may modify further the matched aligned content version to increase comprehension of the aligned content version by the specific user. The **100** system matches a version of the aligned content to a user by matching specific areas of learning where the user exhibits a need for improvement, as assessed by the system **100** in step **208**.

The system **100** also may match multiple aligned content versions to multiple users based upon each user's pre-assessed skill level(s), in step **218**. Using the previous example, a system **100** may match multiple aligned versions of a news article on terrorism to multiple students in a current events class. Thus, each student receives an article covering the same terrorism subject matter, however, each student's version will be presented in a context and format customized to the student's skill level(s). The method of this embodiment provides for an unmodified learning content to be provided at multiple skill levels simultaneously, thereby providing for collaborative learning from the same unmodified learning content by many users of varying skill levels.

At step **220**, the system **100** prepares one or more lesson plans associated with different versions of the aligned content. The lesson plans may include a set of lesson exercises, such as, for example, assessment questions and activities that relates in subject, context, and skill level to each version of the aligned content. An embodiment of the present invention includes a lesson plan comprising a set of vocabulary questions, an essay question for thinking comprehension, a set of mathematical exercises, a set of social studies questions, links to extended background material regarding the subject matter, games associated with the aligned con-

US 9,652,993 B2

11

12

tent, and a user-based poll to prompt interactive discussion of the aligned content. Another embodiment of the present invention includes providing an editing checklist as part of an essay question in a lesson plan, where the checklist provides a list of editing items that a user should include in an essay answer. In step **220**, the system **100** may modify each lesson plan to match the specific learning characteristics of each user, such as, for example, using a specific spoken language, using different size fonts for each lesson, using level-appropriate vocabulary, different graphics, and may provide an audible feature that "reads aloud" one or more portions of the lesson plan. An embodiment of the present invention includes a system **100** modifying each lesson plan by providing the aligned content in a combination of English and a foreign language depending upon a user's current level of progress in moving from the user's native non-English language to English. Thus, the system **100** aligns both the learning content and the context of the related lesson plan to each user's skill level(s).

In another embodiment of the present invention, the system **100** does not perform the function of preparing a lesson plan, in step **220**, but proceeds to step **222**, where the system **100** prepares to deliver the matched aligned version to each respective user.

In step **222**, the system **100** prepares to deliver the lesson plans to each user using, for example, an e-mail system. The system **100** differentiates the context and format of each e-mail to customize the e-mail for each user. An embodiment of the present invention includes preparing differentiated e-mails and lesson plans to deliver a lesson to a group of users using each user's preferred spoken language, specific font sizes for better comprehension, specific graphics, and a customized format correlated to each user's skill level(s). Embodiments of the present invention include a system **100** that delivers lessons using e-mail wherein each e-mail includes a link to the lesson plan, includes a portion of the lesson plan, or includes the entirety of the lesson plan in the body of the e-mail.

In another embodiment of the present invention, a system **100** provides for an evaluator to generate a calendar of lesson plans related to a predetermined selection of unmodified contents or a predetermined selection of unmodified content subject matters, where the calendar covers a time period of an entire academic year. The evaluator may create the calendar in the system **100** using applications provided by the system **100**. In an embodiment of the present invention, the evaluator may generate the calendar using a third party calendar application and load the calendar into the system **100**. The system **100** then obtains unmodified content in accordance with the predetermined selection of unmodified contents or unmodified content subject matters, aligns the obtained unmodified content, and prepares lesson plans to be automatically delivered to the users at predetermined times, in accordance with the evaluator's calendar.

At step **224**, each user receives his or her customized e-mail delivering a lesson plan. Using the e-mail, each user may access his or her customized lesson and begins to perform the associated lesson exercises. As each user completes each lesson exercise, the system **100** receives each user's inputs at step **226** and begins to dynamically re-assess the skill level(s) of each user.

Once each user completes the lesson exercise(s), each user may submit the completed lesson exercise(s) for grading. Grading may be performed by the system **100**, as in step **228**, and the results may be stored in a database and associated with each user's profile. In an embodiment of the present invention, at step **230**, the system **100** evaluates each user's performance in real-time as each user completes each lesson exercise, and provides feedback of the completed lesson to each user, prior to entering a final grade. The system **100** may provide the feedback in step **230** using a feedback engine **108**, as described in the embodiment of FIG. **1**. At step **232**, the feedback feature allows each user to modify the answers to the lesson exercises prior to submitting the completed lesson exercise(s) for final grading. An aspect of this embodiment includes providing the feedback feature to selected users of differing skill levels.

In another embodiment of the present invention, the system **100** may deliver the completed lesson exercise(s) to an evaluator of the user(s) for grading. The evaluator may enter the results of each graded lesson exercise into the system **100** for further evaluation and analysis by the system **100**.

Once the completed lesson exercise(s) have been graded in step **228**, the system **100** may determine whether an adjustment should be made to a user's skill level(s) based upon the completed lesson exercise(s), in step **234**. If the system **100** determines the skill level assessed from the completed lesson is the same as the previous skill level of the user, in step **236**, the system **100** does not adjust the skill level(s) associated with the user.

If the system **100** determines the skill level assessed from the completed lesson exercise(s) is different than the previous skill level of the user, the system **100** adjusts the appropriate skill level(s) of the user, at step **238**. The system **100** is capable of providing continuous re-assessment of the user's skill level(s).

At step **240**, the system **100** reports the results of the completed lesson exercise(s) and any adjustments to the skill levels of one or more users to the evaluator. An embodiment of the present invention includes reporting the results individually to an evaluator. That is, the results are reported as each user completes a lesson exercise. Another embodiment of the present invention includes reporting the combined results of a group of users to an evaluator, for example, in a tabular format. The evaluator may select the specific characteristics associated with a report for the system **100** to generate.

At step **242**, the evaluator evaluates the completed lessons and suggested adjustments and non-adjustments to one or more skill levels of each user. The evaluator may accept the completed lessons and suggested skill level adjustments/non-adjustments, and at step **244**, the system **100** prepares a new lesson plan for each user, accounting for adjustments to skill level(s) to customize the new lesson plan for each user.

The evaluator also may reject either the completed lesson(s) for one or more users and/or the adjusted skill level(s) provided by the system. The evaluator may consider conditions regarding a user's learning environment that are not available to the system **100**. For example, the evaluator may be aware of a disruptive home, a loss of a user's family member, an emergency situation, and the like. If the evaluator does not accept the adjusted skill levels provided by the system **100**, at step **246**, the system **100** may prepare a new lesson customized to each user in accordance with each user's non-adjusted skill level(s).

At step **248**, the system **100** determines whether a user's learning session should continue. If the user's learning session is at an end, for example, the user completes all lesson plans for a specific subject or within an allotted time period, the system **100** terminates the user's learning session at step **250**. If, however, the system **100** determines the

US 9,652,993 B2

**13**

user's learning session should continue, the system **100** repeats the learning and evaluation process starting again with step **214**.

Thus, the system of the embodiment described in FIG. **2** delivers differentiated content to each user that is aligned to the user's skill level(s), maintaining the same content topics, main ideas and core elements, and thereby providing evaluators with the ability to engage whole-class learning using individually differentiated content.

FIG. **3** presents a method **300** for aligning learning content to educational standards and differentiating the content to customize the content for multiple users, in accordance with an embodiment of the present invention. The method **300** illustrates steps that may be performed by a system **100** comprising a differentiation component **102** and a standards component **106**, as described in the embodiment of FIG. **1**. Using the system **100**, the steps of the method **300** may occur in real-time, or the steps may occur at preset periodic intervals of time.

The method **300** begins at step **302** and progresses to step **304** where a system **100** for providing differentiated learning content obtains content standards and stores the standards in one or more databases, such as the educational standards database **146**, described in the embodiment of FIG. **1**. The content standards may be any type of accepted content standards used to align unmodified content to one or more skill levels.

At step **306**, the system **100** performs a self-analysis and assesses the components and modules of the system **100**, specifically, the differentiation engine **102**, the e-mail engine **104**, the standards engine **106**, and the feedback engine **108**. To perform the self-analysis, the system **100** assesses what technical functions and features each component of the system **100** includes at a particular time. The system **100** then produces a set of system competencies used by the system **100** to determine the types of unmodified content the system's components are capable of managing, the modifications may be made to the unmodified content when aligning the unmodified content to one or more educational standards, the modifications made to aligned content when the aligned content is matched to a user's skill level(s), and the types of lesson exercises included in a lesson plan related to the unmodified content.

For example, the system **100** may contain certain technology including voice to text recognition. When the system **100** performs the self-analysis, the system acknowledges the voice to text recognition technology and creates a system competency related to a lesson exercise that allows a user to execute the lesson exercise by "speaking" into a microphone connected to a computer. Thus, the system **100** acknowledges that such lesson exercises may be included in a lesson plan.

Another example includes adding a technology module to the system **100** as a new subject matter area for learning. When the system **100** performs the self-analysis, the system **100** acknowledges the technology module and creates one or more system competencies related to the technology module, such that the system **100** may obtain unmodified content related to technology and may generate lesson plans related to technology with lesson exercises for testing learning content related to technology. For example, the system **100** may obtain a new set of educational standards, such as the National Educational Technology Standards (NETS) generated by the International Society for Technology in Education (ISTE) to integrate into the system components, such as the standards engine **106**. The system **100** then may obtain unmodified content related to technology, such as ethics in

**14**

using the Internet, for example, and align the unmodified content to the NETS standards to generate lesson plans matched to the skill levels of the users.

An embodiment of the present invention includes a system **100** with a technology module that identifies the platform and the software applications of a user's computer when the user accesses the system **100**. The system **100** then incorporates the identified platform and software applications data into one or more technology lesson plans for the user. For example, the lesson plan may test the user's knowledge of certain commands available in a specific application stored on the user's computer, as part of an exercise in a technology lesson plan.

The set of system competencies is stored in a competencies database (not shown). The competencies database may be edited and updated at any time, by the system **100** or by a system administrator, based upon updates or alterations to the system **100**. For example, the system **100** may perform a self-analysis on a periodic basis or when new elements are added to the system **100**. In this manner, the system **100** is a "self monitoring" system. When new features and capabilities are added and implemented, the system performs the self-analysis and updates the system competencies.

At step **308**, the system **100** analyzes the content standards to develop an understanding of the similarities and differences between each content standard and each skill level to which the content standards apply. Specifically, the analysis includes, but is not limited to, an evaluation of the statements of the standards, the structure of the standards, the core meaning of the standards, the related and ancillary meaning of the standards, the learning mode referenced by the standards, the intent of the standards, and the related critical thinking, logical, philosophical, and pedagogical elements of the content standards. Based upon the system's analysis of the multiple elements of the content standards, the system **100** creates a unique numerical scheme output as a set of unique standards codes. The standards codes relate to one or more elements of the content standards as analyzed by the system **100**. The system may store this analysis in a system database, such as an intermediate standards database **148**, as described in the embodiment of FIG. **1**.

At step **310**, the system **100** performs a comparative analysis of the system competencies and the standards codes to match each system competency with one or more applicable standards code. Each match between a system competency and a standards code is an intermediate standard, to produce a set of intermediate standards. The system **100** uses the intermediate standards to align unmodified content with stored content standards. The system **100** may update the intermediate standards as the system competencies change or are re-assessed, or when the system **100** performs an analysis of different or updated content standards. The system **100** may update the intermediate standards in real time, or at preset periodic time intervals. The intermediate standards are stored in a system database, such as the intermediate standards database **148**.

At step **312**, the system **100** obtains and stores unmodified content from one or more sources, such as industry databases, learning databases, proprietary databases, newspapers, and the like. The system **100** may categorize the unmodified content according to subject matter, source, chronologically, and the like.

At step **314**, the system **100** aligns the unmodified content to an applicable set of stored content standards using a set of intermediate standards. The system **100** may perform this analysis using an application, such as the alignment application **144**. An embodiment of the present invention

US 9,652,993 B2

15                                                                              16

includes aligning the unmodified content to the applicable content standards using a hierarchical structure. The intermediate standards analyze not only the statements of the standards, but the structure of the standards, the intent behind the standards, which may be included as part of the standards, and the subtleties of the language of the standards.

In step **314**, the system **100** develops multiple versions of the unmodified content where each version correlates to a specific hierarchical level of the content standards. The subject matter of each version is substantially the same as the unmodified content; however, each version includes a different presentation of the unmodified content. To develop the multiple versions, the system **100** substantially breaks down the unmodified content and builds a modified version of the unmodified content using skill level characteristics, such as appropriate vocabulary and sentence length. Links or "tags" may be attached to certain words within the modified version to map the aligned content with the applicable content standard. The system **100** may store the versions of the aligned content in a database, such as the aligned content database **166**.

Once system **100** completes the alignment process, at step **316**, the system **100** matches versions of aligned content to each user using skill levels associated with each user of the system **100**. The system **100** may perform this function using an application, such as the differentiation application **140**. The matched aligned content then may be used to develop one or more lesson plans for each user. The method may end at step **318**. Another embodiment of the present invention includes a system **100** periodically repeating the method **300** to continually obtain new unmodified content to align to a set of applicable content standards. In yet another embodiment of the present invention, a system that continuously repeats method **300** is provided.

FIG. **4** illustrates a method **400** for providing differentiated aligned content to multiple users through an e-mail system, in accordance with an embodiment of the present invention. The method **400** illustrates steps that may be performed by a system **100** comprising a differentiation component and an e-mail component **104**, such as the system described in the embodiment of FIG. **1**. Using the system **100**, the steps of the method **400** may occur in real-time, or the steps may occur at preset periodic intervals of time. Although this figure describes a method of communication using e-mail, the scope of the invention is not limited to an e-mail communication method, but includes other embodiments comprising methods of communication using text messaging, instant messaging, and any other type of electronic communication.

The method **400** begins at step **402** and proceeds to step **404**, where a lesson plan is prepared for a group of users by an evaluator. Each user has a different skill level as assessed by the system **100**, for example, by an assessment application **140** of the system **100**. Embodiments of the present invention include users grouped by skill level, grade level, a specific school, a specific schooling district, and the like. In the present embodiment, the evaluator is a teacher. However, other embodiments include any type of evaluator who reviews a performance of one or more users of the system **100**.

In step **404**, the evaluator prepares a single e-mail to a group of users covering a specific lesson plan topic. The evaluator may include lesson plan content aligned to educational standards and stored in a system database, similar to the method described in the embodiment of FIG. **3**. In another embodiment of the present invention, an evaluator may provide a link to a lesson plan prepared and stored by a system **100** similar to the method described in the embodiment of FIG. **2**. The evaluator may include general instructions applicable to the group of students.

At step **406**, the system **100** modifies the evaluator's e-mail to produce multiple versions of the evaluator's e-mail, where each version correlates to one or more skill level(s) of each user. For example, a system **100** may modify the body of the e-mail using level-appropriate vocabulary, level-appropriate sentence length, specific graphics, multiple languages, and the like. The system **100** also verifies that the aligned content or selected lesson plan correlates to the skill level(s) of each user.

At step **408**, each user receives an e-mail version correlated to the user's skill level(s), and opens the e-mail to access the learning content. Using the e-mail system, such as the email engine **104**, each user may communicate with other users with an assigned group, such as, for example, a student, another evaluator, a school administrator, and the like, to discuss the lesson plan in his or her e-mail, at step **410**. For example, a user may contact another user in his or her grade class to discuss the most recent lesson plan received in an e-mail. A user also may be restricted from using the e-mail engine **104** to communicate with anyone outside the user's assigned group(s), thereby limiting the use of the e-mail engine **104** to educational studies. In another embodiment, the system forwards a copy of each e-mail sent to a user to the user's parents, for their information and review. This allows the user's parents or guardian also to monitor their child's learning progress and completion of assigned lesson plans.

At step **412**, the system **100** may send a copy of each e-mail sent by all users within a group to the group evaluator. This feature ensures that a user is not misusing the e-mail engine **104**. An embodiment of the present invention includes language and content filters that may be applied to e-mail from one or more users. Another embodiment includes the evaluator choosing to receive copies of all e-mails sent by selected users.

At step **414**, each user may notify the evaluator that he or she has completed a lesson plan, using the e-mail engine **104**. In another embodiment of the present invention, the system **100** sends a notification to an evaluator when each user completes one or more lesson plans, at step **416**. The evaluator then may access the system **100** and grade the completed lesson plan, or may allow the system **100** to grade the completed lesson plan and provide the graded results to the evaluator. This allows the evaluator to monitor the progress and performance of each user.

At step **418**, the system **100** informs the evaluator that one or more skill levels associated with each user has been adjusted by the system. The evaluator may use the e-mail engine **100** to contact a specific user's parents or guardian to discuss the user's progress or lack thereof.

At step **420**, the process may be repeated beginning at step **404** to prepare and deliver another lesson plan to the group of users. Alternately, the process may end at **422**.

FIGS. **5A**-**5**E present example graphic user interfaces for a differentiated lesson plan produced by a system for providing differentiating learning content, according to an embodiment of the present invention, such as the system **100** described in the embodiment of FIG. **1**. In this embodiment, a system **100** obtains unmodified content from THE ASSOCIATED PRESS in the form of an article covering foods served at schools. The system **100** aligns the article to a set of educational standards and produces multiple versions of

US 9,652,993 B2

17

the article, where each version is aligned to a specific educational standard, similar to the method described in the embodiment of FIG. 3.

FIG. 5A illustrates a lesson plan **500** of the article for a fourth grade reading comprehension level, in accordance with the New Jersey Core Curriculum Content Standards for Language Arts Literacy. The lesson plan **500** includes a modified article **502** covering the relevant subject matter, with highlighted level-appropriate vocabulary words **504**. An embodiment of the present invention includes a system **100** that provides the modified article **502** as an audio file to the user. Thus, if a user is having difficulty reading the modified article **502**, or portions of the article, the user may choose to hear the modified article **502** read audibly.

A dictionary definition **506** for each vocabulary word **504** is provided below the article. A user completing this lesson plan **500** may choose to hear the pronunciation of the vocabulary words **504** by clicking on a speaker icon appearing next to each word in the dictionary definitions **506**. Another embodiment of the present invention includes presenting the lesson plan **500** in different languages, such as, for example, Spanish, and in different size fonts for each user. In yet another embodiment of the present invention, the system **100** presents the modified article **502** and the lesson plan **500** in accordance with the level of the user's fluency in a specific language. For example, a user who is learning English may receive a different version of the lesson plan **502** using basic vocabulary, in contrast to a user who is more proficient in the English language and, therefore, would receive the lesson plan **500** as presented in FIG. 5A.

An embodiment of the present invention includes a user with a fourth grade skill level in language arts and literacy receiving a daily lesson plan in an e-mail from his or her evaluator. Upon opening the e-mail, the user accesses the lesson plan **500** and reads through the article **502**. Upon completing a review of article **502**, the user begins to perform lesson exercises, such as the exercise **506** illustrated in FIG. 5B.

The exercise **506** comprises multiple choice questions **508** related to the article **502**. In FIG. 5B, a question **508** is posed to the user, with a choice of four answers **510** available for the user's selection. The user may select the appropriate answer **510** and proceed to the next question **512**. An aspect of the embodiment includes the system **100** re-assessing the literacy skill level of the user as he or she begins to answer each question **508** by comparing the answer **510** selected by the user to a standard correct answer and considering the time spent in answering the question **508**.

Another lesson exercise is an essay question **514** presented in FIG. 5C. The user may complete the essay in the area **516** provided. While the user is entering his or her answer **516**, the system **100** may analyze the answer to re-assess the skill level of the user in real time. An aspect of the embodiment includes analyzing the content of the answer **516** by vocabulary, word frequency, length of the answer **516**, sentence length, and length of time spent answering the essay question **514**. Another embodiment of the present invention includes the system **100** postponing the analysis of the user's answer **516** after the user submits the answer **516** in its entirety as complete.

In FIG. 5C, the user may check the spelling of the answer **510** using the "Check spelling" option **520**. The user also may choose to complete the exercise at a later time by selecting the "Finish Later" option **522**, for example, to leave the computer to eat a meal or perform a chore. Once

18

the user has completed his or her answer **516**, the user submits the answer **516** to the system **100** using the "Submit Now" option **524**.

Prior to submitting a completed answer, the user may check his or her work against a standard answer by selecting the "Check Your Work" option **518**. Option **518** allows the system **100** to analyze the answer **516** against a standard correct answer and against the fourth grade level standard in general. The system **100** then may provide immediate feedback to the user regarding the user's answer **516** using the feedback engine **108**, allowing the user to modify the answer **516** prior to submitting the answer **516** as complete. An embodiment of the present invention includes providing one or more editing checklists, such as the "Include in Your Answer" checklist **528** provided in FIG. 5C, to the user for guidance for assistance with preparing the essay answer **516**.

As shown in FIG. 5C, the user or parent/guardian of a user may view the applicable educational standard by clicking on a standards icon **526**. FIG. 5D presents an excerpt **530** of the educational standard used by the system to produce the lesson plan **500**.

FIG. 5E presents a different version **532** of the original news article used to produce the lesson article **502** in FIG. 5A. The version **532** is aligned to an eighth grade skill level for language arts literacy in accordance with the standards presented in FIG. 5D. The version **532** of the article is longer in length than the version **502** presented in FIG. 5A, and comprises a greater collection of words, longer sentences, and vocabulary words **534** that are more difficult than the vocabulary words **504** illustrated in FIG. 5A.

Similar to the embodiment of FIG. 5A, dictionary definitions **536** of the selected vocabulary words **534** are provided below the article **532**. Additional reading material regarding the subject matter of the article **532** may be provided to the user as a link **538**. The link **538** may be included in every eighth grade lesson plan covering this specific article. In another embodiment of the present invention, the link **538** is provided in selected eighth grade lesson plans based upon each user's assessed skill level and interests provided in a related user profile.

FIG. 6 presents a progress report **600** produced by a system for producing differentiated content, according to an embodiment of the present invention, such as the system **100** with a feedback application **168**, described in the embodiment of FIG. 1. The progress report **600** may be provided to an evaluator of one or more users through an e-mail communication. The system also may store the progress report **600** and provide compile the progress report **600** at the instruction of the evaluator.

In FIG. 6, the progress report **600** provides the performance progress of multiple users **604** in a specific class grade **602** over monthly time periods **608**. An embodiment of the present invention provides for the evaluator to request a progress report for a customized period of time, such as, for example, monthly, quarterly, and annually.

Each user **604** is associated with a specific skill level **606** predetermined by the system. For example, in FIG. 6, the portion of the skill level **606** comprising "XXXL" relates to a LEXILE Score as determined by the system. The portion of the skill level **606** preceding the LEXILE Score relates to a grade level or educational standard level associated with each user **604**.

The progress report **600** may include a total number **610** of lesson exercises completed by each user **604** within a specific time period, and an average grade **612** for each user **604**. The progress report **600** also may provide a class average **616** for each specified time period. A change **614** in

US 9,652,993 B2

19

20

a skill level **606** of a user **604** that occurred during the specified time period may be indicated. The progress report **600** allows for the evaluator to efficiently track the performance of each user **604** using a minimum amount of time to prepare the report **600**, which provides more teaching time for the evaluator.

FIG. **7** presents another progress report **700** regarding multiple educational standards developed by a system for providing differentiated content, in accordance with an embodiment of the present invention, such as the system **100** described in the embodiment of FIG. **1**. The system **100** may use a feedback application to prepare the progress report **700**, such as the feedback application **168** described in the embodiment of FIG. **1**. The progress report **700** is provided to an evaluator of the group of users **706** and covers a specific curriculum **702**, such as language arts, for a specific class grade **704**. The users **706** are identified and each user's skill level **708** is provided similarly to the skill level **606** described in the embodiment of FIG. **6**.

A total number **710** of questions answered by each user **704** is provided for a specified time period. Subject areas **712** within the curriculum **702** where a user **704** has demonstrated a mastering of the area is provided in regards to a specific standard concept. Subject areas **714** and **716** where additional practice is suggested, and where poor performance is determined, also are provided regarding specific standard concepts. The progress report **700** allows an evaluator to review the performance of each user **704** in relation to specific standard concepts and to determine where immediate help may be needed, or where an increase in skill level may be required, such as where a user **704** has mastered all of the concepts regarding a particular standard.

FIG. **8** presents an analysis report **800** of multiple users' performance in regards to a single educational standard concept **804**, in accordance with an embodiment of the present invention. The progress report is provided by a system, such as system **100** with a feedback application **168**, as described in the embodiment of FIG. **1**, to an evaluator of a group of users **808**, and covers a specified curriculum **802**, such as language arts, for a sixth grade class **806**. The standard concept **804** covers reading comprehension at a specific level as defined by an applicable educational standard.

The class of users **808** is identified by name along with each user's assessed reading skill level **810**, similar to the skill levels **606** described in the embodiment of FIG. **6**. A number **812** of questions answered by each user **808**, where the questions relate to the identified standard concept **804**, is provided and a related average score **814** also is provided in the progress report **800**.

With respect to each user's performance, the progress report **800** may include recommended practices **816** to an evaluator regarding each user **808** regarding each user's performance. The progress report also may provide additional lesson exercises **818** for one or more users **808**, thereby assisting an evaluator in teaching the users **808**.

Each of the progress reports described in the embodiments of FIGS. **6**, **7**, and **8** may be stored in a database by the system **100**, such as a performance database **150** described in the embodiment of FIG. **1**.

While the foregoing is directed to embodiments of the present invention, other and further embodiments of the present invention may be devised without departing from the basic scope thereof, where the scope thereof is determined by the following claims.

The invention claimed is:

1. A computer implemented method for providing differentiated content to a user of a plurality of users, comprising the steps of:

obtaining in real-time, by a standards engine including one or more processors, a first unmodified content from at least one source using at least one computer;

obtaining one or more educational standards using at least one computer;

evaluating the one or more educational standards to produce a unique standards code by analyzing at least one of one or more statements of the one or more educational standards, a structure of the one or more educational standards, a core meaning of the one or more educational standards, a related and ancillary meaning of the one or more educational standards, a learning mode referenced by the one or more educational standards, an intent of the one or more educational standards, or related critical thinking, logical, philosophical, and pedagogical elements of the one or more educational standards using at least one computer;

analyzing, by the standards engine, the first unmodified content to determine a reading difficulty level of the first unmodified content in accordance with each of the one or more educational standards;

generating in real-time, by a differentiation engine including one or more processors, a plurality of aligned versions of the first unmodified content by transforming format and content of the first unmodified content, wherein each of the plurality of aligned versions is transformed, respectively, according to a reading difficulty level associated with corresponding one of the one or more educational standards, wherein generating the plurality of aligned versions of the first unmodified content further comprises breaking up the first unmodified content into sentences, selecting a different vocabulary and sentence length according to each reading difficulty level in accordance with the unique standards code while maintaining subject matter of the first unmodified content;

transmitting, simultaneously, a first aligned version of the plurality of aligned versions of the first unmodified content to the user, wherein the first aligned version corresponds to a reading skill level of the user;

generating, by the differentiation engine, one or more lesson plans for the user, the one or more lesson plans comprising questions associated with the first aligned version and subject matter of the first unmodified content, wherein the one or more lesson plans comprises a lesson comprising one or more of a specific spoken language, a particular font size and level-appropriate vocabulary and a particular graphical format based on the reading skill level of the user; and

providing the one or more lesson plans questions associated with the first aligned version to the user via a communication system,

wherein each of the plurality of aligned versions are equivalent substantially similar in subject matter, meaning and context to subject matter, meaning and context of the first unmodified content.

2. The method of claim 1, further comprising:

providing a first set of questions to the user using at least one computer;

receiving a first set of answers related to the first set of questions from the user using at least one computer;

US 9,652,993 B2

<table>
<tr><td>21</td><td>22</td></tr>
</table>

analyzing the first set of answers to produce a first reading level associated with the user using at least one computer;

modifying the first unmodified content in accordance with the first reading level of the user to produce a first modified content using at least one computer; and

preparing electronic message communications to the user via an electronic message system, wherein a body portion of the electronic message communications is customized to the first reading level of the user in addition to the first modified content using at least one computer.

**3.** The method of claim **1**, further comprising facilitating communications among the plurality of users within a same reading level group using at least one computer.

**4.** The method of claim **2**, further comprising the step of preparing a first lesson plan using the first modified content, wherein the first lesson plan comprises a set of lesson exercises related to the first reading level.

**5.** The method of claim **1**, wherein the one or more educational standards are selected from the group consisting of educational standards for reading comprehension, literacy, vocabulary, and mathematics.

**6.** The method of claim **1**, wherein aligning the first unmodified content further comprises mapping words within the first unmodified content to a content standard.

**7.** The method of claim **1**, further comprising:

generating a user profile of the user based on at least a grade level of the user, school district of the user, and subject matter preferences of the user; and

performing an assessment of the user by posing a generated set of questions to the user, the generated set of questions based on the user profile, wherein the assessment comprises at least the reading skill level of the user.

**8.** A system for providing differentiated content to a user of a plurality of users, comprising:

a) at least one processor;

b) at least one input device coupled to at least one network; and

c) at least one storage device storing processor executable instructions which, when executed by the at least one processor, performs a method including:

obtaining in real-time, by a standards engine executing on the at least one processor, a first unmodified content from at least one source using at least one computer;

obtaining one or more educational standards using at least one computer;

evaluating one or more educational standards to produce a unique standards code by analyzing at least one of one or more statements of the standards, a structure of the standards, a core meaning of the standards, a related and ancillary meaning of the standards, a learning mode referenced by the standards, an intent of the standards, or related critical thinking, logical, philosophical, and pedagogical elements of the one or more educational standards using at least one computer;

analyzing, by the standards engine, the first unmodified content to determine a reading difficulty level of the first unmodified content in accordance with each of the one or more educational standards;

generating in real-time, by a differentiation engine including one or more processors, a plurality of aligned versions of the first unmodified content by algorithmically transforming format and content of the first unmodified content, wherein each of the plurality of aligned versions is transformed, respectively, according to a reading difficulty level associated with corresponding one of the one or more educational standards, wherein generating the plurality of aligned versions of the first unmodified content further comprises breaking UP the first unmodified content into sentences, selecting a different vocabulary and sentence length according to each reading difficulty level in accordance with the unique standards code while maintaining subject matter of the first unmodified content;

transmitting, simultaneously, a first aligned version of the plurality of aligned versions of the first unmodified content to the user, wherein the first aligned version corresponds to a reading skill level of the user;

generating, by the differentiation engine, one or more lesson plans for the user, the lesson plan comprising questions associated with the first aligned version and subject matter of the first unmodified content, wherein the one or more lesson plans comprises a lesson comprising one or more of a specific spoken language, a particular font size and level-appropriate vocabulary and a particular graphical format based on the reading skill level of the user; and

providing the one or more lesson plans to the user via a communication system,

wherein each of the plurality of aligned versions are substantially similar in subject matter, meaning and context to subject matter, meaning and context of the first unmodified content.

**9.** The system of claim **8**, further comprising:

providing a first set of questions to the user using at least one computer coupled to the network;

receiving a first set of answers related to the first set of questions from the user using at least one computer;

analyzing the first set of answers to produce a first reading level associated with the user using at least one computer;

modifying the first unmodified content in accordance with the first reading level of the user to produce a first modified content using at least one computer; and

preparing electronic message communications to the user via an electronic message system, wherein a body portion of the electronic message communications is customized to a first reading level of the user in addition to the first modified content using at least one computer.

**10.** The system of claim **9**, further comprising facilitating communications among the plurality of users within a same reading level group using at least one computer.

**11.** The system of claim **10**, further comprising the step of preparing a first lesson plan using the first modified content, wherein the first lesson plan comprises a set of lesson exercises related to the reading skill level of the user.

**12.** The system of claim **10**, wherein the one or more educational standards are selected from the group consisting of educational standards for reading comprehension, literacy, vocabulary, and mathematics.

**13.** The system of claim **10**, wherein aligning the first unmodified content further comprises mapping words within the first unmodified content to a content standard.

**14.** The system of claim **10**, wherein the at least one source is accessed across the network and comprises at least one of: a school database, a news database, an educational database, a proprietary database.

\* \* \* \* \*

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:**  2023-1605

**Short Case Caption:**  Achieve3000, Inc. v. Beable Education, Inc.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes  9,694  words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 06/26/2023          Signature:  /s/ Robert M. Isackson

                          Name:  Robert M. Isackson